MEYER GLITZENSTEIN & CRYSTAL
Eric Glitzenstein, DC Bar No. 358287 (admitted *pro hac vice*)
  *eglitzenstein@meyerglitz.com*
Caitlin Zittkowski, CA Bar No. 290108
  *czittkowski@meyerglitz.com*
William S. Eubanks II, DC Bar No. 987036 (admitted *pro hac vice*)
  *beubanks@meyerglitz.com*
1601 Connecticut Ave., N.W., Suite 700
Washington, DC 20009
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Attorneys for Plaintiffs DEBRA
SHEARWATER, STEVEN A. THAL,
MICHAEL DEE, DR. CAROLYN
CROCKETT,  ROBERT M. FERRIS,
and AMERICAN BIRD CONSERVANCY

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

| | |
|---|---|
| DEBRA SHEARWATER, STEVEN A. THAL, MICHAEL DEE, DR. CAROLYN CROCKETT, ROBERT M. FERRIS, and AMERICAN BIRD CONSERVANCY,<br><br>        Plaintiffs,<br><br>              v.<br><br>DAN ASHE, Director, United States Fish and Wildlife Service; SALLY JEWELL, Secretary, United States Department of the Interior,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civ. No. 5:14-cv-02830-LHK<br>)<br>)<br>)<br>)<br>)<br>) |

### AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs are challenging a final nationwide regulation promulgated by the U.S.

Fish and Wildlife Service ("FWS" or "Service") and the U.S. Department of the Interior ("DOI")

on December 9, 2013 that "extend[ed] the maximum term for programmatic permits" to kill or

otherwise "take" bald and golden eagles from five years to thirty years. 78 Fed. Reg. 73704.  This

major rule change – the "thirty-year eagle take rule" – applies to industrial activities of all kinds

that incidentally take federally protected eagles in the course of otherwise lawful activities but, as acknowledged by the Service, was promulgated specifically to respond to the wind power industry's desire to facilitate the expansion of wind energy projects in areas occupied by eagles. *Id*. at 73709.  However, the rule was adopted in flagrant violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ("NEPA") because the Service did not prepare any document analyzing the environmental impacts of the rule change, as required by NEPA and its implementing regulations.  In addition, the rule change violates the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668d ("BGEPA"), and the Administrative Procedure Act, 5 U.S.C. § 706(2), because the rule subverts the basic eagle protection purposes of BGEPA and eliminates crucial procedural and other safeguards for eagle populations without any adequate explanation. Furthermore, the Service's adoption of the rule violates the Endangered Species Act ("ESA"), as the Service failed to conduct any internal consultation as required by section 7 of the ESA, 16 U.S.C. § 1536.  Accordingly, the regulation should be vacated and remanded to Defendants for compliance with federal law.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g), and venue is proper in the district under 28 U.S.C. § 1391(e).

## PARTIES

3.      Plaintiff Debra Shearwater resides in Hollister, California, and has been observing eagles for decades.  Ms. Shearwater purchased her current residence in Hollister in 1998 specifically because she wanted to live in a location where she could observe golden eagles on a near-daily basis.  Ms. Shearwater owns a business called Shearwater Journeys that specializes in providing commercial tours to observe pelagic birds.  Among other professional endeavors, Ms. Shearwater worked on the Monterey Bay Breeding Bird Atlas for five years.  Ms. Shearwater first

began recreationally observing eagles in Texas in 1970, and in other places in the West starting in 1973.  She is a member of the Plaintiff American Bird Conservancy ("ABC").

4.      Ms. Shearwater moved to California in 1976, and she has been observing golden eagles ever since, as well as tracking many nesting pairs of golden eagles in her geographic region. Ms. Shearwater routinely visits many places in the region to observe or monitor eagles.  Her regular "relaxation drive" through the Santa Ana Valley has yielded many observations of golden eagles, and in 2004 she discovered the first-ever breeding bald eagles in San Benito County (approximately seven miles from her home).  Since 2004, she has reported annually to the local bald eagle expert concerning the nesting success of the pair, which has fledged two young every year but one.  In addition, she has more recently documented nesting bald eagles at Hernandez Reservoir, San Felipe Lake, the Gabilan Mountains, and very likely at San Justo Reservoir, all of which are locations in San Benito County.

5.      In addition to monitoring the nesting of both bald and golden eagles during the breeding season, Ms. Shearwater also writes reports about them on her blog during the winter months when many of them are attracted to San Benito County.  She has observed as many as thirty golden eagles at one time in one small location at Santa Ana Valley.  Because the wintering populations of bald and golden eagles frequently reside in San Benito County, bird enthusiasts from as far away as Europe have traveled to the region, which in turn has led to increased revenue for the local economy.

6.      Ms. Shearwater also enjoys viewing other animal species whose habitats overlap with that of the bald and golden eagles she routinely observes and writes about. These species include the San Joaquin Kit Fox, the Blunt-Nosed Leopard Lizard, the Giant Kangaroo Rat, and the California Condor, all of which are listed as endangered under the ESA.

7.      Ms. Shearwater's recreational, aesthetic, and other conservation interests in observing bald and golden eagles that reside in and migrate through the region in which she lives and routinely observes eagles will be impaired by the thirty-year eagle take rule because the rule is expressly intended to facilitate the construction of industrial wind energy projects and other major projects in areas occupied by eagles by allowing and encouraging wind energy and other projects to obtain eagle "take" permits of extremely long duration.  Adoption of the thirty-year eagle take rule will also impair Ms. Shearwater's recreational, aesthetic, and other conservation interests in the other federally endangered species that she enjoys viewing and observing whose habitats overlap with that of bald and golden eagles in areas that Ms. Shearwater routinely visits.  In particular, Ms. Shearwater's interests in observing and otherwise enjoying the San Joaquin Kit Fox, the Blunt-Nosed Leopard Lizard, the Giant Kangaroo Rat, and the California Condor will be impaired by the  Service's failure to engage in ESA section 7 consultation for the purpose of determining whether the issuance and implementation of the rule is likely to jeopardize the continued existence of these species and/or result in destruction or adverse modification of  the critical habitat of these species, as required by the ESA.

8.      The rule also harms Ms. Shearwater's interests by eliminating procedural opportunities that existed prior to the rule's promulgation that Ms. Shearwater could invoke in an effort to protect eagles and eagle populations in places in which she regularly observes and otherwise enjoys eagles.  In particular, by eliminating the need for affirmative agency decisions at least every five years in order to renew permits for wind power and other projects that kill or otherwise take eagles – decisions that trigger the obligation to prepare NEPA documents that would inform the interested public of a pending decision and afford an opportunity to comment – the rule eliminates a procedural right and access to information to which Ms. Shearwater was entitled under the preexisting regulatory regime; in turn, that procedural and informational

deprivation directly undermines Ms. Shearwater's ability to effectively and meaningfully advocate for eagles and eagle populations in locations that she routinely visits.

9.    In addition, by failing to prepare any NEPA document evaluating the cumulative nationwide or region-wide impacts of the rule on eagles and other wildlife, and alternatives to the approach taken in the rule, Defendants have deprived Ms. Shearwater of an additional procedural right, as well as information required by law, which she needs in order to further her concrete interests in eagle conservation in the specific areas that she routinely visits to observe and otherwise enjoy eagles.  All of these current and imminent injuries are a direct result of the Service's failure to satisfy its statutory duties prior to issuing the challenged rule and would be remedied by a Court ruling setting aside and remanding the rule for full compliance with applicable law.

10.    Plaintiff Steven A. Thal lives in Kentfield, California.  He has served on the Board of Audubon Canyon Ranch and Point Reyes Bird Observatory (now Point Blue) in the San Francisco Bay area, and he was chairman of both of these boards.  Mr. Thal has also served as a board member for Island Conservation in Santa Cruz, California, and is a current member and former board member of ABC.

11.    Mr. Thal enjoys being able to observe bald eagles and finds that such observations are a true and rare pleasure as there are very few bald or golden eagles in the San Francisco Bay area where he resides.  Mr. Thal has taken friends every year for the past thirty years up to the Sacramento Refuge near Willows, California to view birds during the winter months.  Mr. Thal always finds it thrilling to be able to see at least one of two bald eagles in the Sacramento Refuge.  One of the avian spectacles from which Mr. Thal derives great pleasure is seeing bald and golden eagles in the Lake Tule Refuge, Lower Klamath Refuge, and/or Upper Klamath Refuge on the Border of California and Oregon where there are nearly 800 bald eagles in total

between the three refuges.  Mr. Thal also derives great joy from accompanying people who are viewing bald eagles for the first time; he recently took a friend from Connecticut to see the eagle spectacle in the Klamath basin, and Mr. Thal derived immense pleasure from seeing his friend – a lifelong conservationist – observing this extraordinary eagle experience.

12.     Mr. Thal's recreational, aesthetic, and other conservation interests in observing bald and golden eagles that reside in and migrate through the region in which he lives and observes eagles will be impaired by the thirty-year eagle take rule because the rule is expressly intended to facilitate the construction of industrial wind energy projects and other major projects in areas occupied by eagles by allowing and encouraging wind energy and other projects to obtain term eagle "take" permits of extremely long duration.

13.     The rule also harms Mr. Thal's interests by eliminating procedural opportunities that existed prior to the rule's promulgation that Mr. Thal could invoke in an effort to protect eagles and eagle populations in places in which he observes and otherwise enjoys eagles.  In particular, by eliminating the need for affirmative agency decisions at least every five years in order to renew permits for wind power and other projects that kill or otherwise take eagles – decisions that would trigger the obligation to prepare NEPA documents that would inform the interested public of a pending decision and afford an opportunity to comment – the rule eliminates a procedural right and access to information to which Mr. Thal was entitled under the preexisting regulatory regime; in turn, that procedural and informational deprivation directly undermines Mr. Thal's ability to effectively and meaningfully advocate for eagles and eagle populations in locations that he routinely visits.

14.     In addition, by failing to prepare any NEPA document evaluating the cumulative impacts of the rule on eagles and other wildlife, and alternatives to the approach taken in the rule, Defendants have deprived Mr. Thal of an additional procedural right, as well as information

required by law, which he needs in order to further his concrete interests in eagle conservation in the specific areas that he visits to observe and otherwise enjoy eagles. All of these current and imminent injuries are a direct result of the Service's failure to satisfy its statutory duties prior to issuing the challenged rule and would be remedied by a Court ruling setting aside and remanding the rule for full compliance with applicable law.

15. Plaintiff Michael Dee lives in Chatsworth, California and has recently retired from the Los Angeles Zoo after forty years of service, including as the General Curator of the zoo. During his career, he has worked with numerous species of eagles, including bald and golden eagles. In addition, he spends his leisure time observing eagles and other bird species on his numerous travels throughout the world. He saw his first golden eagle on the central coast of California in 1966 and his first bald eagle in the Bosque del Apache Wildlife Refuge in New Mexico in 1968. Since then, Mr. Dee has visited various sites in the United States, including Alaska, to see bald eagles. On his regular family vacations in Northern Wisconsin, he has observed several pairs of nesting bald eagles at Bone Lake. He has also traveled several times to the Snake River Birds of Prey National Conservation Area in Idaho in order to observe eagles. He plans to continue returning to these and other areas to observe bald and golden eagles. Mr. Dee is a member of ABC, as well as Cornell University's Ornithological Society, and the Southwestern Herpetological Society. He is also a board member of the Bighorn Institute, and a board member of the California Wildlife Center, which rehabilitates many bird species, including golden eagles.

16. Mr. Dee derives immense joy and pleasure from observing bald and golden eagles throughout the country, and in particular enjoys watching the parent birds care for their young. He feels that seeing these magnificent creatures is an important part of being an American, and he relishes the closeness he feels with our national bird when observing bald eagles in their native habitats.

17.     Mr. Dee's recreational, aesthetic, and other conservation interests in observing bald and golden eagles that reside in and migrate through the region in which he lives and routinely observes eagles will be impaired by the thirty-year eagle take rule because the rule is expressly intended to facilitate the construction of industrial wind energy projects and other major projects in areas occupied by eagles by allowing and encouraging wind energy and other projects to obtain eagle "take" permits of extremely long duration.

18.     The rule also harms Mr. Dee's interests by eliminating procedural opportunities that existed prior to the rule's promulgation that Mr. Dee could invoke in an effort to protect eagles and eagle populations in places in which he regularly observes and otherwise enjoys eagles. In particular, by eliminating the need for affirmative agency decisions at least every five years in order to renew permits for wind power and other projects that kill or otherwise take eagles – decisions that would trigger the obligation to prepare NEPA documents that would inform the interested public of a pending decision and afford an opportunity to comment – the rule eliminates a procedural right and access to information to which Mr. Dee was entitled under the preexisting regulatory regime; in turn, that procedural deprivation directly undermines Mr. Dee's ability to effectively and meaningfully advocate for eagles and eagle populations in locations that he routinely visits.

19.     In addition, by failing to prepare any NEPA document evaluating the cumulative impacts of the rule on eagles and other wildlife, and alternatives to the approach taken in the rule, Defendants have deprived Mr. Dee of an additional procedural right, as well as information required by law, which he needs in order to further his concrete interests in eagle conservation in the specific areas that he routinely visits to observe and otherwise enjoy eagles. All of these current and imminent injuries are a direct result of the Service's failure to satisfy its statutory

duties prior to issuing the challenged rule and would be remedied by a Court ruling setting aside and remanding the rule for full compliance with applicable law.

20.     Plaintiff Carolyn Crockett has lived in Seattle, Washington since 1967 and is a long-time naturalist, conservationist, and wildlife observer who has been recreationally viewing birds, including eagles, for decades.  Dr. Crockett is professionally trained in animal behavior and primatology, having received her Ph.D. from the University of Washington and having published various research on captive and wild primates and other species.  Among other publications, Dr. Crockett co-published an article about her own observations of bald eagles flying above her house carrying young crows in their talons (apparently as a result of predation).  *See* Robinette, R. L., and Crockett, C. M, *Bald eagle predation on crows in the Puget Sound region*, Northwestern Naturalist 80(2): 70-71 (1999).

21.     Dr. Crockett regularly observes bald eagles both in her residential community of Haller Lake in Seattle and in surrounding communities in the Puget Sound region including a waterfront park that eagles frequent.  Of the many birds she observes in the region, bald eagles bring her the most satisfaction as a result of their beauty and majesty, as well as their role as our national symbol.  Dr. Crockett has observed dozens of bald eagles at their winter roosting site along the Skagit River, a sight that draws many birdwatchers annually.  She has also visited the Olympic Coast every year but one since 2000 and, during those trips, she regularly sees several bald eagles, and occasionally golden eagles as well.

22.     Dr. Crockett's recreational, aesthetic, and other conservation interests in observing bald and golden eagles that reside in and migrate through the region in which she lives and travels and routinely observes eagles will be impaired by the thirty-year eagle take rule because the rule is expressly intended to facilitate the construction of industrial wind energy projects and other major

projects in areas occupied by eagles by allowing and encouraging wind energy and other projects to obtain eagle "take" permits of extremely long duration.

23.     The rule also harms Dr. Crockett's interests by eliminating procedural opportunities that existed prior to the rule's promulgation that Dr. Crockett could invoke in an effort to protect eagles and eagle populations in places in which she regularly observes and otherwise enjoys eagles.  In particular, by eliminating the need for affirmative agency decisions at least every five years in order to renew permits for wind power and other projects that kill or otherwise take eagles – decisions that trigger the obligation to prepare NEPA documents that would inform the interested public of a pending decision and afford an opportunity to comment – the rule eliminates a procedural right and access to information that Dr. Crockett had under the preexisting regulatory regime; in turn, that procedural and informational deprivation directly undermines Dr. Crockett's ability to effectively and meaningfully advocate for eagles and eagle populations in locations that she routinely visits.

24.     In addition, by failing to prepare any NEPA document evaluating the cumulative impacts of the rule on eagles and other wildlife, and alternatives to the approach taken in the rule, Defendants have deprived Dr. Crockett of an additional procedural right, as well as information required by law, which she needs in order to further her concrete interests in eagle conservation in the specific areas that she routinely visits to observe and otherwise enjoy eagles.  All of these current and imminent injuries are a direct result of the Service's failure to satisfy its statutory duties prior to issuing the challenged rule and would be remedied by a Court ruling setting aside and remanding the rule for full compliance with applicable law.

25.     Plaintiff Robert M. Ferris has lived at various locations on the West Coast in California, Oregon, and Washington for nearly fifty years, starting in 1952, and he presently resides in the Pacific Northwest.  He is a conservationist and outdoor enthusiast who has enjoyed

watching birds – including eagles – for more than forty years.  Mr. Ferris is a professional wildlife biologist educated at Oregon State University, University of California at Santa Cruz (BA Biology and Environmental Studies), and San Jose State University (MA Zoology).  He has spent the last two decades as a conservation advocate and currently serves as the executive director of Cascadia Wildlands, which undertakes conservation and species protection efforts from northern California to south-central Alaska, including working on issues impacting raptors such as eagles.  He is a member of ABC.

26.     Mr. Ferris has frequently observed bald and golden eagles in Alaska, British Columbia, Washington, Oregon, and California.  He owns property in Oregon and Washington, including a home on Bellingham Bay where bald eagles are regularly observed from the rear deck of his house.  He values the eagles that visit his home and feels that they enhance the value of his life as well as his property.  Mr. Ferris also is an avid kayaker and rafter in coastal rivers and waters in Oregon and Washington where he often observes bald eagles living or migrating through these wild habitats.

27.     Mr. Ferris's recreational, aesthetic, and other conservation interests in observing bald and golden eagles that reside in and migrate through the region in which he lives and routinely observes eagles will be impaired by the thirty-year eagle take rule because the rule is expressly intended to facilitate the construction of industrial wind energy projects and other major projects in areas occupied by eagles by allowing and encouraging wind energy and other projects to obtain eagle "take" permits of extremely long duration.

28.     The rule also harms Mr. Ferris's interests by eliminating procedural opportunities that existed prior to the rule's promulgation that Mr. Ferris could invoke in an effort to protect eagles and eagle populations in places in which he regularly observes and otherwise enjoys eagles. In particular, by eliminating the need for affirmative agency decisions at least every five years in

order to renew permits for wind power and other projects that kill or otherwise take eagles –

decisions that would trigger the obligation to prepare NEPA documents that would ordinarily

inform the interested public of a pending decision and afford them an opportunity to comment –

the rule eliminates a procedural right and access to information to which Mr. Ferris was entitled

under the preexisting regulatory regime; in turn, that procedural and informational deprivation

directly undermines Mr. Ferris's ability to effectively and meaningfully advocate for eagles and

eagle populations in locations that he routinely visits.

29.     In addition, by failing to prepare any NEPA document evaluating the cumulative

impacts of the rule on eagles and other wildlife, and alternatives to the approach taken in the rule,

Defendants have deprived Mr. Ferris of an additional procedural right, as well as information

required by law, which he needs in order to further his concrete interests in eagle conservation in

the specific areas that he routinely visits to observe and otherwise enjoy eagles.  All of these

current and imminent injuries are a direct result of the Service's failure to satisfy its statutory

duties prior to issuing the challenged rule and would be remedied by a Court ruling setting aside

and remanding the rule for full compliance with applicable law.

30.     Plaintiff ABC is a national non-profit organization whose mission is to conserve

native birds and their habitats throughout the Americas.  ABC is the only United States-based

group with a major focus on bird habitat conservation throughout North and South America.

Founded in 1994, ABC works to reduce threats to eagles and other birds from habitat destruction;

collisions with buildings, communications towers, and wind turbines; predation by non-native

species such as feral cats; and toxins such as hazardous pesticides and lead.  ABC seeks to achieve

these objectives through scientific research and analysis; advocating for bird conservation at the

local, state, regional, and federal levels; forming bird conservation partnerships; and pressing for

regulatory changes to address such threats effectively.

31.     ABC's "Bird-Smart Wind Program" addresses the threats to birds and their habitats from wind energy development that does not adequately take into account potential impacts on birds and important bird habitats.  ABC supports the development of wind power and other renewable energy resources but believes that there is a vital public interest in ensuring that such development occurs in a manner that does not needlessly place bird populations at risk.  The rapid development of the wind industry and proliferation of massive wind turbines can pose a serious threat to eagles, other migratory birds, and other wildlife, particularly when wind power developers build huge turbines, associated power lines, and other infrastructure in ecologically sensitive locations and other areas where they are likely to kill large numbers of migratory birds or other wildlife, or destroy or otherwise disrupt their habitat.  Accordingly, ABC's Wind Program works to eliminate threats to birds and conserve habitat through the implementation of basic principles that recognize that "bird-smart" wind energy is an important part of the solution to climate change.  To reduce and redress bird mortality and habitat loss, bird-smart wind energy development, as promoted by ABC, requires careful site selection, operational and compensatory mitigation, and ongoing bird monitoring.  A key element of ABC's program, in which the organization has and will continue to invest significant resources, is designed to ensure that the FWS develops effective measures for overseeing the siting, construction, and operation of wind facilities in a manner that avoids and minimizes adverse impacts to eagles and other birds to the extent practicable.

32.     ABC regularly submits comments during federal regulatory processes applicable to wind energy projects, both with regard to general policies bearing on wind power and bird impacts, and on individual projects and permit decisions that pose excessive threats to eagles and other birds.  ABC submitted extensive comments on the thirty-year permit rule and has also

commented on individual BGEPA permit applications submitted by wind power developers and others who seek authorization to kill or otherwise take eagles.

33.     The thirty-year eagle permit rule impairs the interests of ABC and its members by significantly increasing the risk that wind power projects, including those presently under consideration, will in fact be constructed in locations occupied by bald and golden eagles; in turn, the expansion of wind power in areas occupied by bald and golden eagles impairs the interests of ABC members, officers, and staff who view eagles for recreational, scientific, aesthetic, and other purposes, especially because the rule eliminates critical procedural opportunities that previously existed and that ABC and other members of the public could invoke to advocate for measures that would be protective of eagles.  In addition, by failing to prepare either an EIS or EA evaluating the nationwide cumulative impacts of the rule on eagles and other wildlife, and alternatives to the approach taken in the rule, Defendants have deprived ABC and its members of a procedural right and information to which they are entitled under law and that they need in order to further their concrete interests in eagle conservation.  By eliminating the requirement for affirmative agency decisions at least every five years in order to renew permits for wind power and other projects that kill or otherwise take eagles, the rule also impairs ABC's organizational interests by necessitating ABC's expenditure of significant financial and other resources to monitor for the impact of projects on eagles, attempt to learn the status of the Service's internal project reviews (if any), and seek to influence the outcome of those reviews notwithstanding the absence of a formal comment opportunity.  In particular, the rule will necessitate, at minimum, ABC's submission of  multiple FOIA requests in an effort to obtain information that otherwise would have been made affirmatively available to the public as a matter of course during permit renewal proceedings; as a result of the rule ABC will also likely be compelled to pursue FOIA litigation for such information, especially given the FWS's recent history of refusing to release, in response to FOIA

requests and  Congressional inquiries, other records bearing on the impacts of wind power projects on eagles and other migratory birds and wildlife.  All of these injuries to ABC and its members are caused by Defendants' promulgation of the rule in violation of federal law and would be remedied through a Court order vacating the rule and remanding it for further consideration pending full compliance with federal law.

34.     Defendant Dan Ashe is the Director of the United States Fish and Wildlife Service and is being sued in his official capacity.  The Service is an agency within the United States Department of the Interior, and it issued the regulation being challenged.

35.     Defendant Sally Jewell is the Secretary of the Interior and is being sued in her official capacity.  As the parent agency of the Service, the Department of the Interior is ultimately responsible for the regulation being challenged.

**STATUTORY FRAMEWORK**

A.     **National Environmental Policy Act**

36.     Congress enacted NEPA in order to "encourage productive and enjoyable harmony between man and his environment" and to "promote efforts which will prevent or eliminate damage to the environment . . . ." 42 U.S.C. § 4321.  NEPA's core function is to "help public officials make decisions that are based on understanding of environmental consequences," 40 C.F.R. § 1500 (c), by requiring federal agencies to take a "hard look" at potential environmental consequences and environmentally enhancing alternatives "*as part of the agency's process of deciding* whether to pursue a particular agency action."  *Baltimore Gas and Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 100 (1983 (emphasis added).

37.     NEPA requires that an Environmental Impact Statement ("EIS") be prepared for every "major Federal action significantly impacting the quality of the human environment."  42 U.S.C. § 4332(c).  Under NEPA implementing regulations issued by the Council on

Environmental Quality ("CEQ"), a federal agency may prepare an Environmental Assessment ("EA") in order to evaluate whether an EIS is required.  40 C.F.R. §§ 1501.3, 1508.9.  The only circumstances under which either an EIS or EA need not be prepared in connection with a particular federal agency action is when the action is "categorically excluded" from NEPA review; however, under CEQ regulations and the Interior Department's own regulations implementing NEPA, a categorical exclusion may be invoked only for a "kind of action that has no significant or cumulative effect on the quality of the human environment."  73 Fed. Reg. 61318 (Oct. 15, 2008).

38.     Furthermore, "[e]ven if a proposed action appears to fit the [c]ategorical [e]xclusion invoked, an agency may not use a [c]ategorical [e]xclusion when 'extraordinary circumstances' exist," i.e., those "in which a normally excluded action may have a significant environmental effect." *Los Padres Forestwatch v. U.S. Forest Serv*., 776 F. Supp. 2d 1042, 1044 (N.D. Cal. 2011) (quoting *California v. Norton*, 311 F.3d 1162, 1168 (9th Cir. 2002)).  If such extraordinary circumstances exist, then the agency must prepare an EA or EIS analyzing the proposed action. *Id*. Extraordinary circumstances include actions that "[h]ave significant impacts on . . . natural resources" such as "migratory birds . . . and ecologically significant or critical areas"; [h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects"; or "[h]ave significant impacts on species listed, or proposed to be listed, [under the ESA] or have significant impacts on designated Critical Habitat for these species." 43 C.F.R. § 46.215.

### B.     Bald and Golden Eagle Protection Act

39.     BGEPA prohibits the "take" of any bald eagle or golden eagle "at any time or in any manner" "without being permitted to do so" by the FWS.  16 U.S.C. § 668(a).  The statute imposes strict liability, providing for civil penalties for any unauthorized take and criminal penalties for unlawful take caused "knowingly, or with wanton disregard."  *Id*. §§ 668(a), (b).

1   "Take" is defined to include "wound, kill . . . molest, or disturb," *id*. § 668c, and includes

2   incidental take as well as intentional actions directed at eagles.  *Id*.  BGEPA allows the FWS to

3   issue permits authorizing the take or disturbance of bald and golden eagles, but only if such take

4   "is compatible with the preservation" of eagles.  *Id*. § 668a.

5

6       40.     In 2009, the Service promulgated implementing regulations under BGEPA, which

7   provide for take permits for both individual instances of incidental take as well as "programmatic

8   permits" for take that is recurring from an ongoing activity.  *See* 50 C.F.R. § 22.26.  Under the

9   regulations, the Service may issue an eagle take permit so long as the take is: (1) "compatible with

10  the preservation" of eagles; (2) necessary to protect an interest in a particular locality; (3)

11  associated with but not the purpose of the activity; and (4) for individual instances of take, the take

12  cannot practically be avoided and, for "programmatic" take, the take is unavoidable even though

13  "advanced conservation practices" are being implemented.  *Id*. § 22.26(f).  For purposes of the

14  BGEPA regulations, "compatible with the preservation" of eagles means "consistent with the goal

15  of stable or increasing breeding populations."  *Id*.

16

17      **C.     <u>Endangered Species Act</u>**

18      41.     Congress enacted the ESA to "provide a program for the conservation of . . .

19  endangered species and threatened species," as well as "the ecosystems upon which [such species]

20  depend." 16 U.S.C. § 1531(b). The ESA defines "conservation" as "the use of all methods and

21  procedures which are necessary to bring any endangered species or threatened species to the point

22  at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). The

23  ESA imposes duties concerning implementation of the ESA on the Secretary of the Interior; these

24  duties have subsequently been delegated to the Director of FWS. 50 C.F.R. § 402.01(b).

25

26      42.     The ESA requires federal agencies to "utilize their authorities in furtherance of the

27  purposes of [the ESA]." *Id.* § 1536(a)(1). Pursuant to section 7(a)(2) of the ESA, "[e]ach federal

28

agency shall, in consultation with [FWS], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." *Id.* § 1536(a)(2). Federal agencies must, "at the earliest time possible," review their actions "to determine whether any action may affect listed species or critical habitat," in which case "formal consultation is required." 50 C.F.R. § 402.14(a). When the proposed agency action requires formal consultation, the agency must request, upon submission of detailed information concerning the agency action at issue and its possible effects on listed species or critical habitat, *Id.* § 402.14(c), that FWS "[f]ormulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4).

43.     When the agency action requiring formal consultation is "authorized, funded, or carried out by" FWS itself, 16 U.S.C. § 1536(a)(2), FWS must conduct "intra-service" section 7 consultation, U.S. Fish & Wildlife Serv. and Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook*, 1-5 (1998), and "may [authorize the action] only upon a finding that it 'is not likely to jeopardize the continued existence of a protected species, or result in the destruction or adverse modification of critical habitat.'" *Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1286 (E.D. Cal. 2000).

## FACTUAL BACKGROUND

44.     When the FWS issued the 2009 regulations, the Service expressly provided that the maximum term for programmatic permits was "five years or less *because factors may change over a longer time such that a take authorized much earlier would later be incompatible with the preservation of the bald eagle or golden eagle.  Accordingly, we believe that five years is a long enough period within which a project proponent can identify when the proposed activity will*

1  *result in take.*"  74 Fed. Reg. 46856 (emphasis added).   A permit holder could seek to renew a

2  permit when its previous permit was set to expire, but issuance of a renewal required new findings

3  on the public record by the Service that the permitted activity continued to be consistent with eagle

4  conservation, and for projects triggering the NEPA obligation to prepare an EA or EIS,

5  applications for renewal were accompanied by an opportunity for public comment in connection

6  with NEPA review on each permit renewal.

7  

8          45.     The 2009 regulations were themselves informed by an extensive EA analyzing

9  various alternatives and potential impacts, *see* FWS, Final Environmental Assessment**,** Proposal to

10  Permit Take as Provided Under the Bald and Golden Eagle Protection Act (Apr. 2009) ("2009

11  EA"), as well as a Finding of No Significant Impact ("FONSI").  The EA recognized that the

12  availability of eagle take permits may result in "greater increases in siting of wind development in

13  areas where eagles occur" with, among other impacts, "increasing loss and fragmentation of

14  golden eagle habitat."  2009 EA at 102-03.  However, the EA and FONSI relied on safeguards

15  built into the rule, *including the Service's obligation to revisit permitting conditions "at least once*

16  *every five years,"* accompanied by public input, as a basis for concluding that the 2009 regulations

17  would not have significant impacts on either eagle populations or habitat, or other wildlife,

18  therefore obviating the need for preparation of an EIS for the 2009 rule.  FONSI at 4 (emphasis

19  added); 2009 EA at 103 ("Re-evaluation and potential adjustments of the permit thresholds and

20  conditions, as well as comprehensive evaluation of cumulative effects at the permit-issuance stage

21  will minimize the cumulative effects of the permit and factors affecting habitat.").

22          46.     Only four years after determining that a maximum five-year permit term was

23  essential to protect eagles, the FWS, in December 2013, "extend[ed] the maximum term for

24  programmatic [BGEPA] permits to 30 years."  78 Fed. Reg. 73707 (Dec. 9, 2013).  In lieu of

25  permit renewal and potential public input through the NEPA process every five years, the new rule

1   simply provides that the Service will conduct its own *internal* review every five years, with no

2   provision for public comment or even any assurance that the Service's internal analysis will be

3   made available to the public.  *Id*. at 73725.

4         47.    The preamble to the thirty-year take rule leaves no doubt that that the six-fold

5   increase in the maximum duration of permits and the significant weakening of public review and

6   comment on BGEPA permitting decisions was adopted at the behest of industry and specifically

7   the wind power industry, which has claimed that the shorter permit duration was somehow

8   impeding the expansion of the industry in eagle habitat, although no empirical data were presented

9   in the preamble to the rule to support that contention.  *See, e.g.*, *id*. at 73709 ("Wind developers

10  have informed the DOI and the Service that five-year permits have inhibited their ability to obtain

11  financing, *and we changed the regulations to accommodate that need*.") (emphasis added).

12        48.    Further, this significant change from the 2009 permitting regime was accompanied

13

14  by no NEPA review whatsoever, i.e., the Service did not prepare an EIS or even an EA and

15  FONSI, as the Service did in 2009 when it proposed a *more* protective permitting regime for

16  eagles.  Instead, in response to myriad complaints from the environmental community – including

17  in lengthy comments submitted by ABC – that *some* form of NEPA review was plainly required

18  for a policy change of such magnitude that will facilitate increased wind energy production in

19

20  occupied eagle habitat and consequently result in environmental impacts, the FWS declared that

21  the rule change was "categorically excluded" from any NEPA review on the grounds that the

22  change being made was "primarily administrative" in nature and that any environmental impacts

23  would be considered when the agency is making project-by-project decisions concerning whether

24  to issue programmatic permits.  78 Fed. Reg. 73722.  FWS also asserted that the agency "reviewed

25  [its] reliance upon this categorical exclusion against the Department of the Interior's list of

26

27  extraordinary circumstances . . ., and f[ou]nd that none apply to this rule."  78 Fed. Reg. 73714.

28

49.     The Service thereby avoided any comprehensive analysis of the wildlife-related impacts of the rule change *as a whole* on eagles as well as other migratory bird populations and wildlife habitat that would be impacted by expanding wind power operations within the range of bald and golden eagle populations.  The agency also thereby avoided any consideration of alternatives to the rule adopted — e.g., (1) significantly increasing enforcement of BGEPA at existing wind power projects where eagles are routinely killed, including such projects in California, but where the Service has failed to pursue any meaningful enforcement actions to address violations of the Act ; and (2) alternative BGEPA permitting approaches that might address any legitimate complaints the wind power industry might have with the BGEPA permitting program while at the same time far better protecting eagles and other wildlife.

50.     The Service also refused to conduct any internal section 7 consultation prior to the rule change. The Service deemed this consultation unnecessary, stating simply that "consultation under ESA Section 7 may be required prior to issuance of a permit for an individual project" that may impact a listed species. 78 Fed. Reg. 73722.  However, the Service did not explain how review of individual projects could adequately address the *cumulative* nationwide effect of the rule change on listed species and critical habitat, especially in light of the Service's concession in the 2009 EA that promoting wind power project development in areas occupied by eagles may lead to cumulative "loss and fragmentation" of wildlife habitat. 2009 EA at 102-03.

51.     Wind energy developers in various parts of the country, including in California, are already pursuing long-term eagle take permits under the thirty-year take rule.  For instance, the Tule Wind Energy Project in San Diego County, California has applied for a thirty-year take permit, and Pacific Gas and Electric Co. has applied for a thirty-year take permit for a non-wind energy project.  On information and belief, wind energy developers in various parts of the country, including in California and other states in which Plaintiffs or their members reside, are already

relying upon the rule to plan for and proceed with development of wind power projects in areas occupied by bald and golden eagles and hence where projects could not lawfully proceed in the absence of a BGEPA permit.

52.     Plaintiffs provided Defendants with notice concerning their intent to sue Defendants for their violations of the ESA, as well as NEPA and BGEPA, in connection with FWS's issuance of the thirty-year eagle permit rule by letter dated April 30, 2014.  Plaintiffs have received no response to that letter.

## PLAINTIFFS' CLAIMS FOR RELIEF

## CLAIM ONE (NEPA/APA)

53.     By refusing to prepare an EIS or even an EA in connection with the thirty-year take rule, and by instead deeming the rule to be categorically excluded from any NEPA review, the Service has violated NEPA and its implementing regulations, and has acted arbitrarily and capriciously and "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2).  The rule is not, as the Service asserted in invoking a categorical exclusion, "primarily administrative in nature," 78 Fed. Reg. 73722, but, rather, *is expressly designed to have a significant impact on the environment* by facilitating the development of industrial wind power and other projects in areas occupied by eagles.  Even if the rule were an action that the Service could ordinarily classify as categorically excluded, which it is not, extraordinary circumstances exist here requiring preparation of an EIS or EA, insofar as implementation of the rule "may have significant environmental effect[s]," *Los Padres Forestwatch*, 776 F. Supp. 2d at 1044, including "significant impacts on . . . natural resources" such as "migratory birds . . . and ecologically significant or critical areas"; "cumulatively significant environmental effects"; and "significant impacts on species listed, or proposed to be listed, [under the ESA] or . . . designated Critical Habitat for these species."  43 C.F.R. § 46.215.  Therefore, under NEPA and its implementing

1   regulations such impacts, and alternatives to the regulatory regime adopted by the Service, must be

2   analyzed in a NEPA document *before* the Service adopts and begins implementation of the thirty-

3   year eagle take rule.

4       54.     Nor is there any lawful basis for the Service's assertion that NEPA review is

5   unnecessary on the rule change because such review will be conducted on a permit-by-permit

6   basis. *See* 78 Fed. Reg. 73721.  Not only does the rule actually *undermine* NEPA review on

7   individual permitting decisions – by eliminating affirmative renewal decisions at least every five

8   years and replacing them with internal FWS "reviews" that are not required by the rule to be

9   accompanied by any NEPA or public review – but the NEPA analysis for the initial permit

10  applications will focus on the impacts associated with the individual permits.  Under NEPA and

11  implementing regulations, that site-specific review cannot lawfully substitute for a program-level

12  analysis of impacts associated with facilitating industrial wind power and other major projects in

13  eagle habitat throughout the country.  Especially because a programmatic NEPA analysis was

14  deemed necessary and appropriate when the Service adopted the 2009 rule – as the Service

15  recognized in preparing an extensive EA at that time even with respect to a far more eagle-

16  protective regime than the thirty-year rule – it was arbitrary, capricious, and contrary to law for the

17  Service to refuse to prepare any NEPA document when it abruptly reversed position on one of the

18  central features of the 2009 rule (i.e., five-year permit terms with mandatory, affirmative renewal

19  reviews) and replaced it with a maximum permit duration that is six times as long and relies on (at

20  best) internal, non-public reviews in lieu of transparent, publicly accountable decisions on whether

21  and under what conditions to renew a permit.

22      55.     The arbitrary and unlawful nature of the FWS's decision to categorically exclude

23  the rule from any NEPA review is further demonstrated by the Service's public notice, issued

24  *subsequent* to the rule's adoption, that the Service is engaging in a "NEPA analysis [that] will

evaluate the environmental effects of a range of alternatives for eagle management," and that this evaluation will "*further analyze* the effects of longer term nonpurposeful take permits."  79 Fed. Reg. 35566 (June 23, 2014) (emphasis added).  Not only does this notice misleadingly imply to the public that the Service *previously* analyzed the environmental impact of the rule in some manner – rather than categorically excluding it from any NEPA review – but the notice also undermines the asserted rationale for the categorical exclusion by acknowledging that the "effects" of the rule as a whole can and should be analyzed in a NEPA document.  At the same time, the FWS's notice underscores the flagrant NEPA violation that occurred when the rule was adopted because the entire purpose of NEPA is to ensure that an agency takes a "hard look" at agency rules and other actions *before*, rather than after, they are adopted in final form.  *See Andrus v. Sierra Club*, 442 U.S. 347, 351 n.2 (1979) (a NEPA document must be "prepared early enough so that it can serve practically as an important contribution to the decisionmaking process *and will not be used to rationalize or justify decisions already made*") (emphasis added); 40 C.F.R. § 1500.1(c) ("NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action.").

### CLAIM TWO (BGEPA/APA)

56.     The thirty-year eagle take rule contravenes Congress's purpose in enacting BGEPA and is otherwise arbitrary, capricious, and "not in accordance with law," in violation of the APA, 5 U.S.C. § 706(2).  In adopting BGEPA, Congress's primary purpose was to "increase the protection afforded bald and golden eagles," S. Rep. 92-1159, 92d Cong., 2d Sess. (Sept. 15, 1972), 1972 U.S. Code Cong. Admin. N. 4285.  The primary purpose and practical effect of the thirty-year eagle take rule, however, is not to increase the protection afforded bald and golden eagles, but, rather, to "accommodate" the purported "needs" of the wind power and other industries for longer permit terms, 78 Fed. Reg. 73709, and to "provide [wind] project developers

the *certainty* provided by a permit for the anticipated project life." *Id.* at 73709 (emphasis added).

In adopting the thirty-year eagle take rule, the Service never explained how affording project

developers regulatory "certainty" notwithstanding the unprecedented risks to eagle populations

posed by doing so is in any way consonant with the objectives and design of BGEPA.

57.      In adopting the thirty-year eagle take rule, the Service did not, and made no effort

to, reconcile the rule with the finding the Service made, just four years earlier, that a permit

duration of only "five years or less" was appropriate and necessary under BGEPA "because

factors may change over a longer time such that a take authorized much earlier would later be

incompatible with the preservation of the bald eagle or golden eagle." 74 Fed. Reg. 46856.  In

reversing position, the Service pointed to no new science or studies that purportedly supported a

significantly longer permit duration or a dramatically different permitting process in which, once a

long-term permit is issued, the burden is expressly imposed on the Service to justify revisiting the

permit terms, rather than on the project developer to justify renewal.  To the contrary, the Service

admitted that "[i]n the case of managing eagle populations in the face of energy development,

there is considerable uncertainty," and that the Service "has not currently identified [Advanced

Conservation Practices] for wind energy projects that reduce eagle disturbance and blade-strike

mortality," 78 Fed. Reg. 73705 — factors that plainly support *maintaining* rather than discarding

the present requirement for affirmative permit renewal decisions at least every five years**.**  The

Service's abrupt and inadequately justified reversal of position, especially one that has resulted in

a dramatic lessening of safeguards for eagles, constitutes agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(A).

## CLAIM THREE (ESA)

58.     The Service has violated the ESA by adopting the thirty-year eagle take rule without conducting any section 7 consultation to insure that issuance and implementation of the rule "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).  Contrary to the Service's rationale for sidestepping the section 7 consultation requirement – namely, that the thirty-year take rule "will not affect endangered or threatened species or designated critical habitat" since the rule "simply increases the number of years that a programmatic permit may be valid under certain conditions and requires [the Service] to conduct 5-year reviews to monitor compliance with the permit conditions," 78 Fed. Reg. 73722, – the rule is expressly designed to facilitate the development of wind power in bald and golden eagle habitat, which will also have cumulative impacts on endangered and threatened species and their critical habitats, which must be analyzed in section 7 consultation as well as pursuant to a NEPA process.  The Service's amorphous "evaluations" of individual permits at "5-year intervals," 78 Fed. Reg. 73706, cannot provide an adequate or lawful substitute for rigorous section 7 consultation, prior to the thirty-year take rule's adoption and implementation, to assess the rule's potential effects on listed species and designated critical habitat that overlaps with the range of bald and golden eagles.  Therefore, by foregoing such consultation, the Service violated the ESA, 16 U.S.C. § 1536(a)(2), and the APA,  5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

(1)     declare the thirty-year eagle take rule to be in violation of NEPA, BGEPA, the APA, and the ESA

(2)     set aside the rule and remand it to Defendants for further consideration;

(3)     award Plaintiffs their attorneys' fees and costs; and

(4)     grant such other relief as the Court deems proper.


**DATED**: September 25, 2014                    Respectfully submitted,

                                                 ___/s/_____
                                                 Eric Glitzenstein, DC Bar No. 358287
                                                 (admitted *pro hac vice*)
                                                    *eglitzenstein@meyerglitz.com*
                                                 Caitlin Zittkowski, CA Bar No. 290108
                                                    *czittkowski@meyerglitz.*com
                                                 William S. Eubanks II, DC Bar No. 987036
                                                 (admitted *pro hac vice*)
                                                    *beubanks@meyerglitz.com*

                                                 MEYER GLITZENSTEIN & CRYSTAL
                                                 1601 Connecticut Ave., N.W., Suite 700
                                                 Washington, DC 20009
                                                 Telephone: (202) 588-5206
                                                 Facsimile: (202) 588-5049


                                                 Attorneys for Plaintiffs DEBRA
                                                 SHEARWATER, STEVEN A. THAL,
                                                 MICHAEL DEE, DR. CAROLYN
                                                 CROCKETT,  ROBERT M. FERRIS,
                                                 and AMERICAN BIRD CONSERVANCY

1

## CERTIFICATE OF SERVICE

2

    I, Caitlin Zittkowski, hereby certify that on September 25, 2014, I caused the foregoing

3

Amended Complaint to be served upon counsel of record through the Court's electronic service.

4

    I declare under penalty of perjury that the foregoing is true and correct.

5

6

7

**DATED**: September 25, 2014                              ___/s/_____
                                                          Caitlin Zittkowski, CA Bar No. 290108

8                                                          *czittkowski@meyerglitz*.com

9                                                          MEYER GLITZENSTEIN & CRYSTAL
                                                          1601 Connecticut Ave., N.W., Suite 700
10                                                         Washington, DC 20009
                                                          Telephone: (202) 588-5206
11                                                         Facsimile: (202) 588-5049

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Amended Complaint, Civ. No. 5:14-cv-02830-LHK

28