MEYER GLITZENSTEIN & CRYSTAL
Eric Glitzenstein, DC Bar No. 358287 (admitted *pro hac vice*)
  *eglitzenstein@meyerglitz.com*
Caitlin Zittkowski, CA Bar No. 290108
  *czittkowski@meyerglitz.com*
William S. Eubanks II, DC Bar No. 987036 (admitted *pro hac vice*)
  *beubanks@meyerglitz.com*
1601 Connecticut Ave., N.W., Suite 700
Washington, DC 20009
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Attorneys for Plaintiffs DEBRA
SHEARWATER, STEPHEN A. THAL,
MICHAEL DEE, DR. CAROLYN
CROCKETT,  ROBERT M. FERRIS,
and AMERICAN BIRD CONSERVANCY

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

| | |
|---|---|
| DEBRA SHEARWATER, STEPHEN A. THAL, MICHAEL DEE, DR. CAROLYN CROCKETT, ROBERT M. FERRIS, and AMERICAN BIRD CONSERVANCY, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civ. No. 5:14-cv-02830-LHK |
| DAN ASHE, Director, United States Fish and Wildlife Service; SALLY JEWELL, Secretary, United States Department of the Interior, | ) Hearing Date: July 23, 2015 ) Time: 1:30 PM PST ) Hon. Lucy H. Koh |
| Defendants, | ) ) |
| and | ) ) |
| AMERICAN WIND ENERGY ASSOCIATION | ) ) ) |
| Defendant-Intervenor | ) ) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1    Plaintiffs hereby move for summary judgment on the grounds that there are no disputed

2  issues of fact in this case involving review on an Administrative Record, and Plaintiffs are entitled

3  to judgment as a matter of law.  In support of this motion, Plaintiffs are filing a memorandum of

4  points and authorities, Exhibits A-F, and a Proposed Order.

5

6

7    Dated: March 31, 2015                          Respectfully submitted,

8                                                   */s/* Eric R. Glitzenstein_____
                                                    Eric Glitzenstein, DC Bar No. 358287
9                                                   (admitted *pro hac vice*)
                                                    *eglitzenstein@meyerglitz.com*
10                                                  William S. Eubanks II, DC Bar No. 987036
                                                    (admitted *pro hac vice*)
11                                                  *beubanks@meyerglitz.com*
                                                    Caitlin Zittkowski, CA Bar No. 290108
12                                                  *czittkowski@meyerglitz.*com
13
                                                    MEYER GLITZENSTEIN & CRYSTAL
14                                                  1601 Connecticut Ave., N.W., Suite 700
                                                    Washington, DC 20009
15                                                  Telephone: (202) 588-5206
                                                    Facsimile: (202) 588-5049
16

17
                                                    Attorneys for Plaintiffs DEBRA
18                                                  SHEARWATER, STEPHEN A. THAL,
                                                    MICHAEL DEE, DR. CAROLYN
19                                                  CROCKETT,  ROBERT M. FERRIS,
                                                    and AMERICAN BIRD CONSERVANCY
20

21

22

23

24

25

26

27

28
Motion for Summary Judgment, Civ. No. 5:14-cv-02830-LHK

1   MEYER GLITZENSTEIN & CRYSTAL
    Eric Glitzenstein, DC Bar No. 358287 (admitted *pro hac vice*)
2     *eglitzenstein@meyerglitz.com*
    Caitlin Zittkowski, CA Bar No. 290108
3     *czittkowski@meyerglitz.com*
    William S. Eubanks II, DC Bar No. 987036 (admitted *pro hac vice*)
4     *beubanks@meyerglitz.com*
    1601 Connecticut Ave., N.W., Suite 700
5   Washington, DC 20009
    Telephone: (202) 588-5206
6   Facsimile: (202) 588-5049

7   Attorneys for Plaintiffs DEBRA
    SHEARWATER, STEPHEN A. THAL,
8   MICHAEL DEE, DR. CAROLYN
    CROCKETT,  ROBERT M. FERRIS,
9   and AMERICAN BIRD CONSERVANCY

10              **UNITED STATES DISTRICT COURT FOR THE**
11               **NORTHERN DISTRICT OF CALIFORNIA**
                        **San Jose Division**
12   _____
13   DEBRA SHEARWATER, STEPHEN A. THAL,  )
     MICHAEL DEE, DR. CAROLYN CROCKETT,  )
14   ROBERT M. FERRIS, and AMERICAN BIRD )
     CONSERVANCY,                        )
15                                       )
            Plaintiffs,                  )
16                                       )
                 v.                      )   Civ. No. 5:14-cv-02830-LHK
17                                       )
     DAN ASHE, Director, United States Fish and )   Hearing Date: July 23, 2015
18   Wildlife Service; SALLY JEWELL, Secretary, )   Time: 1:30 PM PST
     United States Department of the Interior, )   Hon. Lucy H. Koh
19                                       )
            Defendants,                  )
20                                       )
     and                                 )
21                                       )
     AMERICAN WIND ENERGY               )
22   ASSOCIATION                         )
                                         )
23          Defendant-Intervenor         )
     _____)
24

25

26              **MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
                   <u>**MOTION FOR SUMMARY JUDGMENT**</u>
27

28

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION AND STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL AND FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    THE REGULATORY FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      1.    The National Environmental Policy Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      2.    The Bald and Golden Eagle Protection Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.    FACTUAL BACKGROUND 4

      1.    The 2009 Eagle Act Regulations and Environmental Assessment. . . . . . . . . . . . 4

      2.    The Proposed 30-Year Eagle Take Rule And Public Opposition. . . . . . . . . . . . 7

      3.    The FWS's Adoption Of The Rule Without Any NEPA Review. . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A.    STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B.    THE FWS'S REFUSAL TO ENGAGE IN ANY NEPA REVIEW VIOLATES
     NEPA AND IS ARBITRARY AND CAPRICIOUS. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      1.    Where, As Here, An Agency Action Is Intended To Have An Impact On
         The Environment, The Service's Invocation Of A CE Violates NEPA's
         "Hard Look" Requirement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      2.    The Specific CE Invoked By The FWS Does Not Apply.. . . . . . . . . . . . . . . . . . 17

      3.    Even If The CE Applied, There Are "Extraordinary  Circumstances" That
         Foreclose Its Application Here.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.    THE FWS VIOLATED THE ENDANGERED SPECIES ACT BY FAILING TO
     ENGAGE IN SECTION 7 CONSULTATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE**

*Alaska Ctr. for the Env't v. U.S. Forest Serv.,*
    189 F.3d 851 (9th Cir. 1999) ........................................................................ 13

*Anderson v. Evans,*
    371 F.3d 475 (9th Cir. 2004) ........................................................................ 22

*Andrus v. Allard,*
    444 U.S. 51 (1979) ...................................................................................... 2, 3

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
    631 F.3d 1072 (9th Cir. 2011) ........................................... 14, 15, 19, 20, 25

*California v. Norton,*
    311 F.3d 1162 (9th Cir. 2002) ................................................................ 21, 24

*California ex rel Lockyer v. USDA,*
    575 F.3d 999 (9th Cir. 2009) ........................................................... 18, 21, 25

*Citizens for a Better Env't v. U.S. Dep't of Agric.,*
    481 F. Supp. 2d 1059 (N.D. Cal. 2007) ........................................... 17, 20, 23

*High Sierra Hikers Ass'n v. Blackwell,*
    390 F.3d 630 (9th Cir. 2004) .......................................................................... 2

*Jones v. Gordon,*
    792 F.2d 821 (9th Cir. 1986) ........................................................................ 21

*Karuk Tribe of California v. U.S. Forest Serv.,*
    681 F.3d 1006 (9th Cir. 2012) ...................................................................... 25

*Klamath Siskiyou Wildlands Ctr. v. Boody,*
    468 F.3d 549 (9th Cir. 2006) ........................................................................ 14

*Los Padres Forestwatch,*
    776 F. Supp. 2d 1042 (N.D. Cal. 2011) ......................................................... 2

*National Wildlife Fed'n v. Babbitt,*
    128 F. Supp. 2d 1274 (E.D. Cal. 2000) ........................................................ 25

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
    241 F.3d 722 (9th Cir. 2001) ........................................................................ 22

*Occidental Eng'g Co. v. INS,*
    753 F.2d 766 (9th Cir. 1985) .......................................................................... 4

*Sierra Club v. Bossworth,*
    510 F.3d 1016 (9th Cir. 2007) ........................................... 14, 17, 20, 21, 24

*United States v. Dion,*
    476 U.S. 734 (1986) .................................................................................. 2, 3

*United States v. Fryberg,*
    622 F.2d 1010 (9th Cir. 1980) ........................................................................ 2, 3

*United States v. Hugs,*
    109 F.3d 1375 (9th Cir. 1997) ............................................................................. 3

*United States v. Vasquez-Ramos,*
    531 F.3d 987 (9th Cir. 2008) ................................................................................ 3

*W. Watersheds v. Kraayenbrink,*
    632 F.3d 472 (9th Cir. 2011) ......................................................... 16, 17, 21, 25

**STATUTES**

5 U.S.C. § 706(2) ................................................................................................ 1, 13

16 U.S.C. §§ 668-668d .............................................................................................. 1

16 U.S.C. §§ 703-712 .............................................................................................. 23

16 U.S.C. § 1536 ........................................................................................................ 1

42 U.S.C. § 4332(C) .................................................................................................. 2

42 U.S.C. §§ 4321-4370f ........................................................................................... 1

**REGULATIONS**

40 C.F.R. § 1500.1 ..................................................................................................... 1

40 C.F.R. §1501.3 ...................................................................................................... 2

40 C.F.R. § 1502.4(b) .............................................................................................. 20

40 C.F.R. § 1508.4 ............................................................................................... 2, 16

40 C.F.R. § 1508.9 ..................................................................................................... 2

40 C.F.R. § 1508.25(a)(1) ....................................................................................... 24

40 C.F.R. § 1508.27(b) ............................................................................................ 15

40 C.F.R. § 1508.28 ................................................................................................. 20

43 C.F.R. § 46.205 ............................................................................................. 16, 17

43 C.F.R. § 46.205(a) ........................................................................................ 16, 17

43 C.F.R. § 46.210(i) ......................................................................................... 18, 19

43 C.F.R. § 46.215 ......................................................................................... 21, 22, 23

43 C.F.R. § 46.305(a) ................................................................................................ 2

50 C.F.R. § 22.3 .................................................................................................... 4, 5

50 C.F.R. § 22.26(f)(1) ............................................................................................ 4

50 C.F.R. § 402.14(a) ........................................................................................ 24, 25

### INTRODUCTION AND STATEMENT OF ISSUES

The Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668d ("BGEPA"), makes it unlawful for anyone to kill or otherwise "take" Bald or Golden Eagles without a permit from the Defendant U.S. Fish and Wildlife Service ("FWS").  This case concerns a nationwide regulation adopted at the behest of the wind power industry that extends the duration of BGEPA permits authorizing the killing, injuring, or other "taking" of eagles from five years to thirty years. Although the regulation (referred to herein as the "thirty-year eagle take rule") was adopted for the express purpose of facilitating the development of industrial wind power and other projects in occupied eagle habitat, and was therefore *intended* to have a significant impact on the environment, the FWS – an agency within the Defendant Department of the Interior ("DOI") – refused to prepare either an Environmental Impact Statement ("EIS") or even an Environmental Assessment ("EA") addressing the impacts of, and alternatives to, the rule, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f ("NEPA").  Defendants took this course although leading wildlife conservation groups, various Indian Tribes, the National Park Service, and even Defendants' own BGEPA and NEPA experts urged Defendants to abandon the rule or at the very least comply fully with NEPA's "hard look" requirement before embarking on a regulatory change that takes unprecedented risks with the nation's eagle populations.

While Defendants' flagrant NEPA violation is a sufficient basis for sending the thirty-year take rule back to the drawing board, Defendants also violated section 7 of the Endangered Species Act, 16 U.S.C. § 1536 ("ESA"), because Defendants did not even consider impacts on endangered and threatened species that share eagle habitat.  The Court should thus do what the Administrative Procedure Act ("APA") requires under such circumstances: "set aside" the rule and remand it to Defendants pending full compliance with federal environmental law.  5 U.S.C. § 706(2).

### LEGAL AND FACTUAL BACKGROUND

**A.    THE REGULATORY FRAMEWORK**

**1.    The National Environmental Policy Act**

NEPA "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1.  As this Court has explained, NEPA "provides the necessary process to ensure that federal

agencies take a hard look at the environmental consequences of their actions.'" *Los Padres Forestwatch*, 776 F. Supp. 2d 1042, 1043 (N.D. Cal. 2011) (Koh, J.) (quoting *High Sierra Hikers Assoc. v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004)).  NEPA requires preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Under regulations issued by the Council on Environmental Quality ("CEQ"), a federal agency may prepare an EA to evaluate whether an EIS is required.  40 C.F.R. §§ 1501.3, 1508.9.  Agencies must solicit public comment on EISs, *id.* § 1503.1 and, under DOI/FWS regulations, the Service also "must, to the extent practicable, provide for public notification and public involvement when an [EA] is being prepared."  43 C.F.R. § 46.305(a).

The only circumstances under which an agency may avoid preparing either an EIS or an EA is when the agency action is properly "categorically excluded" from NEPA review.  A "categorical exclusion" ("CE") is a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect" in an agency's NEPA implementing regulations.  40 C.F.R. § 1508.4.  However, even if a proposed action would otherwise fall within a CE, an agency must prepare an EIS or EA when "extraordinary circumstances" enumerated in the agency's regulations exist.  40 C.F.R. § 1508.4.

### 2.    The Bald and Golden Eagle Protection Act

BGEPA "renders it a federal crime to 'take . . . *at any time or in any manner* any bald eagle commonly known as the American eagle or any golden eagle . . . ."  *United States v. Dion*, 476 U.S. 734, 740 (1986) (emphasis added).  "Take" is broadly defined to include "wound, kill . . . molest, or disturb."  16 U.S.C. § 668c.  Congress intended to "ban all threats" to eagles' ability to survive, and wanted "even incidental dangers . . . to be eliminated."  *United States v. Fryberg*, 622 F.2d 1010, 1015, 1016 (9th Cir. 1980).  Accordingly, the "prohibition [on take] is 'sweepingly framed'" so as to further the broad conservation purposes of the statute.  *Dion*, 476 U.S. at 740 (quoting *Andrus v. Allard*, 444 U.S. 51, 56 (1979)).

As initially enacted in 1940, BGEPA's protections applied only to the Bald Eagle, based on Congress's recognition that there is a "compelling [national] interest" in such protection because the "'bald eagle is [not] a mere bird of biological interest but a symbol of the American

ideals of freedom.'"  *United States v. Vasquez-Ramos*, 531 F.3d 987, 991 (9th Cir. 2008) (quoting 54 Stat. 250 (1940)).  As explained in the House Report accompanying the legislation:

> there can be no question as to the desirability of protecting the eagle.  Its status as the emblem of the sovereignty of the United States settles that; the bird should be a ward of the National Government.   Real lovers of nature, of which there are millions in this country now, count it as a red-letter day when they see an eagle, and they are united in support of legislation such as is proposed in this bill.

H. Rep. 2104, 76th Cong., 3d Sess. 1 (May 8, 1940).

In 1962, Congress "extended the law's ban" on taking to Golden Eagles, in large measure because that species "is an important part of the ceremonies and religion of many Indian tribes," and "Indians are deeply interested in the preservation of both the golden and the bald eagle." *Dion*, 476 U.S. at 743, 742 (internal quotation omitted); *see also United States v. Hugs*, 109 F.3d 1375, 1378 (9th Cir. 1997) ("The legislative history of the [Eagle Act] reflects the importance of protecting eagles because of their religious significance to Native Americans.").  In 1972, "penalties under the statute were reinforced," *Allard*, 444 U.S. at 57 n.8, with Congress significantly "increasing the permissible punishment from a possible $ 500 fine to a $ 15,000 fine and increasing the possible prison sentence from six months to one year."  *Fryberg*, 622 F.2d at 1016.  Consistent with the "Congressional intent to ban all conceivable threats" to eagles' survival, *id*. at 1016, BGEPA authorizes the Secretary of the Interior, which has delegated the authority to the FWS, to permit the taking of eagles only "'for the religious purposes of Indian tribes,' and for other narrow purposes, upon a determination that such taking . . . is compatible with the preservation of the bald eagle or golden eagle."  *Dion*, 476 U.S. at 740 (quoting 16 U.S.C. § 6668a).

B.      **FACTUAL BACKGROUND**[1]

1.      **The 2009 Eagle Act Regulations and Environmental Assessment**

In 2009, the FWS issued regulations "authoriz[ing] limited take of [Bald and Golden Eagles] under [BGEPA], where the take to be authorized is associated with otherwise lawful activities," i.e., take is not the purpose of the activity but is a foreseeable consequence.  74 Fed. Reg. 46835 (Sept. 11, 2009) (reproduced in the Administrative Record ("AR") at 42).  The regulations addressed both individual instances of take, as well as criteria for permits for "programmatic take," which includes "take that is recurring" and "occurs over the long term . . . ."  50 C.F.R. § 22.3.[2]

With regard to "[p]ermit duration," although the FWS recognized that many activities for which programmatic permits might be sought would be long term in nature – such as "maintenance of highways throughout a State or other jurisdiction that routinely disturbs eagles," AR 48 (74 Fed. Reg. 46842) – the 2009 regulations provided that the *maximum* term for any programmatic permit would be *five years*.  *See* AR 84 ("The duration of each permit issued under this section . . . will be based on the duration of the proposed activities, the period of time for which take will occur, the level of impacts to eagles, and mitigation measures, *but will not exceed five years*.") (emphasis added).  At the end of that period, the "applicant could submit a request for renewal," affording an opportunity for the Service, in a new decision, "to re-evaluate the permit conditions if more take is occurring than anticipated," as well as address any other factors bearing on whether the permit should be renewed or modified.  AR 51.  At the renewal stage, the permit applicant would have to establish to the Service's satisfaction that the requested take during the

---

[1] In an APA case, a reviewing court's function is not to resolve disputed facts and make *de novo* factual determinations but, rather, "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769-70 (9th Cir. 1985).  Consequently, such cases are typically decided on cross-motions for summary judgment, which are used to resolve the purely legal question of whether the agency acted lawfully and reasonably in light of the facts in the record.  *Id.*

[2]  The 2009 regulations provided that to issue a programmatic permit the Service must find that the effects of the take are "compatible with the preservation of bald eagles and golden eagles," 50 C.F.R. § 22.26(f)(1), which means that the Service could only authorize actions deemed "consistent with the goal of stable or increasing breeding populations."  AR 42.

additional five years (or less) would be "compatible with the preservation of the bald eagle or the golden eagle, which is the statutory mandate." AR 57.  Because permit renewal decisions are affirmative agency actions triggering the obligation for the preparation of EISs or EAs under NEPA, *see* AR 68, the system established in 2009 allowed for public access to, and involvement in, agency decision making on programmatic permits affecting eagles at least every five years.

In the preamble to the 2009 regulations, the Service explained that:

the rule limits permit tenure to five years or less *because factors may change over a longer period of time such that a take authorized much earlier would later be incompatible with the preservation of the bald eagle or the golden eagle.  Accordingly, we believe that five years is a long enough period within which a project proponent can identify when the proposed activity will result in take.*

AR 62 (emphasis added).  The Service further explained that periodic renewal decisions were necessary because "[w]e expect that circumstances will often change such that the original ACPs ["Advanced Conservation Practices"] for minimizing take may no longer be considered the most effective measures that could be adopted," and hence:

[t]here are likely to be technological advances in some industries that would warrant adoption of new, more effective conservation measures.  Also, new information regarding eagle biology, behavior, and responses to the permitted activity *may warrant re-examination of the effects of the permitted activity and re-evaluation of the permit conditions.*

AR 67 (emphasis added); *see also* 50 C.F.R. § 22.3 (AR 82) (defining ACPs that must be implemented for any programmatic permit as "scientifically supportable measures that are approved by the Service and represent the best available techniques to reduce eagle disturbance and ongoing mortalities to a level where remaining take is unavoidable").

Consistent with the limitation of permits for even long-term activities to a maximum of five years, the Service also stressed that it did *not* anticipate issuing a significant number of permits for *lethal* take of either Bald or Golden Eagles.  Rather, "[w]e anticipate that permits issued under this regulation will usually authorize take that occurs *in the form of disturbance*" and that only in "*some limited cases*, a permit may authorize lethal take that results from but is not the purpose of an otherwise lawful activity."  AR 44 (74 Fed. Reg. 46838) (emphasis added).  Further, the Service stated that it would be especially cautious in issuing *any* permits to take Golden Eagles

due to evidence of declining populations.  AR 45; *see also* AR 55 ("[B]ecause population data indicate that take of golden eagles should be extremely limited, we anticipate issuing only a minimal number of new take authorizations for golden eagles under these new regulations.").[3]

Notwithstanding the 2009 rule's adoption of limitations designed to minimize the impact of BGEPA permits on eagles, the FWS prepared and circulated for public comment an extensive EA addressing the anticipated cumulative impacts associated with the rule.  *See* AR 92-300.  The final EA acknowledged that, although the Service was "setting thresholds for [authorized] take based upon the predicted ability of the [eagle] populations to support that level off take," programmatic take permits could, in conjunction with other factors, have a deleterious effect on eagle populations and could also "indirectly result in impacts to habitat from loss, fragmentation, and reduced suitability for eagles and other wildlife due to implementation of projects or portions of projects that may not have proceeded without the permit because they are located in areas that are currently considered too high-risk for eagle mortality."  AR 196.  However, the EA, along with a Finding of No Significant ("FONSI") (AR 86), concluded that no EIS was required in large measure because the Service anticipated that, should new information reflecting threats to eagles emerge, it could be brought to bear on whether permits lasting no longer than five years should be renewed and/or additional permits issued.  *See, e.g.*, AR 183 ("[I]f data suggest population declines are approaching a level where additional take will be incompatible with the preservation of the eagle . . . the Service will refrain from issuing permits until we can reevaluate the premises

---

[3] Nothing in the 2009 regulations suggests that the Service anticipated, at that time, issuing a large number of BGEPA permits to industrial wind power companies to kill eagles through turbine operation.  Rather, as the agency subsequently acknowledged, "the Service anticipated that most permits would be for short-term disturbance of eagles, or to authorize *historic forms of programmatic take where conservation measures were being implemented to yield a net benefit to eagles*."  AR 11234 (emphasis added).  The few references to wind power projects in the 2009 rule were statements suggesting how *difficult* it would be for a wind power project to obtain a programmatic permit to kill eagles, especially Golden Eagles.  *See* AR 48 (explaining that the FWS was "unaware of any measure that would eliminate eagle mortalities when turbines are sited in golden eagle habitat (including migration corridors)," but that "[i]f ACPs can be developed to significantly reduce the take, the operator may qualify for a programmatic take permit, since the ongoing mortalities are the direct result of the turbines.")  AR 48; *see also* AR 69 ("[T]ake of eagles within migratory corridors is a significant concern with regard to certain activities, particularly wind-power facilities.").

upon which our estimation of take is based, and until such time that the take will be compatible

with the preservation of the bald eagle and the golden eagle.").

### 2.    The Proposed 30-Year Eagle Take Rule And Public Opposition

Shortly after the 2009 rule was issued, "there was a substantial increase in the development

of wind power for renewable energy purposes."  AR 11234.  Eagles are especially "vulnerable to

blade-strike mortality at wind turbines," *id.*, which "tower over 400 feet and have blades over 100

feet long, with tip speeds approaching 180 miles per hour."  AR 7549.  It has been well-

documented for many years that that wind turbines constructed in eagle habitat can kill and maim

eagles in large numbers.  As explained in the 2009 EA, the "problem in the U.S. surfaced in the

late 1980s and early 1990s at the Altamont Pass Wind Resources Areas," a facility just east of San

Francisco Bay.  AR 162.  Hundreds of raptors are killed by the Altamont turbines every year due

to turbine collisions, including dozens of Golden Eagles.  *Id.*; *see also* AR 8076 (explaining that

the Altamont turbines "kill[] an average of 67 eagles each year"); AR 7793 (estimating that, in

total, nearly 3,000 eagles have been killed by the Altamont Pass turbines).  Eagle deaths have been

documented at other wind power facilities as well.  *See, e.g.*, AR 8076 (the "Los Angeles

Department of Power's smaller Pine Tree Wind Turbine Center killed eight eagles during the last

two years [prior to 2012]"); AR 8066 ("[a]t least forty Golden Eagles have been killed in the last

three years at reporting wind farms" in Wyoming).

Given the present and projected expansion in industrial wind power and the fact that the

2009 regulation and accompanying EA contained little analysis of the effects of that expansion on

eagles, the FWS began to consider two related regulatory amendments, both driven by the wind

power industry's professed desire to greatly expand operations in eagle habitat.  First, the Service

embarked on a general reconsideration of the 2009 regulations, including the standards that should

be applied in issuing lethal take permits to wind power and other activities seeking programmatic

permits.  *Id.*  In 2012, the Service initiated that process through issuance of an Advanced Notice of

Proposed Rulemaking ("ANPR"), *see* 77 Fed. Reg. 22278 (April 13, 2012), which, according to

the FWS, *will* involve compliance with NEPA through issuance of an EIS or EA.  *See* 79 Fed.

Reg. 35564 (June 23, 2014).

Memorandum in Support of Motion for Summary Judgment, Civ. No. 5:14-cv-02830-LHK

7

Second, in view of the wind power industry's complaints that the "five-year maximum tenure of permits under the Eagle Take Rule is fundamentally unworkable for the industry considering the life of most wind projects is 20 to 30 years," the Service also began to consider another major rule change that would dramatically expand the maximum duration of BGEPA programmatic permits.  AR 11235.  Given the relationship between the two projected rulemakings, the FWS "initially planned to consider the issue of permit tenure as part of" its general revision of the 2009 rule, *id.,* but "given the gravity of the situation as conveyed by [the wind power] industry," the Service instead moved forward with a rule to extend the maximum tenure of programmatic permits under the Eagle Take Rule "as soon as possible."  *Id.*

In April 2012 – on the same day that it issued its ANPR for other changes to the 2009 rule – the Service proposed to "extend the maximum term for programmatic permits to 30 years," a change that, according to the Service's proposal, was specifically intended to "facilitate" the "development of renewable energy and other projects designed to operate for many decades" in the habitat of Bald and Golden Eagles.  AR 29.  The principal rationale for the proposal was, quite simply, that the wind power industry wanted it: "[b]ecause industry has indicated that it desires a longer permit, the Service is proposing to expand the program" so that permits to kill or otherwise take eagles could be issued "through 30 years maximum." AR 32.

Although the proposal was explicitly designed to *have* a significant impact on the environment by "facilitating" the development of industrial wind power and other long-term projects in eagle habitat, and the FWS also acknowledged the "known risk to eagles from collisions with wind turbines and electric power lines," AR 36, the Service declared that it would not prepare *any* NEPA document – not even an EA – in connection with the rule.  In doing so, the FWS asserted that the rule was merely "administrative" in nature and therefore "categorically excluded" from any NEPA review.  AR 38, 39.

The proposal met with vehement opposition from a multitude of non-profit conservation organizations, Indian tribes, and even other governmental agencies.  *See* AR 3132 (Briefing Memo

to the Deputy Secretary of the Interior) ("[t]he environmental community has adamantly opposed the Department/Service promulgating the final rule").[4]  Governmental bodies that opposed the proposal included the Pacific Flyway Council, an entity within the Association of Fish and Wildlife Agencies (AR 7555) and the National Park Service ("NPS"), the FWS's sister agency within the Interior Department, which has a "particular interest" in "[w]ind energy developments near NPS lands or located in migratory fly-ways."  AR 7545.  NPS stressed that it "<u>does not support extending the term for programmatic take permits of bald and golden eagles to 30 years as proposed</u>" because the "proposed rule appears to designate 30 years based on the lifecycle of industry development rather than the life history of the species under protection." AR 7545.

Those opposing the proposal set forth myriad reasons for doing so, including that the FWS had failed to set forth *any* rationale or factual foundation for reversing its finding that programmatic permits of longer than five years would be excessively risky to eagle populations; that there are no proven measures for minimizing adverse impacts of wind power projects placed in occupied eagle habitat, thus making it especially perilous to grant permits of up to thirty years; and that, by eliminating the need for permit reviews and accompanying NEPA analyses at least every five years, the proposal would eliminate the public's ability to monitor and participate in determinations of whether and under what conditions projects should be permitted to kill eagles for three decades.  *See* AR 4784-4728 (FWS summary of the comments).  Tribal representatives also stressed that the rule poses a particular threat to the tribes' unique cultural and religious

---

[4]  The conservation, wildlife protection, and scientific organizations urging withdrawal of the proposal included the Plaintiff American Bird Conservancy (AR 7626), the National Audubon Society, and many local Audubon chapters throughout the country (AR 7547, 7825, 7838, 7852, 8058, 8115, 8220), the National Parks Conservation Association (AR 8076), the Wyoming Outdoor Council (AR 8063), Defenders of Wildlife (AR 8115), the Natural Resources Defense Council (AR 8115), the Center for Biological Diversity (AR 7862), the Nature Conservancy (AR 7857), the Humane Society of the United States (AR 7842), the Ornithological Council (AR 7806), the Hawk Migration Association (AR 7806);  the Oregon Natural Desert Association (AR 7731),  Save the Eagles International (AR 7727), and the Maryland Ornithological Society (AR 7496).  Indian tribes and tribal representatives opposing the rule change included the Inter Tribal Council of Arizona (AR 2320), the Salt River Pima-Maricopa Indian Community (AR 8223), the San Carlos Apache Tribe (AR 8149), the Fort McDowell Yavapai Nation (AR 8090), the Sault Ste. Marie Tribe of Chippewa Indians (AR 8242), the Nez Pierce Tribe (AR 7883), Confederated Bands and Tribes of the Yakama (AR 7532), and the Hopi Tribe (AR 7509).

interests.  AR 2330 (Inter-Tribal Council of Arizona).  The commenters urged that, at the very

least, FWS should conduct NEPA analysis in connection with the proposed rule change given that

the invocation of a CE for a rule change of such magnitude is impossible to reconcile with the

Service's obligation to "take a 'hard look' at environmental consequences *before* taking action."

AR 8116 (Defenders of Wildlife et al.) (emphasis added).

### 3.      The FWS's Adoption Of The Rule Without Any NEPA Review

After reviewing the public comments, the FWS staff responsible for developing the rule

*agreed* with the critiques of conservation organization, tribes, NPS, and other commenters that

allowing wind power companies and others to obtain BGEPA permits for up to thirty years would

be detrimental to eagles.  *See* AR 11246 (statement by the rule's principal author that the long-

term permits would be "*inherently less protective for eagles* than 5-year permits that require, upon

renewal, the project proponent to implement any known measures to reduce take") (emphasis

added).  In addition, FWS staff concurred with the commenters that, not only was there no

plausible legal basis for invoking a CE, *see, e.g.*, AR 5251 ("agree[ing] with the comment" that

invocation of a CE violates the Service's obligation to take a "hard look" at environmental

impacts), but that the FWS should initiate preparation of an EIS, and not simply an EA.

For example, Eliza Savage, who is the "Eagle Program Manager for the Division of

Migratory Bird Management" in the FWS and had "responsibility for overseeing the drafting and

revision" of the 30-year eagle take rule and other BGEPA regulations, *see* ECF No. 49-1 at ¶ 1;

AR 11360 (identifying Ms. Savage as the "rule writer"), summarized the myriad reasons proffered

by commenters as to why a CE could not be invoked and, saying that it was a "no-brainer that we

needed to do a NEPA analysis," AR 11242, concluded with the unequivocal recommendation:

"EIS needed."  AR 11248.  Ms. Savage further opined that the "proposed longer permit tenure

fails to add any safeguards for eagles, while significantly reducing their protection" and that:

> [t]he proposed rule changes are more than "administrative" *and so do not fall under
> the NEPA categorical exclusion invoked by the Service.  Real, significant, and
> cumulative biological impacts will result if the proposed regulatory changes are
> implemented.*  Furthermore, the 2009 F[inal] EA did not envision or address
> numerous prospective permits authorizing . . . sustained eagle mortality – such as
> wind development – but rather were attempting to address historical take from

unregulated entities. *Extending the permit tenure to 30 years without undergoing a new, comprehensive NEPA analysis, much less carrying out the commitments made in the 2009 FONSI, is not in accordance with NEPA.*

AR 2998 (emphasis added).

Similarly, Diana Whittington, a NEPA expert within the Service who was an author of the 2009 EA, stressed that the rule change entailed potential impacts far beyond anything contemplated in the 2009 EA, and that the "issuance of long-term, industrial scale programmatic permits for lethal take was **outside the scope** of the 2009 EA," which did not contemplate a large number of prospective permits authorizing activities causing on-going and sustained eagle mortality – such as wind development . . . ." AR 5124.  Ms. Whittington further warned that "[s]ome of the major points on which we are vulnerable (and, frankly, will likely not be able to make our case on either NEPA or APA) . . . include: *[m]isuse of categorical exclusion (the one we applied should not be used for this kind [of action]*" and the "potential for significant impacts to both species of eagles as cultural resources." AR 5249 (emphasis added).[5]

In October 2012, the FWS staff working on the rule met with the FWS Director to provide a "[b]ottom line" recommendation to "*shelve the tenure rule and do an EIS*." *Id.* (emphasis added).  That recommendation, however, was rejected by the Director who, believing that it was "[u]nlikely we'll be sued by NGOs," instructed the staff to "[g]o ahead with finaliz[ing] the tenure rule" without an EIS or even an EA.  *Id.*

---

[5]  *See also* AR 11360 (9/24/12 e-mail from Ms. Savage referring to the rule as a "train wreck" and a "process that no one could be proud of"); AR 11362 (9/21/12 e-mail from the Chief of the FWS's Division of Migratory Bird Management stating that "I believe we are vulnerable in several areas and we should propose a more comprehensive strategy to more fully develop our approach to eagle management and permits"); AR 11361 (9/22/12 e-mail from the FWS's National Raptor Coordinator anticipating that the "risky" eagle tenure rule would result in the Service "spend[ing] the next 2 years in court"); FWS 11294 (internal FWS comment referring to "the critical NEPA deficiencies"); AR 5083 (9/25/12 e-mail from Ms. Savage stating that "many of [the comments] have a great deal of merit in my opinion"); AR 5200 ("[W]e should complete an [EIS] that addresses both adaptive management and tribal concerns before proceeding on the tenure rule."); AR 11255 (draft Information Memorandum for the Director recommending that the agency "reconsider its approach" to the rule in light of the public comments and should "use the input provided through public comment on both the tenure rule and the ANPR to develop a Notice of Intent to prepare an environmental impact statement on a new proposed rule").

The Service issued the final rule in December 2013, with only "minor modifications."  AR 2.  In doing so, the Service declared that, although "large soaring birds, specifically raptors, are especially vulnerable to colliding with wind turbines," and there is "considerable uncertainty" as to "which strategies would best mitigate the effects of wind energy developments on raptors," the Service had determined that the "five-year term limit imposed by the 2009 regulations . . . should be extended *to better correspond to the operational timeframe of renewable energy projects*."  AR 2 (emphasis added).  In a press release accompanying the rule's publication, the Secretary of the Interior stressed that the rule was specifically designed to "help the renewable energy industry and others develop projects that can operate in the longer term" in eagle habitat.  AR 318.

Indeed, to further accommodate the wind power industry, in issuing the final rule, the FWS adopted a dramatically new approach to the "Advanced Conservation Practices" required for programmatic Eagle Act permits.  Thus, "[b]ecause the Service has not currently identified ACPs for wind energy projects that reduce eagle disturbance and blade-strike mortality," AR 3 – which would ordinarily be a barrier to permit approval under the 2009 regulations – the final 30-year take rule authorizes the issuance of permits on the basis of *"experimental* ACPs," i.e., ACPs that "have not yet been scientifically demonstrated to be effective."  *Id*. (emphasis added).  Although the Service conceded that it has no idea whether any such ACPs will actually ameliorate wind turbine impacts to eagles, *id.* (experimental ACPs "may show little value in reducing take"), the Service determined that they should nonetheless be allowed so as to  *"enabl[e] wind energy facilities to move forward in the meantime*."  *Id.* (emphasis added).[6]

---

[6] The preamble to the rule leaves no doubt that this unprecedented "experimental" approach was developed specifically for the wind power industry and, indeed, that the Service is deferring applying it to any other industry, presumably because it is deemed too risky for eagle populations to support permit issuance as a general matter.  *See* AR 3 ("*If this approach is successful in the context of wind projects*, the Service will consider employing a similar process in developing permitting provisions for other industries as necessary.") (emphasis added); *see also* AR 2033 (explanation by the rule's principal author that the "need to use experimental techniques at wind facilities because there are no known measures that meet the definition of ACPs to reduce take at wind facilities" is "*basically saying that any permit we issue to a wind facility violates the regulations*") (emphasis added).

The final rule also "clarifies" that the preexisting system, under which programmatic permits had to be affirmatively renewed at least every five years, with accompanying opportunities for NEPA review and *public* input, was being replaced by a system of purely *internal a*gency "reviews" of data submitted by permit holders.  AR 3.  "Depending on the findings of the review, [the Service] *may* make changes to a permit consistent with its terms and conditions," but the rule imposes no obligation on the Service even to advise the interested public as to the upshot of any internal "review," let alone afford the public an opportunity to have input into whether decades-long permits will or should be modified and in what manner.  *Id.*

The Service also confirmed its refusal to engage in any NEPA review on the rule itself, insisting that it had properly invoked a CE notwithstanding that the express *purpose* of the rule is to affect the environment by "facilitating" the expansion of industrial wind power in eagle habitat by affording wind project developers a level of permitting "certainty" they did not enjoy under the prior system.  Wind energy developers are presently "pursuing long-term eagle take permits" under the rule.  *See* Defendants' Answer to Amended Complaint (ECF No. 22) at ¶ 51; *id.* (admitting that companies have "submitted applications for 30-year take permits").

## ARGUMENT

### A.    STANDARD OF REVIEW

Defendants' actions are reviewable under the APA, which requires a reviewing court to "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and agency action adopted "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).  To "determine whether an agency action is arbitrary or capricious, a court must consider 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (internal quotation omitted).  In addition, "to withstand review, the agency must articulate a rational connection between the facts found and the conclusions reached," and "when an agency has taken

1 action without observance of the procedure required by law, that action will be set aside." *Sierra*

2 *Club v. Bossworth*, 510 F.3d 1016, 1023 (9th Cir. 2007) (internal citations omitted).[7]

3 **B.      THE FWS'S REFUSAL TO ENGAGE IN ANY NEPA REVIEW**
**VIOLATES NEPA AND IS ARBITRARY AND CAPRICIOUS.**

4

5          1.      **Where, As Here, An Agency Action Is *Intended* To Have An Impact On**
**The Environment, The Service's Invocation Of A CE Violates NEPA's**

6 **"Hard Look" Requirement.**

7          The "role" of a reviewing court in a NEPA case is to "insure that the agency has taken a

8 'hard look' at environmental consequences" of its actions.  *Cal. Wilderness Coal. v. U.S. Dep't of*

9 *Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011) (quoting *Kleppe v. Sierra Club*, 4277 U.S. 390, 410

10 n.21 (1976).  Accordingly, "when an agency decides to proceed with an action in the absence of an

11 EA or EIS, the agency must adequately explain its decision" and "cannot avoid its responsibilities

12 under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant

13 effect on the environment."  *Cal. Wilderness Coal.*, 631 F.3d at 1097 (internal quotations omitted).

14 Indeed, so long as a "plaintiff raises substantial questions whether a project *may* have a significant

15 effect, an *EIS* must be prepared." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 563

16 (9th Cir. 2006) (emphasis added).

17          When these standards are applied here, it is clear that, by forgoing preparation of an EIS or

18 even an EA in connection with a major rule change, Defendants have failed to take the "hard look"

19 required by NEPA.  To begin with, from a NEPA standpoint, it makes no difference whether

20 encouraging the development of industrial wind power and other projects in eagle habitat is good

21 or bad from a policy standpoint, or even whether, on balance, the FWS believes that it represents

22 sound environmental policy.  *See* AR 6 (final rule) ("We believe this final regulation strikes a

23 good balance between providing that certainty [to wind power developers] and ensuring that

24

25 ───────────────
[7]    As set forth in the accompanying standing declarations, Plaintiffs are five individuals and a

26 leading bird protection organization with concrete, recreational, aesthetic, scientific, and
organizational interests in the conservation of eagles; those interests are threatened by a rule that is

27 intended to significantly expand industrial wind power in eagle habitat, and that will severely limit
opportunities for public involvement in the FWS's implementation of BGEPA.  *See* Ex. A-F.

28

1    eagles continue to be protected.").  The CEQ regulations implementing NEPA make this crystal

2    clear, providing that the "[i]mpacts" that must be considered in determining the need for an EIS

3    "may be both beneficial and adverse," and that a "significant effect may exist *even if the Federal*

4    *agency believes that on balance the effect will be beneficial*."  40 C.F.R. § 1508.27(b)(1)

5    (emphasis added).  Accordingly, the only pertinent legal question here is whether the rule "*may*

6    have a significant effect" that must be *studied* in an EIS or, at the very least, an EA.  *Cal.*

7    *Wilderness Coal.*, 631 F.3d at 1097 (emphasis added).

8         The answer to that dispositive question – as is plain from the final rule itself – is

9    emphatically "yes."  Indeed, Defendants' steadfast refusal to comply with NEPA is impossible to

10   harmonize with Service's oft-repeated acknowledgement that the *very purpose of the rule is to*

11   *have a significant impact on the environment* by encouraging the development of industrial wind

12   power and other renewable energy projects *in eagle habitat*, through the prospect of BGEPA

13   permits that are up to six times longer than the five-year permit duration that previously existed.

14   As noted, this objective is made explicit in both the final and proposed rules, *see supra* at 12-13,

15   and it is reiterated by FWS officials throughout the record.[8]

16

17   _____

18   [8]  *See, e.g.,* AR 18 (final rule) ("This change will facilitate the development of renewable
     energy."); AR  5 (final rule) ("The Service believes that that the 5-year limitation on the duration

19   of [Eagle Act] permits is an unnecessary impediment for activities or projects that will last more
     than 5 years."); AR 6 (final rule) ("Wind developers have informed the DOI and the Service that

20   5-year permits have inhibited their ability to obtain financing, and we changed the regulations to
     accommodate that need."); AR 17 (final rule) ("Utility-scaled wind energy facilities and electric

21   transmission companies are likely to be the most frequent programmatic permit applicants,
     because of the known risk to eagles from collisions with turbines and electrocution on power

22   lines."); AR 10489 ("Briefing Paper") (the "final regulations the Service plans to publish (Tenure
     Rule) will facilitate the responsible development of projects that will be in operation for many

23   decades"); AR 11557 ("Note to Reviewers") ("[T]his change will facilitate the responsible
     development of renewable energy and other projects that are designed to be in operation for many

24   decades."); AR 11825 ("Information Memorandum") (the rule was developed in response to the
     wind industry's desire for a "favorable regulatory environment for development of renewable

25   energy"); AR 1936 ("The intent is to facilitate the development of renewable energy and other
     projects designed to operate for decades."); AR 2874 (Briefing Paper) ("The regulation is needed

26   to accommodate the planning and financing needs of energy project developers."); AR 3658
     (Supporting Statement for Paperwork Reduction Act Submission) ("[T]he 5-year term limit . . . is

27   not long enough to enable many such project proponents to secure the funding, lease agreements,
     and other necessary assurances to move forward with their projects.").

28

     Memorandum in Support of Motion for Summary Judgment, Civ. No. 5:14-cv-02830-LHK

In a situation such as this one, in which an agency action is *adopted for the explicit purpose of having a significant effect on the environment*, it is axiomatic that, under both the CEQ and DOI regulations, the FWS cannot invoke a CE.  *See* 40 C.F.R. 1508.4 (actions covered by CEs cannot "individually or cumulatively have a significant effect on the environment"); 43 C.F.R. § 46.205(a) (CEs encompass only a "kind of action that has no significant individual or cumulative effect on the quality of the human environment").  Moreover, Circuit precedent compels the conclusion that the drastic curtailment of public involvement that flows from the rule change is *itself* a significant change that must be studied in a NEPA document.

Crucially, in adopting the rule, the FWS flatly conceded that the new approach drastically curtails opportunities for public comment and oversight during the decades-long life of wind power and other projects.  In responding to public comments contending that a "30-year permit would decrease opportunities for public stakeholder involvement because decisions on issuance and *reissuance* [of permits] are subject to NEPA analysis and tribal consultation," the Service *agreed* that "[l]eaving the 5-year maximum permit term in place *would have allowed for additional public and Tribal comment during the NEPA process for each of the multiple permit applications the Service would have evaluated for an activity expected to last decades*."  AR 6 (emphasis added).  In sharp contrast, the system of purely internal FWS "reviews," with no obligation to announce decisions on permit renewal, let alone involve the public in a NEPA process on such decisions, eviscerates public comment beyond the initial permit decision, even for projects lasting three decades.  *See* AR 2598 (memo from Counselor to the Assistant Secretary for Fish, Wildlife, and Parks) ("We can anticipate criticism that the 5-year review process is a non-transparent, closed-to-the-public process, in contrast to a permit renewal process.").

Under Circuit precedent, this adverse impact on public involvement **alone** necessitates rejection of a CE and requires NEPA analysis.  Indeed, in *Western Watersheds v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011), the Ninth Circuit held that the Interior Department violated NEPA although the agency at issue there – the Bureau of Land Management ("BLM") – had *prepared an EIS* in connection with certain regulatory changes.  The court held that the EIS had  failed to take a "hard look" at whether (as BLM's "own experts" advised the agency) there would be an

1   "environmental effect caused by both the across-the-board reduction in public involvement in

2   management of grazing on public lands and the elimination of public input into particular

3   management decisions."  *Id.* at 492.  Here, by refusing to prepare *any NEPA document at all* in

4   connection with a major rule change that will admittedly curtail public involvement in BGEPA

5   permitting decisions for long-term projects, Defendants have committed a far more egregious

6   violation of NEPA than the one that the Court of Appeals discerned in *Western Watersheds*.

7                **2.        The Specific CE Invoked By The FWS Does Not Apply.**

8         Under these circumstances, the Service's invocation of a CE can and should be summarily

9   rejected.  As the Ninth Circuit has explained, CEs "by definition, are limited to situations where

10  there is an insignificant or minor impact on the environment."  *Sierra Club*, 510 F.3d at 1027; *see*

11  *also Citizens for a Better Env't v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1088 (N.D. Cal.

12  2007) ("Application of a CE is inappropriate if there is the possibility that an action *may have* a

13  significant environmental effect.") (emphasis in original); 43 C.F.R. § 46.205 (DOI regulations

14  defining a CE as a "category or kind of action that has *no* significant individual or cumulative

15  effect on the quality of the human environment") (emphasis added).  Accordingly, when, as here,

16  the stated objective of a regulation with nationwide effect is to *have* an environmental impact by

17  encouraging the development of a major industry in the habitat of two federally protected eagle

18  species, the Court need go no further under Circuit precedent to declare the FWS's invocation of a

19  CE arbitrary and capricious.

20        In any event, should the Court consider the agency's specific rationale for invoking a CE, the

21  agency's position is even more untenable.  DOI's own regulations provide that if a "proposed

22  action does not meet the criteria for any of the listed Departmental categorical exclusions . . . then

23  the proposed action *must be analyzed*" in an EA or EIS.  43 C.F.R. § 46.205(a) (emphasis added).

24  Here, Defendants have invoked only one CE, and the 30-year eagle take rule plainly does not

25  "meet the criteria" for that exclusion.  The CE applies solely to "[p]olicies, directives, regulations,

26  and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; *or*

27  whose environmental effects are too broad, speculative, or conjectural to lend themselves to

28

meaningful analysis and will later be subject to the NEPA process, either collectively, or case-by-case."  43 C.F.R. § 46.210(i) (emphasis added).

Although the proposed rule suggested that the first part of this exclusion is somehow applicable, the final rule evidently abandons any counterintuitive notion that the exponential increase in permit duration sought by the wind power industry can somehow be dismissed as solely "administrative" or "procedural" in nature.  *See also California ex rel. Lockyer v. USDA*, 575 F.3d 999, 1013 (9th Cir. 2009) (rejecting as "unreasonable" the Forest Service's application of a CE for "administrative" and "procedural" actions to a regulation that would affect development in roadless areas).[9]  Rather, the Service relied on the rationale that the "extension of the allowable permit duration from 5 to 30 years is subject to the second part of this categorical exclusion."  AR 11 (emphasis added).  To satisfy that part of the CE, Defendant must establish *both*: (1) that the environmental effects of the rule are "too broad, speculative, or conjectural to lend themselves to meaningful analysis," *and* (2) that those effects "will later be subject to the NEPA process, either collectively, or case-by-case."  43 C.F.R. § 46.210(i).  Defendants, however, cannot, meet *either* of those tests.

As for the first test, neither the final rule, nor any other document in the record, even attempts to establish that no "meaningful analysis" of the rule's effects can be documented in an EA or an EIS, and any such assertion would be belied by the fact that the FWS *did* conduct an extensive NEPA review in connection with the 2009 rule, which addressed the extent to which both eagle and "non-eagle resources" could be impacted through expanded opportunities for BGEPA permits.  AR 1559.  The Service has also prepared NEPA documents on other rulemakings affecting raptors, *see* AR 111, and has embarked on a NEPA process involving *other* aspects of the BGEPA regulations that are directly related to the five-year eagle take permit.  *See* AR 2868.  Thus, the

---

[9] The Service did state that *other* aspects of the rule, not at issue in this case, are "subject to the first part of this categorical exclusion."  AR 18.

1   Service is in fact perfectly capable of conducting NEPA review on rulemakings such as the one at

2   issue here when it wants to do so.[10]

3       Nor have Defendants established that all of the environmental impacts associated with the rule

4   "will later be subject to the NEPA process, either collectively or case-by-case."  43 C.F.R. §

5   46.210(i).  It is correct, as the final rule asserts, that the effects of *each individual permit* "will be

6   addressed on a case-by-case basis" before the FWS issues a programmatic permit.  AR 11.  But

7   that is hardly tantamount to analyzing the *cumulative environmental implications of the rule as a*

8   *whole*, as would be required if an EA or EIS had been prepared prior to the rule's adoption.  For

9   example, assuming that the very premise of the rule is correct that the availability of lengthy

10  permits will facilitate financing and other support for major projects in eagle habitat that would

11  otherwise be lacking, the overall, cumulative effect that may have on eagle populations and

12  habitats, as well as other wildlife and resources, will certainly not be addressed in "case-by-case"

13  permit proceedings.  Rather, the extent to which the rule will in fact "encourage . . . the siting" of

14  projects that otherwise would not even be pursued and other "programmatic effects" are "subject

15  to review for environmental impacts *at this time or not at all*."  *Cal. Wilderness Coal.*, 631 F.3d at

16  1103 (emphasis added).  Under such circumstances, Circuit precedent dictates that the CE be

---

18  [10]  The final rule itself suggests multiple environmental effects that lend themselves to "meaningful," if not essential, evaluation in an EIS or EA.  For example, the use of
19  "experimental," unproven ACPs has never been analyzed in any NEPA document because the 2009 regulations and accompanying EA were premised on the assumption that programmatic
20  permits could *not* be issued without effective ACPs for the relevant industry first being established.  *See* AR 66 ("These [2009] regulations allows us to authorize take that results in
21  mortality as long as the issuance criteria for a standard permit under this section are met, but would not allow us to issue a permit for programmatic take without development and
22  implementation of ACPs.").  In addition, the final rule and underlying record set forth precise numerical projections of the number of programmatic permits likely to be issued during the
23  foreseeable future as a result of the increased permit duration, as well as the large percentage of those expected to be issued to the wind power industry.  *See* AR 6644 (projecting that over 30
24  years, FWS may issue 1,108 30-year permits and that the Service "expects that the majority of private applicants seeking a 30-year permit will be in the wind production business"); *see also* AR
25  5595 (estimating the number of permits through 2020); AR 5751 (estimating the number of permits by industry).  Defendants have not even begun to explain why it is impossible to engage in
26  "meaningful" analysis of associated environmental impacts.  *Cf. Cal. Wilderness Coal.*, 631 F.3d at 1098 (holding that "although the effects" of an agency's programmatic action "might be
27  uncertain and difficult to quantify, the potential consequences of such effects are significant enough to undermine [the agency's] conclusory determination that no EA need be prepared").

28

rejected.  *Id.*; *see also Sierra Club*, 510 F.3d at 1027 ("That the Forest Service may perform an impacts analysis at the project level does not relieve it of its obligation to ensure that the [agency action] as a whole has no cumulative impacts.  *Relying solely on a project level analysis is inadequate . . . .*") (emphasis added).

The NEPA implementing regulations likewise make clear that the fact that site-specific NEPA documents may be required for individual permit decisions in no way undercuts the need for NEPA compliance on the rule as a whole.  "NEPA does indeed contemplate preparation of EAs and EIS's in the case of programmatic rules and changes" and the "CEQ regulations governing NEPA specifically envision programmatic environmental impact statements."  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1985 (N.D. Cal. 2007) (citing 40 C.F.R. § 1502.4(b)).[11]  It is well-established, therefore, "at least in this [C]ircuit" that "NEPA's requirement for an EIS is *not* necessarily limited to site or project-specific impacts or activities, as defendants suggest."  *Citizens for Better Forestry*, 481 F. Supp. 2d at 1086 (emphasis in original) (citing cases).  Because "an environmental analysis must be performed for even broad programmatic actions that have environmental effects," *Sierra Club*, 510 F.3d at 1028 (citing 40 C.F.R. § 1502.4(b)), Defendants cannot sidestep that result by invoking a CE that plainly does not fit the facts.  Indeed, Defendants can point to "[n]o Ninth Circuit case involving invocation of a CE, that was upheld on appeal, [that] involved broad, far-reaching programmatic actions such as" the 30-year eagle take rule.  *Citizens for Better Forestry*, 481 F. Supp. 2d at 1087.

### 3. Even If The CE Applied, There Are "Extraordinary Circumstances" That Foreclose Its Application Here.

"Even if a proposed action appears to fit the CE invoked, an agency may not use a CE when 'extraordinary circumstances' exist."  *Citizens for Better Forestry*, 481 F. Supp. 2d at 1081.  Further, "'[w]here there is substantial evidence in the record that exceptions to the categorical

---

[11]  Indeed, the CEQ regulations contemplate this very situation, providing for "tiering," which "refers to the coverage in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide statements or ultimately site-specific statements) incorporating by reference the general discussions."  40 C.F.R. § 1508.28.

exclusion *may* apply, the agency must at the very least explain why the action does not fall within one of exceptions.'" *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F3d. 999, 1017 (9th Cir. 2009) (emphasis added) (quoting *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002)). DOI/FWS's NEPA regulations set forth a number of such "extraordinary circumstances," and if "any" of them apply, a CE may not be invoked.  43 C.F.R. § 46.215.  Here, at least **four** of the enumerated circumstances are clearly implicated by the rule.

**First**, the rule is the quintessential example of an action that has "highly controversial environmental effects . . . ."  43 C.F.R. § 46.215(c).  A "proposal is highly controversial when substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor, or there is a substantial dispute [about] the size, nature, or effect of the major Federal action."  *Sierra Club*, 510 F.3d at 1030-31 (internal quotations omitted).  Not only has the FWS flatly *admitted* that the rule at issue is "highly controversial with the environmental community" because of its potential to decimate eagle populations, AR 2283, but such concerns have even been reinforced by the FWS's sister agency within DOI, the National Park Service, as well as by the FWS's own NEPA and BGEPA experts, who urged the agency to prepare an EIS.  *See supra* at 7-11.  This establishes "controversy" under Circuit precedent.  *See Sierra Club*, 510 F.2d at 1031 (relying on concerns expressed by agency officials to reject a CE on grounds of "controversy").[12]  At minimum, the FWS has "failed to meet its burden to provide a 'well-reasoned explanation' demonstrating that these responses . . . do not suffice to create a public controversy based on potential environmental consequences.'"  *Sierra Club*, 510 F.3d at 1032 (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.32d 722, 736 (9th Cir. 2001)).

---

[12] *See also California v. Norton*, 311 F.3d at 11776 (oil leasing suspensions had "highly controversial environmental effects" precluding invocation of a CE when the effects were "the subject not only of scientific, but of public controversy"); *Jones v. Gordon*, 792 F.2d 821, 826-29 (9th Cir. 1986) (agency's invocation of CE was improper because public comments raising concerns about the effects of a permit to capture killer whales established public controversy); *cf. Western Watersheds*, 632 F.3d at 493 (finding a NEPA violation where the agency gave "short shrift to a deluge of concerns from its own experts," as well as concerns from outside experts).

1    **Second**, the FWS's own statements establish that the rule entails "highly uncertain and

2    potentially significant environmental effects or involve[s] unique or unknown environmental

3    risks." 43 C.F.R. § 46.215(d). The Service stated that "[i]n the case of managing eagle

4    populations in the face of energy development, there is *considerable uncertainty*." AR 2

5    (emphasis added), and that while eagles are "especially vulnerable to colliding with wind turbines

6    . . . *we are uncertain about the relative importance of different factors that influence that risk*"

7    and "*also uncertain which strategies would best mitigate the effects of wind energy developments*

8    *on raptors*." AR 2 (emphasis added). It was precisely because of such conceded uncertainty,

9    coupled with the Service's desire to "facilitate" wind energy expansion in eagle habitat in the face

10   of it, that the agency took the novel step of allowing wind projects to "experiment" with

11   "conservation" measures with no demonstrated ability to avoid or minimize eagle deaths. *Id.*

12   Hence, this is the paradigmatic case in which the agency's action involves "highly

13   uncertain" effects and "unique or unknown environmental risks." 43 C.F.R. § 46.215(d). Indeed,

14   Circuit precedent establishes that this level of uncertainty necessitates preparation of an EIS. *See*

15   *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) (EIS required where environmental effects of a

16   hunting quota directed at a small number of resident whales was uncertain and subject to

17   legitimate scientific dispute); *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 733 ("The Parks

18   Service's repeated generic statement that the effects are unknown does not constitute the requisite

19   'hard look' mandated by the statute if preparation of an EIS is to be avoided."). At minimum, the

20   Service's own description of the system it has developed for "experimenting" with the fate of two

21   iconic species so as to "enable[e] wind energy facilities to move forward in the meantime," AR 3,

22   demands preparation of an EA.

23   **Third**, by the same token, the rule "[e]stablishes a precedent for future action or

24   represent[s] a decision in principle about future actions with potentially significant environmental

25   effects." 43 C.F.R. § 46.215(e). While the Service admits that its reliance on "experimental"

26   ACPs is presently confined to the wind power industry, it has also concededly laid the

27   groundwork for "consider[ing] employing a similar process in developing permitting provisions

28   for other industries" in the future. AR 3. Such a substantial, if not radical, shift in regulatory

approach cannot be accomplished in the absence of NEPA compliance.  *See Citizens for Better Forestry*, 481 F. Supp. 2d at 1089 (finding that a CE could not be invoked where an agency rule "may establish a precedent for further action with significant effects").

**Fourth**, in various ways, the rule may have "significant impacts on such natural resources and unique geographic characteristics as *historic or cultural resources*; *park*, recreation, or refuge lands . . . *migratory birds*, and other ecologically significant or critical areas."  43 C.F.R. § 46.215(b) (emphasis added).  Bald and Golden Eagles are themselves "historic or cultural resources" of the utmost importance to the nation as a whole as well as numerous Native American Tribes and, as noted, many tribal representatives submitted comments explaining how the rule places their unique cultural interests in eagles at grave risk.  *See supra* at 9; AR 2330 (Inter-tribal Council of Arizona) ("extraordinary circumstances" exist because the rule "implicates protections for the religious, cultural, and historic concerns of Tribes," including those found in various statutes, regulations, and executive orders designed to safeguard tribal interests).  With regard to "park" resources, once again, the federal agency responsible for conserving national parks took the extraordinary step of submitting formal comments to its sister DOI agency warning that the rule threatens eagle populations that reside in national parks and use migratory corridors.  *See supra* at 9.  As for "migratory birds," not only are eagles themselves in that category (and thus protected by the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712, as well as BGEPA), but the rule's contemplated "facilitation" of wind power projects in eagle habitat will invariably impact myriad *other* migratory bird species that share eagle habitat and are also at risk from turbine collisions.  *E.g.,* AR 7808 (Ornithological Council) ("At Altamont, the estimate of raptor mortality between March 1998 and September 2002 *ranged from 1,127 raptors and 2,710 other birds to 2,227 raptors and 11,520 other birds by turbines alone.*") (emphasis added).

Multiple "extraordinary circumstances," therefore, foreclose invocation of a CE even if it otherwise could be deemed applicable.  The FWS was obligated "at the very least [to] explain why the action does not fall within one of the exceptions," *California*, 311 F.3d at 1117, but failed to provide any such explanation.  Rather, while acknowledging that numerous commenters had

pointed to "four different extraordinary circumstances" that arguably "apply in this case," the Service merely asserted that "[w]e have found that none apply [sic] to this final rule," without providing any additional explanation for that "finding." AR 11. That does not suffice under Circuit precedent. *See California*, 311 F.3d at 1175-76 (rejecting invocation of a CE where the agency had summarily concluded that no "extraordinary circumstances" were present).[13]

## C. THE FWS VIOLATED THE ENDANGERED SPECIES ACT BY FAILING TO ENGAGE IN SECTION 7 CONSULTATION

In issuing the rule, Defendants also violated section 7(a)(2) of the ESA, which requires that "[e]ach federal agency shall, in consultation with the FWS, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). If a federal action "may affect listed species or critical habitat," a process known as "formal consultation," culminating in a Biological Opinion, is required to determine whether the action will jeopardize a listed species or impair critical habitat. 50 C.F.R. § 402.14(a). The FWS is not relieved of this legal obligation when the Service itself is taking an action that "may affect a protected species"; rather, "[w]hen the action agency is the

---

[13] Still another reason why Defendants cannot sidestep NEPA review on the rule is that the CEQ regulations provide that "closely related" actions "should be discussed in the same impact statement,"40 C.F.R. § 1508.25(a)(1), and that an agency cannot avoid preparing an EIS by "breaking [an action] down into small component parts." 40 C.F.R. § 1508.27(b)(7); *see also Sierra Club*, 510 F.3d at 1028 ("NEPA[] prohibit[s] an agency from breaking up a large or cumulative project into smaller components in order to avoid designating the project a major federal action' that would be subject to NEPA analysis requirements") (internal quotation omitted). In adopting the final rule, the Service acknowledged that the permit duration issue is in fact "closely related" to the issues that are the subject of the pending ANPR, AR 10 (emphasis added) – and that *are* being subjected to NEPA review – and the FWS NEPA and BGEPA experts, including the rule's principal author, repeatedly urged that all revisions to the 2009 regulations be analyzed in a single NEPA document. *E.g.*, AR 1543 (agreeing with comments that the "decisions on issues set forth in the ANPR are prerequisites to any decision on permit duration and should be addressed concurrently"); AR 5241 (identifying ANPR issues that go "straight to the heart of what will be required under . . . the tenure rule"). Indeed, the "Service had initially planned to consider the issue of permit tenure as part" of the overall revision to the 2009 rule – which, consistent with the CEQ regulations, "would have allowed the implications of such long-term programmatic permits to be fully analyzed under NEPA," AR 297 – but then abandoned that course, principally because it would "[u]pset the wind industry." AR 1760 ("Options for Eagle Tenure Rule").

1  Service itself," as in this case, "it must engage in internal consultation under § 7" for the purpose

2  of ensuring that its own actions are not contributing to the loss of imperiled species or their critical

3  habitat.  *National Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1286 (E.D. Ca. 2000).

4       The Court of Appeals has instructed that the "threshold for triggering the [ESA] is

5  relatively low; consultation is required whenever a federal action '*may affect* listed species or

6  critical habitat.'" *Lockyer*, 575 F3d. at 1019 (quoting 50 C.F.R. § 402.14(a)) (emphasis added).

7  "'Any possible effect, whether beneficial, benign, adverse or of an undetermined character,

8  triggers the formal consultation requirement . . . .'" *Lockyer*, 575 F.3d at 1018 (quoting 51 Fed.

9  Reg. 19,949 (June 3, 1986)).  This low "may affect" standard is satisfied here since many ESA-

10  protected species share the same habitat as eagles and thus may be affected by the expansion of

11  industrial wind projects in eagle habitat that the rule seeks to foster.[14]  Yet the FWS refused to

12  engage in any section 7 consultation, *see* AR 19, in violation of the ESA.  *See Lockyer*, 575 F.3d

13  at 1019 (where a regulation might result in increased activity in roadless areas occupied by listed

14  species, the agency was obligated to engage in ESA consultation); *see also Karuk Tribe of*

15  *California v. U.S. Forest Service*, 681 F.3d 1006, 1027-28 (9th Cir. 2012) (applying "may affect"

16  standard to require consultation); *Western Watersheds*, 632 F.3d at 496 (same).

## CONCLUSION

18       For the foregoing reasons, the Court should set aside and remand the rule to the FWS.[15]

---

20  [14]  *E.g.*, AR 11825 (Draft Information Memorandum from the FWS Director to the Interior
21  Secretary) (the "potential costs" of expanded renewable energy projects "include the loss of
habitat for endangered species"); AR 195 (2009 EA) (issuance of Eagle Act permits "will
indirectly result in impacts to habitat from loss, fragmentation, and reduced suitability for eagles
22  *and other wildlife*") (emphasis added); AR 7727 (comments raising concerns about the impact of
the rule on endangered Whooping Cranes and California Condors); AR 2327 (the "new 30-year
23  programmatic take permits, and the development of wind energy and other projects they will
facilitate, will impact the fabric of countless natural ecosystems").

25  [15]  The rule is also arbitrary and capricious because the FWS failed to explain the reversal of its
prior position that permits issued for longer than five years would not be consistent with BGEPA.
However, because  Defendants' compliance with NEPA and/or Section 7 of the ESA will result in
26  an expanded record and, potentially, a revised approach to the tenure issue, the Court need not
address this additional basis for setting aside the rule.  *See Cal. Wilderness Coal.*, 631 F.3d at
27  1106 (vacatur and remand on NEPA grounds made it unnecessary to resolve other issues).

1    **DATED**: March 31, 2015          Respectfully submitted,

2                                       */s/* Eric R. Glitzenstein_____
                                        Eric Glitzenstein, DC Bar No. 358287
3                                       (admitted *pro hac vice*)
                                        *eglitzenstein@meyerglitz.com*
4                                       William S. Eubanks II, DC Bar No. 987036
                                        (admitted *pro hac vice*)
5                                       *beubanks@meyerglitz.com*
                                        Caitlin Zittkowski, CA Bar No. 290108
6                                       *czittkowski@meyerglitz*.com

7                                       MEYER GLITZENSTEIN & CRYSTAL
                                        1601 Connecticut Ave., N.W., Suite 700
8                                       Washington, DC 20009
                                        Telephone: (202) 588-5206
9                                       Facsimile: (202) 588-5049

10                                      Attorneys for Plaintiffs DEBRA
11                                      SHEARWATER, STEPHEN A. THAL,
                                        MICHAEL DEE, DR. CAROLYN
12                                      CROCKETT,  ROBERT M. FERRIS,
                                        and AMERICAN BIRD CONSERVANCY
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

I, Caitlin Zittkowski, hereby certify that on March 31, 2015, I electronically filed the

3

foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

4

such filing to all counsel of record.

5

I declare under penalty of perjury that the foregoing is true and correct.

6

7

8

/s/Caitlin Zittkowski_____
Caitlin Zittkowski

9

*czittkowski@meyerglitz.com*

10

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700

11

Washington, DC 20009
Telephone: (202) 588-5206

12

Facsimile: (202) 588-5049

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28