1  MEYER GLITZENSTEIN & CRYSTAL
   Eric Glitzenstein, DC Bar No. 358287 (admitted *pro hac vice*)
2     *eglitzenstein@meyerglitz.com*
   Caitlin Zittkowski, CA Bar No. 290108
3     *czittkowski@meyerglitz.com*
   William S. Eubanks II, DC Bar No. 987036 (admitted *pro hac vice*)
4     *beubanks@meyerglitz.com*
   1601 Connecticut Ave., N.W., Suite 700
5  Washington, DC 20009
   Telephone: (202) 588-5206
6  Facsimile: (202) 588-5049

7  Attorneys for Plaintiffs DEBRA
   SHEARWATER, STEPHEN A. THAL,
8  MICHAEL DEE, DR. CAROLYN
   CROCKETT,  ROBERT M. FERRIS,
9  and AMERICAN BIRD CONSERVANCY

10                 **UNITED STATES DISTRICT COURT FOR THE**
11                    **NORTHERN DISTRICT OF CALIFORNIA**
                              **San Jose Division**
12  _____
13  DEBRA SHEARWATER, STEPHEN A. THAL,   )
    MICHAEL DEE, DR. CAROLYN CROCKETT,   )
14  ROBERT M. FERRIS, and AMERICAN BIRD  )
    CONSERVANCY,                         )
15                                       )
           Plaintiffs,                   )
16                                       )
              v.                         )    Civ. No. 5:14-cv-02830-LHK
17                                       )
    DAN ASHE, Director, United States Fish and  )  Hearing Date: July 23, 2015
18  Wildlife Service; SALLY JEWELL, Secretary,   )  Time: 1:30 PM PST
    United States Department of the Interior,    )  Hon. Lucy H. Koh
19                                       )
           Defendants,                   )
20                                       )
                                         )
21  and                                  )
                                         )
22  AMERICAN WIND ENERGY               )
    ASSOCIATION                          )
23                                       )
                                         )
24  _____ Defendant-Intervenor. _____)
25
26            **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDERAL**
           **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN**
27          **SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
28

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.      PLAINTIFFS HAVE STANDING  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Plaintiffs' Procedural Injury Claims Are Sufficient For Standing.  . . . . . . . . . . . 3

        B.      Defendants' Objections To Plaintiffs' Procedural Injury Claims Are Baseless.  . . 7

        C.      ABC Also Has Organizational Standing In Its Own Right  . . . . . . . . . . . . . . . . . 11

II.     THE FWS VIOLATED NEPA BY INVOKING A CATEGORICAL EXCLUSION
        FOR A RULE CHANGE DESIGNED TO IMPACT THE ENVIRONMENT.  . . . . . . . 13

        A.      The FWS Must Take A "Hard Look" At The Rule's Impacts. . . . . . . . . . . . . . . 13

        B.      The CE Invoked By The FWS Does Not Apply. . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.      "Extraordinary Circumstances" Preclude Invocation Of A CE  . . . . . . . . . . . . . 21

III.    THE FWS VIOLATED SECTION 7 OF THE ESA.  . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

1

2      **CASES**                                                                    **PAGE**

3      *Alaska Ctr. for the Env't v. U.S. Forest Service*,
4          189 F.3d 851 (9th Cir. 1999) ............................................................... 18

5      *Animal Legal Def. Fund v. The Great Bull, LLC*,
           No. 14-cv-01171-MEJ, 2014 WL 2568685 (N.D. Cal. June 6, 2014) ......................... 12, 13
6
       *Animal Legal Def. Fund v. Glickman*,
7          154 F.3d 426 (D.C. Cir. 1998) ........................................................... 6, 8

8      *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*,
           767 F.3d 781 (9th Cir 2014) ............................................................. 3, 4
9
       *California ex rel. Lockyer v. U.S. Dep't of Agric.*,
10         575 F.3d 999 (9th Cir. 2009) ............................................................. 10

11     *Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
           631 F.3d 1072 (9th Cir. 2011) ...................................................... 19, 20, 21
12
       *California v. Norton*,
13         311 F.3d 1162 (9th Cir. 2002) ........................................................... 21

14     *Catron Cnty. Bd. of Comm'rs, N.M. v. U.S. Fish and Wildlife Serv.*,
           75 F.3d 1429 (10th Cir. 1996) ............................................................ 2
15
       *Citizens for Better Forestry v. U.S. Department of Agriculture*,
16         341 F.3d 961 (9th Cir. 2003) ............................................................. 9

17     *Citizens to Preserve Overton Park v. Volpe*,
           401 U.S. 402 (1971) ..................................................................... 14
18
       *Clapper v. Amnesty Int'l USA*,
19         133 S. Ct. 1138 (2013) .................................................................. 10

20     *Coho Salmon v. Pac. Lumber Co.*,
           61 F. Supp. 2d 1001 (N.D. Cal. 1999) ..................................................... 6
21
       *Ctr. for Biological Diversity v. U.S. Dep't of HUD*,
22         541 F. Supp. 2d 1091 (D. Ariz. 2008) .................................................... 25

23     *Duke Power Co. v. Carolina Envtl. Study Group. Inc.*,
           438 U.S. 59 (1978) ....................................................................... 8
24
       *El Dorado Estates v. City of Fillmore*,
25         765 F.3d 1118 (9th Cir. 2014) ........................................................... 12

26     *Envtl. Info. Ctr. v. Stone-Manning*,
           766 F.3d 1184 (9th Cir. 2014) ........................................................... 11
27
       *Envtl. Prot. Info. Ctr. v. Blackwell*,
28         389 F. Supp. 2d 1174 (N.D. Cal. 2014) ................................................... 2

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ............................................................................................ 11

*Humane Soc'y of U.S. v. Locke,*
   626 F.3d 1040 (9th Cir. 2010) ........................................................................... 14

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
   478 U.S. 221 (1986) .............................................................................................. 8

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
   681 F.3d 1006 (9th Cir. 2012) ( .................................................................... 3, 25

*Kern v. U.S. Bureau of Land Mgmt.,*
   284 F.3d 1062 (9th Cir. 2002) ........................................................................... 10

*Laub v. U.S. Dep't of the Interior,*
   342 F.3d 1080 (9th Cir. 2003) ........................................................................... 10

*Los Padres Forestwatch v. U.S. Forest Serv.,*
   776 F. Supp. 2d 1042 (N.D. Cal. 2011) .................................................. 16, 18, 21

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .............................................................................................. 3

*MedImmune, Inc. v. Genetech, Inc.,*
   549 U.S. 118 (2007) ............................................................................................ 11

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) .............................................................................................. 8

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726 (1988) ............................................................................................ 10

*Pac. Rivers v. Thomas,*
   30 F.2d 1050 (9th Cir. 1994) ............................................................................. 25

*Res. Ltd. v. Robertson,*
   35 F.3d 1300 (9th Cir. 1993) ............................................................................... 9

*Sierra Club v. Babbitt,*
   65 F.3d 1502 (9th Cir. 1995) ............................................................................. 15

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) ................................................................................................ 8

*Smith v. Pac. Properties & Dev. Corp.,*
   358 F.3d 1097 (9th Cir. 2004) ........................................................................... 11

*Alaska v. Andrus,*
   591 F.2d 537 (9th Cir. 1979) ............................................................................. 15

*Summers v. Earth Island Institute,*
   555 U.S. 488 (2009) ............................................................................................ 10

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134(9th Cir. 2000) .................................................................. 11

*United States v. Dion*,
    476 U.S. 734 (1986) .................................................................. 23

*United States v. Vasquez-Ramos*,
    531 F.3d 987 (9th Cir. 2008) .................................................................. 23

*Valle Del Sol, Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) .......................................................... 12, 13

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*,
    435 U.S. 519 (1978) .................................................................... 2

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................. 11

*W. Watersheds Proj. v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ............................................... 9, 10, 16, 17

*Wilderness Society v. Rey*,
    622 F.3d 1251 (9th Cir. 2010) .............................................................. 10


**STATUTES**

16 U.S.C. §§ 668-668d ........................................................................ 1

16 U.S.C. §§ 703-712 ........................................................................ 20

16 U.S.C. § 1536 ........................................................................ 1

42 U.S.C. §§ 4321-4370f ........................................................................ 1

42 U.S.C. § 4332 ........................................................................ 19

42 U.S.C. § 4332(E) ........................................................................ 20

44 U.S.C. §§ 3501-3521 ........................................................................ 19


**REGULATIONS**

79 Fed. Reg. 19974 (April 10, 2014) ........................................................... 24

79 Fed. Reg. 69192 (Nov. 20, 2014) ........................................................... 24

79 Fed. Reg. 73706 (Dec. 11, 2014) ........................................................... 24

80 Fed. Reg. 17974 (April 2, 2015) ........................................................... 24

80 Fed. Reg. 24955-56 (May 1, 2015) ........................................................... 9

80 Fed. Reg. 26832 (May 11, 2015) ............................................................... 24

80 Fed. Reg. 30032 (May 26, 2015) ............................................................... 20

40 C.F.R. § 1506.6 ...................................................................................... 16

40 C.F.R. § 1508.27(b)(1) ............................................................................ 2

43 C.F.R. § 46.210(i) ............................................................................ 18, 20

43 C.F.R. § 46.215(b) ................................................................................ 23

43 C.F.R. § 46.215(c) ................................................................................ 21

43 C.F.R. § 46.215(d) ............................................................................... 22

43 C.F.R. § 46.215(e) ............................................................................... 22

50 C.F.R. § 13.28 ...................................................................................... 16

50 C.F.R. § 402.02 .................................................................................... 25

50 C.F.R. § 402.14(a) ................................................................................. 2

1    The narrow, albeit crucial, issue in this case is whether the Defendant Fish and Wildlife

2   Service ("FWS") must at least *analyze* the potential impacts of the thirty-year eagle take rule

3   pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and

4   section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.  Because the rule is

5   expressly *designed* to have a significant impact on the environment by encouraging the

6   development of wind power and other projects in the habitat of bald and golden eagles – species

7   protected by the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. §§ 668-668d –

8   FWS's invocation of a Categorical Exclusion ("CE") to avoid preparation of an Environmental

9   Impact Statement ("EIS") or even a more limited Environmental Assessment ("EA") is contrary to

10  law and arbitrary and capricious.  Nor did Defendants analyze, at all, the potential effects of the

11  rule on endangered and threatened species that share the same habitat as eagles.

12    In 2009, the FWS concluded that the maximum duration of BGEPA permits must be

13  limited to five years to safeguard bald and golden eagles.  The *only* thing that has changed since

14  then is that wind power industry said that it needed thirty-year permits and the FWS acceded

15  without even analyzing the impact of that change in accordance with NEPA and the ESA.  The

16  Federal Defendants do *not* dispute that the new rule was intended to affect the environment by

17  accommodating the desires of the wind power industry.  To the contrary, Defendants concede that

18  the purpose of the rule was to "***encourage applications for permits***" to kill or otherwise "take"

19  bald and golden eagles, "by extending the permit term in the Take Rule ***to better match the***

20  ***operating lifetime of wind-energy facilities***."  Def. Mem. at 7 (emphasis added).[1]

21    Defendants' belief that this highly controversial policy change – opposed by the FWS's

22  own experts as well as the National Park Service ("NPS"), environmental and wildlife protection

23  groups, and Native American tribes – "will facilitate the *responsible* development of renewable

24  energy" in eagle habitat, *id*. (quoting AR 1), cannot justify Defendants' failure to take a "hard

25

26  _____

27  [1]   The brief of the American Wind Power Association ("AWEA") largely reiterates the
    government's arguments.  To the limited extent that it does not, Plaintiffs are today also filing a
    separate opposition to AWEA's arguments.

28

1   look" – or *any* look – at the *impacts* of the rule change in a NEPA document or in section 7

2   consultation.  As explained in Plaintiffs' opening brief (with no rebuttal from Defendants), the

3   Council on Environmental Quality ("CEQ") regulations implementing NEPA instruct that

4   environmental impacts necessitating preparation of an EIS may be "both beneficial and adverse,"

5   and that a "significant effect may exist *even if the Federal agency believes that on balance the*

6   *effect will be beneficial.*"  40 C.F.R. § 1508.27(b)(1) (emphasis added).  Hence, courts do not

7   excuse agencies from preparing NEPA documents on the basis of their policy preferences.[2]

8   Likewise, the section 7 process must be invoked for any federal agency action that "*may* affect

9   listed species or critical habitat" in any manner.  50 C.F.R. § 402.14(a) (emphasis added).

10          In short, Defendants' assertion that they adopted the rule to facilitate the "responsible

11   development" of wind power projects in bald and golden eagle habitat, and to "strik[e] a balance

12   between providing certainty to project proponents and protecting eagles," AR 9 (final rule), fails to

13   absolve Defendants of the obligation to analyze impacts under NEPA and section 7*,* and instead

14   does the opposite; it establishes that these legal requirements *must* be satisfied for a policy

15   decision of this magnitude.  NEPA "place[s] upon an agency the obligation to consider every

16   significant aspect of the environmental impact" of a policy choice, *Vt. Yankee Nuclear Power*

17   *Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553 (1978), and to do so *"*as part of the

18   agency's process of deciding whether to pursue a particular action."  *Balt. Gas and Elec. Co.*, *v.*

19   *Natural Res. Def. Council*, 462 U.S.87, 100 (1983).  Similarly, a central function of ESA section

20   7's consultation mandate is to ensure, with regard to "any discretionary action that may affect a

21   listed species or critical habitat," that agencies take those impacts into consideration *before* taking

22   _____

23   [2]  *See, e.g.*, *Catron Cnty. Bd. of Comm'rs, N.M. v. U.S. Fish and Wildlife Serv.*, 75 F.3d 1429,
     1437 (10th Cir. 1996) ("[T]hat the Secretary believes the effects of a particular designation to be

24   beneficial is equally immaterial to his responsibility to comply with NEPA.  '[E]ven if the Federal
     agency believes that on balance the effect [of the action] will be beneficial,' regulations

25   promulgated by the [CEQ] nonetheless require an impact statement.") (quoting 40 C.F.R. §
     1508.27(b)(1)); *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1197 (N.D. Cal. 2014)

26   ("This argument is, in essence, that the benefits of the [agency action] will outweigh any adverse
     effects.  The problem with this argument is that, '[a] significant effect may exist even if the

27   Federal agency believes that on balance the effect will be beneficial.'") (quoting 40 C.F.R. §
     1508.27(b)(1)).

28

1  such action.  *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en

2  banc).

3      Accordingly, the Court should vacate and remand the rule for compliance with the

4  mechanisms that Congress established for agency decisions of this kind.  Initially, however,

5  Plaintiffs will explain why Federal Defendants' standing objection is groundless.

6  **I.      PLAINTIFFS HAVE STANDING**

7      To establish standing, a plaintiff must (1) suffer an "injury in fact"; (2) there "must be a

8  causal connection between the injury and the conduct complained of"; and (3) the "injury has to be

9  fairly . . . traceable to the challenged action of the defendant . . . ."  *Lujan v. Defenders of Wildlife*,

10  504 U.S. 555, 561 (1992) (internal quotation omitted).  At the summary judgment stage, the

11  plaintiff "must set forth by affidavit or other evidence specific facts . . . which for purposes of the

12  summary judgment motion will be taken to be true."  *Id.* (internal quotation omitted).  The Court

13  "need not address the standing of each plaintiff if [the Court] conclude[s] that any plaintiff has

14  standing."  *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the*

15  *Interior*, 767 F.3d 781, 789 (9th Cir 2014).  Here, Plaintiffs have filed six standing Declarations,

16  which are more than sufficient to establish standing under applicable precedents.

17      **A.      Plaintiffs' Procedural Injury Claims Are Sufficient For Standing.**

18      Where, as here, Plaintiffs contend that the FWS has violated procedural obligations under

19  NEPA and the ESA, Plaintiffs can establish injury in fact so long as they can demonstrate that the

20  violation "could impair a separate concrete interest of theirs," *Defenders of Wildlife*, 504 U.S. at

21  572 – such as a concrete interest in wildlife observation.  *Id.* at 562-63 ("Of course, the desire to

22  use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable

23  interest for purposes of standing.").  Further, the Supreme Court has held that a plaintiff with a

24  "concrete interest" can complain about an agency's failure to comply with a required procedure,

25  such as the failure to prepare an EIS, "*without meeting all the normal standards for redressability*

26  *and immediacy*" that would otherwise apply, *id.* at 573 n.7 (explaining that someone who may be

27  harmed by a federally licensed dam "has standing to challenge the licensing agency's failure to

28  prepare an [EIS], even though he cannot establish with any certainty that the statement will cause

the license to be withheld or altered, and *even though the dam will not be completed for many years*") (emphasis added).[3]

Plaintiffs have met these requirements.  For example, Plaintiff Debra Shearwater, a resident of Hollister in Benito County, California and a member of Plaintiff American Bird Conservancy ("ABC"), explains that she has been observing golden eagles since moving to California in 1976 and that she "purchased [her] current home specifically to observe Golden Eagles on a near-daily basis."  ECF No. 52-1 ¶ 2.  She also states:

> I have enjoyed observing eagles throughout the region, particularly during my regular relaxation drives through Santa Ana Valley . . . I also document and track nesting pairs of Golden Eagles throughout the region.  In 2004, I discovered the first-ever breeding Bald Eagles in San Benito County, just seven miles from my home.  Ever since, I have reported annually to the local Bald Eagle expert regarding the pair's nesting success . . . In addition, I have recently documented nesting Bald Eagles at Hernandez Reservoir, San Felipe Lake, the Gabilan Mountains, and very likely San Justo Reservoir, all of which are within San Benito County.

*Id.* ¶ 3.  Ms. Shearwater further explains that "[i]n addition to Bald and Golden Eagles, I also enjoy observing other animal species whose habitats overlap with those of eagles" and that are protected by the ESA, such as the "San Joaquin Kit Fox, the Blunt-Nosed Leopard Lizard, the Giant Kangaroo Rat, and the California Condor."  *Id.* ¶ 5.

Ms. Shearwater's Declaration also explains that, insofar as the thirty-year take rule is "expressly intended to encourage the development of wind energy and other renewable energy projects in areas occupied by eagles, by providing these projects with eagle 'take' permits lasting up to three decades . . . including in California, this will significantly impair [her] ability to observe, enjoy, and study these beautiful creatures in the wild," *id.* ¶ 6.  The rule is "also likely to impair [her] ability to observe and enjoy federally endangered species whose habitats overlap with

---

[3]  *See also California ex rel. Imperial Cty. Air Pollution Control Dist.*, 767 F.3d at 789-90 (a plaintiff asserting a violation of a required procedure need only establish that the agency "violated procedural rules designed to protect their concrete interests, and that the challenged action will threaten those interests"); *id.* ("For procedural rights, 'our inquiry into the imminence of the threatened harm is less demanding.'") (internal quotation omitted).

that of bald and golden eagles and that will be adversely affected by the expansion of industrial activities in eagle habitat that the rule is intended to encourage." *Id.* ¶ 7.

Ms. Shearwater's declaration also details how the FWS's NEPA violations threaten her concrete interests in eagles:

> [t]he FWS's promulgation of the thirty-year eagle take rule without any review of the rule's environmental impacts under NEPA – through preparation of an [EIS] or at least an [EA] – is extremely detrimental to my interests in enjoying, observing, and studying eagles.  Such NEPA review would at least be required to analyze the potential cumulative effects on eagles of facilitating and encouraging the expansion of wind power and other projects in eagle habitat, as well [as] consider alternatives to the FWS's ill-advised decision to dramatically increase the duration of BGEPA permits notwithstanding the Service's admission that there is a dearth of crucial information, particularly with regard to the status and vulnerability of golden eagle populations.  An appropriate NEPA analysis would compel the FWS to compile and analyze additional information, which would be of great value to me and others who derive tremendous benefits from eagles, and who also endeavor to study and advocate for them.

*Id.* ¶ 10; *see also id.* ¶ 8 (the rule "also eliminates my opportunity to participate in permit renewal processes for wind power and other major projects that will kill or otherwise harm eagles"; "authorizing BGEPA permits to be issued for three decades directly and irreparably undermines my ability to effectively and meaningfully advocate for eagles and eagle populations (and other wildlife) in areas I regularly visit").  As for ESA-listed species, Ms. Shearwater's Declaration states that "because the FWS refused to engage in any ESA section 7 consultation analyzing the potential impacts of the rule on ESA-listed species and their dwindling habitats, the rule is very likely to adversely affect [her] recreational and other concrete interests" in the California Condor and the other ESA-protected species whose habitats overlap with those of eagles.  *Id.* ¶ 7.

The other individual plaintiffs, who are also avid naturalists and members of ABC with longstanding recreational, professional, and other concrete interests in eagles, likewise document in their declarations how the rule threatens those interests.[4]  In turn, the Declaration submitted by

---

[4]  *See* Declaration of Michael Dee (ECF No. 52-4)  ¶¶ 2-4 (explanation by the former General Curator of the Los Angeles Zoo that he has "had the opportunity to work with a number of species of eagles," including bald and golden eagles," that he now "spend[s] a considerable amount of time observing eagles and other bird species during [his] personal travels," and that the rule will (footnote continued)

ABC's Vice President for Conservation Advocacy explains that the rule impairs the interests of these and other ABC members "by encouraging the development of industrial wind power and other projects in areas occupied by Bald and Golden Eagles" as well as ESA-protected species. Declaration of Darin C. Schroeder (ECF No. 52-2) ¶ 5; *id.* ¶ 6 ("[w]ind power projects built in eagle habitat have been documented as being highly dangerous to eagles, with confirmed deaths at various projects throughout the country, including in California"); *id.* ¶¶ 7, 12 ( the "expansion of industrial wind power projects in eagle habitat, as anticipated and encouraged by the rule, will also adversely affect other species that share the habitat of eagles and that ABC members observe and study for recreational purposes and professional reasons," including the "California Condor, the Lesser Prairie Chicken, and Sprague's Pipit").[5]

_____

"result in substantial industrial projects within eagle habitat, causing the loss of a significant number of bald and golden eagles and impairing eagle populations, thus harming [his] ability to observe and enjoy" eagles, "including in the specific areas in which [he and his] family have enjoyed observing eagles for many years"); Declaration of Carolyn Crockett, PhD (ECF No. 52-3) ¶¶ 2-5 (explaining that she has studied eagles and routinely sees them in her "Seattle neighborhood of Haller Lake and in surrounding communities in the Puget Sound region," that bald eagles are her favorite bird to see in the wild, and that the rule impairs her "concrete interests in Bald and Golden Eagle conservation by effectively eliminating [her] ability and the ability of conservation organizations [she] support[s] to participate and comment in the permit renewal process and, thus, [her] opportunity to advocate on behalf of eagles"); Declaration of Stephen A. Thal (ECF No. 52-5) at ¶¶ 1-4 (explanation by resident of Kentfield, California, who has served on the boards of Audubon Canyon Ranch and the Point Reyes Bird Observatory, that "[e]very year for the past thirty years, [he has] taken friends to the Sacramento Refuge near Willows, California, to observe eagles and other birds during the winter months," a practice he will "continue as long as [he is] able," that he also "observe[s] Bald and Golden Eagles in the Lake Tule Refuge, the Lower Klamath Refuge, and the Upper Klamath Refuge on the border of California and Oregon," and that the thirty-year eagle take rule will "inevitably harm [his] interests in observing eagles by resulting in the killing and injuring of individual eagles and by jeopardizing eagle populations in locations where [he has] observed eagles for many years"); Declaration of Robert M. Ferris (ECF No. 52-6) ¶¶ 1-4 (explanation by professional wildlife biologist, who has enjoyed observing eagles "for more than forty years" and who "regularly observe[s] eagles from the rear deck of [his] house" in Bellingham, Washington," that the rule is "likely to adversely impact [his] recreational activities and eagle watching," and that the rule "eliminates the opportunity for the public to have meaningful input into whether permits should be maintained, modified, or revoked").

[5]   That Defendants disagree with Plaintiffs' arguments concerning the rule has no bearing on Plaintiffs' standing. *See Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998) (en banc) ("A party need not *prove* that the agency action it attacks is unlawful . . . in order to have standing to level that attack.") (internal quotation omitted) (emphasis in original); *Coho Salmon v. Pac. Lumber Co.*, 61 F. Supp. 2d 1001, 1013 (N.D. Cal. 1999) ("Whether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits.") (citing *Glickman*, 154 F.3d at 441).

**B.     Defendants' Objections To Plaintiffs' Procedural Injury Claims Are Baseless.**

In arguing that none of the Plaintiffs has standing, Defendants not only largely disregard Plaintiffs' Declarations, but they also ignore controlling Circuit precedent as well as their own oft-stated rationale for the rule.  Defendants assert that "Plaintiffs merely speculate that the Tenure Amendment – as opposed to the original Take Rule – *might* encourage development of wind projects," Def. Mem. at 12 (emphasis added).  But the very *purpose* of the rule, as stated in the final rule's preamble and repeated at every step in the process leading to its issuance, is to "*facilitate the development of renewable energy and other projects that are designed to be in operation for many decades*" in eagle habitat, by removing an "*impediment for activities or projects that will last more than 5 years.*"  AR 5, 18 (final rule) (emphasis added); *see* Plaintiffs' Opening Memorandum ("Pl. Mem.") at 15 n.8 (collecting record citations).

Lest there be any remaining doubt about whether the wind power industry itself regards the rule as paving the way for a plethora of new projects in eagle habitat that otherwise would not come to fruition, it is dispelled by the Declaration submitted by intervenor AWEA when it moved for party status.  The Declaration states that "AWEA and its members believe that this extension" – i.e., "extend[ing] the maximum duration of a programmatic permit for the incidental take of eagles from five (5) to thirty (30) years" – "*is necessary for the future of wind energy development*" in areas occupied by eagles.  ECF No. 33-1 (Declaration of John M. Anderson) ¶¶ 6, 7 (emphasis added).  AWEA's declarant further explains that "*[b]ecause occasional, unintentional eagle mortality is an unavoidable reality for wind energy facilities*" constructed in eagle habitat:

> AWEA's member's [sic] financing of projects, which are in service for well over five years *would be severely threatened* without a guarantee of renewal of projects for a term greater than five years and/or significantly changed permit conditions upon renewal if granted.  *The current Eagle Permit Tenure Rule has materially decreased the uncertainty facing wind energy facilities that may occasionally result in eagle fatalities, because it gives developers more long-term certainty that a wind energy facility will retain permit authorization throughout its serviceable life.*  In addition, the Eagle Permit Tenure Rule reduces the possibility that a facility might face unanticipated mitigation costs late in its life after the facilities' economics have been fixed.

*Id.* ¶ 9 emphasis added).

It is understandable that the wind power industry desires decades-long environmental permits and the "materially decreased" uncertainty that goes along with them. *Id*. ¶ 9. Indeed, the industry's interest in expanding in places where bald and golden eagles will "unavoidabl[y]" be killed by wind turbines, *id*. ¶ 7 (emphasis added) – a criminal violation of federal law without a BGEPA permit – is what indisputably prompted adoption of the rule, and also what afforded AWEA a sufficiently concrete interest to intervene in this case. On the other side of the coin, those with concrete interests in observing, studying, and otherwise enjoying bald and golden eagles – and whose interests are therefore placed at grave risk *by the very same regulatory change* for which the industry argued so vociferously – must have Article III standing to press their claims of noncompliance with essential procedural safeguards embodied in NEPA and the ESA. *See Monsanto Co v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010) (organic farmers had standing to assert a NEPA violation in connection with the government's deregulation of genetically altered alfalfa because they sought to "avert the risk of gene flow to their crops"); *cf. Duke Power Co. v. Carolina Envtl. Study Group. Inc.*, 438 U.S. 59, 74 (1978) (holding that plaintiffs had standing to challenge the constitutionality of a statute that was designed to facilitate the construction of nuclear power plants that, if built, would emit "non-natural radiation into [their] environment").[6]

Equally untenable is Defendants' contention that Plaintiffs cannot establish standing without pointing to a "specific project that was planned for an area that they used." Def. Mem. at

---

[6] Defendants' implication that Plaintiffs lack standing because the rule under challenge "only allow[s] an operator a defense to liability should operations of a facility 'take' an eagle," Def. Mem. at 12, is a non-starter, especially in view of AWEA's concession (and the administrative record's confirmation) that unpermitted projects built in eagle habitat will "unavoidably" kill eagles in violation of federal law. "Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, *if that conduct would allegedly be illegal otherwise*." *Glickman*, 154 F.3d at 440 (emphasis added) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 n.25 (1976); *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 231 n.4 (1986)). Because the government concedes that project operators need a "defense to liability" when their projects kill or otherwise "take" eagles – i.e., that such conduct would be unlawful in the absence of the authorization the thirty-year take rule was created to provide – it necessarily follows that those whose interests are directly threatened by that action have standing to challenge its legality. *Id*.

12.  Indeed, that precise argument has been soundly and repeatedly rejected by the Court of Appeals in the context of procedural injury claims such as those pressed by Plaintiffs here.[7]

In *Citizens for Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961 (9th Cir. 2003),  the plaintiffs challenged a new national forest management policy based on claims that the Forest Service had failed to comply with the procedural requirements of NEPA and the ESA. Although the plaintiffs, as here, had submitted "numerous affidavits" identifying specific locations where they "observe nature and wildlife," and they alleged that these places would be subjected to "added risk" by virtue of the agency's failure to comply with NEPA and the ESA, the government contended that the plaintiffs could not challenge the rule because its "environmental impact is indirect" and would not be felt until it was implemented through the development of further "site-specific" decision documents.  *Id*. at 971-73.

The Court of Appeals dismissed that argument, reasoning that "[o]ur precedent compels us to conclude otherwise," *id*. at 973, and that in a procedural injury case like this one the "imminence or lack thereof of site-specific action is simply a factual coincidence, rather than a basis for legal distinction," *id*. at 977.  The court explained that, in a series of cases, the Ninth Circuit had established that plaintiffs with concrete interests in wildlife observation and enjoyment of nature who sought to challenge regulations or other broad agency planning documents on the grounds that the agency had violated NEPA or other required procedures did *not* need to "'point to the precise area . . . where the injury will occur.'"  *Id*. at 974 (quoting *Res. Ltd. v. Robertson*, 35 F.3d 1300, 1303 (9th Cir. 1993)); *see also W. Watersheds Proj. v. Kraayenbrink,* 632 F.3d 472, 484-85 (9th Cir. 2011) (the plaintiff had standing to bring NEPA and ESA section 7 claims challenging agency regulations that "decreased public involvement in public lands management,"

_____

[7]  The factual premise of Defendants' argument is also wrong since, in reliance on the thirty-year take rule, projects are *already* being "planned" that will affect eagles in the areas Plaintiffs use for eagle observation, study, and enjoyment.  For example, six days before Defendants filed their brief, the FWS published in the Federal Register a notice that Pacific Gas and Electric Company is pursuing a "30-year programmatic eagle take permit for take of bald and golden eagles" for a vast area encompassing fifty-four counties in California, including San Benito County, *see* 80 Fed. Reg. 24955-56 (May 1, 2015), where Ms. Shearwater regularly observes, studies, and otherwise enjoys eagles as well as ESA-listed species that share eagle habitat.  *See supra* at 4-5.

although the regulations had not yet been applied to any specific parcels of concern to the plaintiffs); *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003) (plaintiffs had standing to challenge a proposed plan and programmatic EIS regarding the management of California Bay-Delta water resources; "when, as here, a procedural violation is the injury alleged, the requirements of immediacy of the threatened harm are relaxed . . . . Thus, the fact that Plaintiff cannot show immediate harmful action will be taken based on the allegedly defective EIS is not fatal to establishing standing").[8]

Consistent with these rulings, the Supreme Court has declared that individuals who would otherwise have standing to sue and who are therefore "injured by a failure to comply with the NEPA procedure *may complain of that failure at the time the failure takes place*, for the claim can never get riper." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1988) (emphasis added). That reasoning has been expressly adopted by the Court of Appeals in holding that where, as here, an agency has purportedly failed to comply with NEPA or section 7 of the ESA in the course of making a programmatic decision that threatens the interests of the plaintiffs, such a dispute is "ripe for adjudication" without awaiting site-specific application. *Kraayenbrink*, 632 F.3d at 486; *see also California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1011 (9th Cir. 2009) (the plaintiffs could pursue an immediate NEPA-based challenge to a nationwide regulation governing the process for protecting roadless areas because the "plaintiffs are taking advantage of what may be their only opportunity to challenge the [rule] on a nationwide, programmatic basis"); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002) ("Because the plaintiffs here

---

[8]  The cases cited by Defendants are readily distinguishable.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) implicated no procedural injury claim but, rather, involved a substantive challenge to government surveillance activities resting on a "highly attenuated chain of possibilities." *Id*. at 1147.  In *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the only individual who submitted a declaration specifying how a Forest Service regulation that limited public involvement might affect his concrete interests – which the government conceded "*was* sufficient to establish Article III standing" – had "settled" his claims, thus eliminating the "injury in fact" that would have supported the asserted procedural injury, *id*. at 494 (emphasis added). And in *Wilderness Society v. Rey*, 622 F.3d 1251 (9th Cir. 2010), the only individual who had submitted a declaration could assert only "[p]ast injury" and did "not allege that his future enjoyment [was] in any way threatened" by the agency action, *id*. at 1256-57.

bring a NEPA challenge to an EIS . . . they are able to show an imminence of harm to the

plaintiffs").[9]

### C.      ABC Also Has Organizational Standing In Its Own Right

Although the procedural injury asserted by the individual Plaintiffs and by ABC on behalf

of its members makes it unnecessary for the Court to go any further in its standing analysis,

ABC's Declaration establishes another, distinct injury.  In addition to suing on behalf of its

members, an organization may have standing to sue "in its own right."  *Warth v. Seldin*, 422 U.S.

490, 511 (1975).  Where an organization is compelled to expend resources to counteract the

allegedly unlawful practices of the defendant, "[s]uch concrete and demonstrable injury to the

organization's activities – with the consequent drain on the organization's resources – constitutes

far more than simply a setback to the organization's abstract social interests."  *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that an equal opportunity housing

organization had standing to challenge discriminatory housing practices because the organization

alleged that the practices "perceptibly impaired [the organization's] ability to provide counseling

and referral services for low- and moderate-income homeseekers").

The Ninth Circuit has "interpreted *Havens* to stand for the proposition that an organization

may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its

organizational mission; and (2) "diversion of its resources to combat" the allegedly unlawful

conduct.  *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).

Accordingly, while an organization does not have standing merely by "incurring litigation costs or

simply choosing to spend money fixing a problem that otherwise would not affect the organization

---

[9] Although Defendants have framed their challenge as one to standing instead of ripeness, "[s]tanding and ripeness boil down to the same question in this case," *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128 n.8 (2007), i.e., whether, in a case predicated on a procedural violation, plaintiffs with a concrete interest can sue at the time the violation occurs.  Accordingly, Circuit precedents finding such challenges to be ripe for adjudication have a direct bearing.  *See Mont. Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1189 (9th Cir. 2014) ("[W]e previously recognized that 'in many cases, ripeness coincides squarely with standing's injury in fact prong.' . . .  Regardless of whether we use verbal formulations developed for standing or the ones developed for ripeness, our analysis is materially unchanged.'") (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc)).

1   at all," the organization *does* have standing when a governmental policy impedes the

2   organization's ability to carry out its core mission and diverts resources that otherwise would have

3   been spent on other ways of carrying out that mission. *Valle Del Sol, Inc. v. Whiting*, 732 F.3d

4   1006, 1018-19 (9th Cir. 2013) (internal quotation omitted).[10]

5          ABC's Declaration establishes *Havens* standing.  It states that "ABC is the only United-

6   States based group with a major focus on bird habitat conservation throughout North and South

7   America," and that ABC works to reduce threats to birds from myriad impacts "through scientific

8   research and analysis; advocating for bird conservation at the local, state, and federal levels;

9   forming bird conservation partnerships; and pressing for regulatory changes to address such

10  threats effectively."  ECF No. 52-2 ¶ 1.  ABC has a "Bird-Smart Wind Program" that

11  "recognize[s] that 'bird-smart' wind energy is an important part of the solution to climate change,"

12  but seeks to "ensur[e] that such development occurs in a manner that does not needlessly place

13  bird populations at risk."  *Id.*  ¶ 2.  A key element of that program "is to ensure that that the FWS

14  develops effective measures for overseeing the siting, construction, and operation of wind

15  facilities in a manner that avoids and minimizes adverse impacts to the extent practicable."  *Id.*

16         As detailed in ABC's Declaration, the thirty-year take rule's adoption in violation of

17  NEPA and the ESA undermines the organization's bird conservation mission, and specifically its

18  wind program.  The Declaration explains that "ABC and other members of the public who do not

19  work for the federal government or wind power companies, have tremendous expertise that can

20  and should be brought to bear on whether BGEPA permits should be maintained, modified, or

21  revoked in appropriate circumstances," but by "limiting long-term permit reviews to internal

---

[10]  *See also Whiting*, 732 F.3d at 1018-19 (an organization that provided services to undocumented
aliens had standing to challenge a state statute that allegedly interfered with the organization's
ability to provide those services); *El Dorado Estates v. City of Fillmore*, 765 F.3d 1118, 1121-22
(9th Cir. 2014) (applying *Havens* to hold that an organization seeking to establish housing for
seniors had standing to seek relief from a city's allegedly unlawful interference with that
objective); *cf. Animal Legal Def. Fund v. The Great Bull, LLC*, No. 14-cv-01171-MEJ, 2014 WL
2568685, at *4 (N.D. Cal. June 6, 2014) (finding that animal protection organizations had standing
to challenge allegedly unlawful rodeo practices because the organizations had to divert "resources
not only in response to Defendants' activities but also to counteract the effect these events have on
Plaintiffs' own outreach and education efforts designed to prevent animal cruelty").

assessments by FWS personnel, the inevitable result is that eagles and eagle populations of concern and interest to ABC and its members will be harmed . . . ." *Id*. ¶¶ 10, 11.

In addition, the rule's jettisoning of public project reviews that, under the 2009 rule, had to be conducted in connection with renewal applications at least every five years and afforded an opportunity for public involvement through the NEPA process, "not only eliminates essential procedural safeguards but also harms ABC's organizational interests by necessitating ABC's expenditure of significant financial and other resources in order to . . . attempt to learn the status of the Service's internal project reviews." *Id*. ¶ 8 (emphasis added); *see also id*. ¶ 10 (the substitution of internal reviews for public renewal proceedings "will require a significant expenditure of time, resources, and personnel for ABC even to attempt to compensate for the serious deprivation of information occasioned by the rule"). Consequently, the "rule will both seriously compromise ABC's institutional efforts to advance the protection of eagles and compel ABC to spend its limited resources attempting to compensate for the deprivation of information that will result directly from the rule's adoption." *Id*. (emphasis added). In addition to procedural injury, therefore, this case *also* presents a classic example of *Havens* standing predicated on the rule's direct interference with the organization's ability to carry out its bird conservation mission.[11]

## II.    THE FWS VIOLATED NEPA BY INVOKING A CATEGORICAL EXCLUSION FOR A RULE CHANGE DESIGNED TO IMPACT THE ENVIRONMENT.

### A.    The FWS Must Take A "Hard Look" At The Rule's Impacts.

Agency action expressly designed to have an impact on the environment – such as the thirty-year take rule – cannot be immunized from NEPA review. Pl. Mem. at 14-16. Moreover, as the Ninth Circuit held in *Kraayenbrink*, a regulation that reduces public involvement in agency decisions affecting natural resources and wildlife must be analyzed in a NEPA document to satisfy NEPA's "hard look" requirement. *Id*. at 16-17.

---

[11]  *Havens* standing (which is not addressed in Defendants' brief) is *not* the same as "[m]ere informational injury," Def. Mem. at 13; thus, Plaintiffs are *not* basing any of their standing arguments simply on the deprivation of information that will flow from the rule, notwithstanding Defendants' misplaced effort to cast Plaintiffs' standing allegations in those terms, *id*.

1    Defendants appear to acknowledge that Plaintiffs' argument would have been valid if the

2    FWS had adopted the thirty-year take rule *as proposed*, but Defendants contend that the Service

3    somehow dramatically improved the rule – from the standpoint of eagle protection and public

4    involvement – when it was adopted in final form, so that Plaintiffs "offer false criticisms that no

5    longer apply."  Def. Mem. at 1; *id.* at 15 ("Plaintiffs' quarrel seems to be with the [thirty-year take

6    rule] as originally proposed, not with the final Amendment").  This argument, however, is flatly

7    contradicted by what the FWS told the public when it adopted the rule in final form.

8    When it promulgated the final rule, far from suggesting that it had made dramatic changes

9    from the proposal, the FWS said just the opposite, stating that "[o]n April 13, 2012, we proposed

10   to amend the regulations to provide for terms of up to 30 years" and that, ***"[i]n today's***

11   ***rulemaking*, *we are finalizing that proposal with minor modifications*.**"  AR 2 (emphasis added).

12   Consequently, any notion that Defendants made major changes from the proposal that was

13   lambasted by the FWS's own BGEPA and NEPA experts, as well as the National Park Service,

14   conservation groups, and Native American tribes – is nothing more than Defendants' "*post hoc*

15   rationalization" on which the Court, under basic administrative law precepts, may not rely.

16   *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419-20 (1971); *Humane Soc'y of U.S.*

17   *v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010) (refusing to sustain agency action based on the

18   "*post hoc rationalizations* offered by defendants" in their briefs").  If anything, by incorporating

19   the concept of "experimental" Advanced Conservation Practices ("ACPs") as a *further*

20   accommodation to the wind industry – which was not mentioned in the proposed rule – the final

21   rule is even riskier for eagle populations than the proposal and therefore even more in need of the

22   "hard look" that NEPA requires.  *See* Pl. Mem. at 12, 22-23.

23   More important, the "minor modifications" made in the final rule have nothing whatsoever

24   to do with whether the effects of the rule should be subjected to NEPA review.  In this connection,

25   Defendants' contention that, as finally issued, the thirty-year take rule "differs from the original

26   Take Rule only in procedure," Def. Mem. at 15, is both disingenuous and demonstrably incorrect.

27   It is disingenuous because if the thirty-year take rule was in fact functionally identical to the

28   system it replaced, then the wind power industry would not have spent time and resources

advocating for its adoption; it would not have the stated objectives of "facilitat[ing] the development of renewable energy and other projects" in eagle habitat and "provid[ing] more certainty to project proponents and their funding sources," AR 18; and AWEA would not have intervened in this Court on the grounds that, in fact, the new rule "materially decreased the uncertainty facing wind energy facilities that may occasionally result in eagle fatalities," and "*gives developers more long-term certainty* that a wind energy facility will retain permit authorization throughout its serviceable life" irrespective of its impact on eagles.  ECF No. 33-1 at ¶ 9 (emphasis added).

As the final rule makes clear and the wind power industry has conceded, the two systems do not, in fact, differ "only in procedure."  In fact, a system under which permits may be issued for thirty years, providing for only internal agency reviews during the lengthy permit term, is *fundamentally* different than a system under which permits could last a maximum of five years and then had to be *affirmatively renewed through a new agency decision at least every five years*.  Most important, as the very cases cited by Defendants make clear, an affirmative agency decision to *renew* a permit – as was required under the 2009 rule – is an affirmative "agency action" that triggers the Service's duty to comply with NEPA (and its public participation requirements), as well as an opportunity for *judicial review* of every agency decision to renew the permit.  *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (explaining that an agency's obligation to comply with NEPA is "triggered by a discretionary federal *action*") (emphasis added).  In stark contrast, the thirty-year take rule's provision for purely *internal* "evaluations" of *previously issued long-term permits*, AR 3, does *not* require any agency action triggering NEPA compliance or even any opportunity for judicial review of the Service's compliance with NEPA.  *Id*.  ("governmental inaction does not trigger NEPA") (citing *Alaska v. Andrus*, 591 F.2d 537, 540-41 (9th Cir. 1979)).  That is *why* the FWS substituted such reviews for affirmative renewal decisions, and why the thirty-year take rule affords far more "long-term certainty for project proponents . . . . AR 7.[12]

---

[12] This legal and practical reality is in no way ameliorated by the "minor modifications" made in the final rule.  The rule provides that the FWS will, in some unspecified manner and at some (footnote continued)

1    Defendants' contention that the public's participatory rights are not lessened under the

2    thirty-year take rule because the agency's renewal determinations under the five-year rule "did not

3    *necessarily* require much in the way of additional NEPA analysis or public involvement," Def.

4    Mem. at 15 (emphasis added), is another impermissible *post hoc* rationalization.  When the FWS

5    adopted the final rule, in response to public comments that a "30-year permit would decrease

6    opportunities for public stakeholder involvement because decisions on issuance and reissuance are

7    subject to NEPA analysis and tribal consultation," the FWS *conceded* that "[l]eaving the 5-year

8    maximum permit term in place ***would have allowed for additional public and Tribal comment***

9    ***during the NEPA process for each of the multiple permit applications the Service would have***

10   ***evaluated for the an activity expected to last decades***."  AR 6 (emphasis added); *see also Los*

11   *Padres Forestwatch v. U.S. Forest Serv.*, 776 F. Supp. 2d 1042, 1050 (N.D. Cal. 2011) (Koh, J.)

12   (the CEQ regulations "requir[e] all federal agencies to '[m]ake diligent efforts to involve the

13   public in preparing and implementing their NEPA procedures'") (quoting 40 C.F.R. § 1506.6).

14   Thus, the FWS candidly *admitted* that the rule would reduce opportunities for public involvement

15   in agency decisions and accompanying NEPA reviews; the agency simply asserted that this policy

16   change was justified because it would help further the "central objective of this regulation . . . to

17   provide more certainty to project developers for the operational life of a project."  AR 6.

18       The FWS's belief that sacrificing public involvement "strike[s] a good balance" from a

19   policy perspective, *id.*, does not relieve of the Service of its duty to analyze the environmental

20   implications of that major policy choice (and alternatives to it) in a NEPA document.

21   *Kraayenbrink* makes this crystal clear.  *See* 632 F.3d at 492 ("While diplomacy with permittees or

22   lessees of public rangelands is certainly a worthy goal, it is no substitute for the Bureau of Land

23   
_____

24   unspecified time, make "available to the public" *raw data* on eagle fatalities compiled by
     permittees, AR 22, but the rule makes no provision for what the public can *do* with that data and,

25   in particular, creates no mechanism for the public to participate in the Service's internal

26   "review[s]" of whether to modify or revoke a previously issued permit.  *Id.*  And while the FWS
     could, in theory, revoke a BGEPA permit – a power that the Service has with regard to all permits

27   it issues, *see* 50 C.F.R. § 13.28 – that hardly negates the value of public participation in, and the
     opportunity to obtain judicial review of, the FWS's affirmative permit renewal decisions.

28

1   Management's ["BLM"] obligations to comply with NEPA.").  Indeed, *Kraayenbrink* is squarely

2   controlling here, since one of the specific ways in which public participation was lessened by the

3   regulation at issue in that case concerned the process for *renewing* grazing permits.  *See id.* at 480

4   (explaining that, "under the 2006 Regulations, the BLM is no longer required to involve interested

5   members of the public when . . . *renewing an individual grazing permit*") (emphasis added).

6   Consequently, in view of the Court of Appeals' finding of a NEPA violation where BLM

7   *prepared an EIS* but nonetheless failed to take a "hard look" at the environmental effects

8   associated with the "reduction in public involvement in management of grazing," the necessary

9   conclusion here is that the FWS has flagrantly violated NEPA by preparing no NEPA document at

10  all in connection with a rule change that likewise effectuates an "across-the-board reduction in

11  public involvement" in long-term programmatic authorizations to kill or otherwise take bald and

12  golden eagles.  *Id.* at 492.[13]

13          Yet another significant legal difference is that under the system requiring affirmative

14  renewal decisions at least every five years, the entity seeking ongoing permission to kill eagles had

15  the affirmative burden of demonstrating that all criteria for "issuance" of a permit in the first

16

17  _____

18  [13]   In attempting to distinguish *Kraayenbrink*, Defendants assert that, here, the "public would
    certainly be involved in the *initial* decision to issue a site-specific programmatic take permit," and
    would also "be involved *if* a five-year review of information – made publicly available – resulted

19  in the need for a significant permit amendment."  Def. Mem. at 15 (emphasis added).  To the
    extent that this argument implies that the FWS will even make available to the public the agency's

20  internal "five-year review[s] of information," it is misleading.  The final rule merely says that the
    Service will make available to the public "*eagle mortality information from annual reports*"

21  submitted by permittees and "*eagle-mortality information* compiled in five-year review reports,"
    AR 22 (emphasis added), i.e., the public will apparently obtain the compiled *raw numbers* of eagle

22  deaths as reflected in the permitees' own monitoring reports.  The rule makes no mention of
    providing the FWS's *analysis* of the mortality data, or the basis for any determination by the

23  agency as to whether additional conservation measures are necessary in light of the data, or
    whether a permit should otherwise be modified or revoked in view of new information (such as

24  evidence of declining eagle populations).  In addition, Defendants' statement that the public may
    become involved only "*if*" the FWS decides that there is a "need for a significant permit

25  amendment," Def. Mem. at 15 (emphasis added), concedes that the public will *not* be involved at
    all when the Service determines, for whatever reason, to leave a previously issued permit intact (or

26  simply fails to address the matter one way or the other).  But the situations in which conservation
    groups, Native-American tribes, or other members of the public *may disagree with the FWS's*

27  *assessment* of the impact of a permitted activity, whether the activity should be continued, and, if
    so, on what terms, are the very ones requiring public involvement.

28

instance continued to be met in light of the available information.  AR 7 ("Renewal of a permit is an issuance of a permit, and all issuance criteria must be met.").  The thirty-year take rule imposes no such obligation on the permit holder for the continuation of a previously issued long-term permit.  To the contrary, in adopting the final rule, the Service stated that its amendment of a long-term permit following an internal review had to be "*consistent with the limits jointly agreed to at the outset of each permit.*"  AR 2 (emphasis added); *see also* AR 4779 (Oct. 3, 2012 e-mail from rule's principal author) ("[T]his decision makes the effects [of] 30-year permits *significantly different than multiple 5-year permits that are held to the standard of implementing all potentially effective measures each time the permit is renewed.*") (emphasis added).  The bottom line is that a thirty-year permit rule deliberately crafted to afford "long-term certainty for project proponents," AR 7, is vastly different from the five-year permit renewal system, and those differences must be analyzed in a NEPA document under Circuit precedent.

**B.**     <u>The CE Invoked By The FWS Does Not Apply.</u>

Where, as here, a rule change is *intended* to have a significant impact on the environment, FWS's invocation of a CE must be rejected because CEs are "limited to 'situations where there is an insignificant or minor effect on the environment.'"  *Los Padres Forestwatch*, 776 F. Supp. 2d at 1044 (quoting *Alaska Ctr. for the Env't v. U.S. Forest Service*, 189 F.3d 851, 859 (9th Cir. 1999)).  The thirty-year take rule is explicitly intended to foster wind energy projects in areas occupied by eagles with the understanding that eagles will necessarily be killed (and otherwise "taken") as a result.  The Service predicts that it could issue at least *1100* thirty-year permits under the rule, most of which will be for wind power projects.  *See* Pl. Mem. at 19 n.10.  That should be the end of the matter, for many hundreds of industrial wind projects operating many thousands of turbines in eagle habitat is more than an "insignificant or minor effect on the environment."

In any case, Defendants have failed to justify resort to the specific CE invoked here – which requires both that the environmental effects of the rule are "too broad, speculative, or conjectural to lend themselves to meaningful analysis," *and* that those effects "will later be subjected to the NEPA process," 43 C.F.R. § 46.210(i).  Defendants assert that the effects of the thirty-year take rule are "purely conjectural," Def. Mem. at 15, and cannot be "projected in a

meaningful way," *id*. at 14, although, in adopting the final rule, the FWS itself made both general and specific projections concerning the rule's effects.  Thus, the FWS projected that the longer permit term "*will facilitate* the development of renewable energy and other projects that are designed to be in operation for many decades" in eagle habitat, AR 18 (emphasis added), and that "[u]utility-scale wind energy facilities and electric transmission companies *are likely to be the most frequent programmatic permit applicants*, *because of the known risk to eagles* from collisions with wind turbines and electrocution of power lines," AR 17 (emphasis added).

In addition, in complying with other statutory requirements – such as the Paperwork Reduction Act, 44 U.S.C. §§ 3501-3521 – the FWS also made specific predictions as to the number of long-term permits that would be issued under the rule.  *See, e.g.*, AR 6644 (predicting that the FWS "could issue 1,108 30-year permits," the "majority" of which "will be in the wind energy production business"); *see also* Pl. Mem. at 19 n.10.  Especially since it was feasible for the FWS to make those general and specific predictions, the agency was also required to take the "hard look" at potential environmental impacts (and alternatives) that is mandated by NEPA, which Congress directed must be complied with "*to the fullest extent possible*."  42 U.S.C. § 4332 (emphasis added).  This is especially so given the indisputable impact of the rule change on public involvement opportunities – an issue that *Kraayenbrink* specifically instructs must be analyzed in a NEPA document – and the final rule's incorporation of other elements with far-reaching environmental implications, i.e., the use of "experimental," untested ACPs for the wind industry specifically.  *See* Pl. Mem. at 19 & n.10.

Defendants do not dispute that they have performed NEPA reviews in connection with *other* broad regulations and programmatic decision documents, although those also necessarily entailed impacts that, while potentially significant, "may be uncertain and difficult to quantify." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1098 (9th Cir. 2011).  Most relevant, Defendants were able to prepare an extensive EA on the 2009 BGEPA regulations, in which the five-year permit term was established, confirming that it is entirely feasible for the Service to engage in such a NEPA analysis when it wishes to do so.  *See* Pl. Mem. at 18-19.

Defendants' only answer – that the "original Take Rule reflected potential on-the-ground differences between a variety of alternatives," Def. Mem. at 15 n.5 – misses the mark since the final thirty-year take rule itself points to "potential on-the-ground differences" between a rule change that is expressly designed to "facilitate the development of renewable energy and other projects" through the provision of extremely long-term permits, AR 18, and alternative means of implementing BGEPA (such as leaving the prior system in place).  A central function of NEPA – which Defendants have undermined by refusing to prepare an EIS or even an EA – is to ensure that agencies "study, develop, and describe appropriate alternatives to recommended courses of action . . . ." 42 U.S.C. § 4332(E).  Accordingly, Defendants have no plausible argument that the FWS is unable to engage in *any* "meaningful analysis" of the rule's potential effects and alternatives that might avoid or minimize those effects.  43 C.F.R. § 46.210(i).[14]

Nor can Defendants satisfy the second, independent requirement of the CE, since it is apparent that the cumulative effects *of the rule itself*, as well as alternatives to it, will not "later be subject to the NEPA process, either collectively or case-by-case."  43 C.F.R. § 46.210(i). Defendants' contention that the FWS will somehow examine overall "cumulative impacts at the site-specific level," Def. Mem. at 16, is an oxymoron.  There is no conceivable way in which a "site-specific" consideration of a particular wind power or other project will adequately substitute for a nationwide or even regional cumulative-effects analysis of how a rule change designed to "facilitate the development of renewable energy and other projects" in eagle habitat, AR 18, will potentially affect eagles, eagle populations, and other wildlife *throughout the country*. Consequently, this case in fact closely parallels *California Wilderness Coalition v. U.S. Dep't of*

---

[14]  Since Plaintiffs' opening brief was filed, the FWS has announced that it is "preparing an environmental impact statement" in connection with still another rulemaking that will require the FWS to address the broad programmatic effects of a potential rule change on eagles and other migratory birds.  80 Fed. Reg. 30032 (May 26, 2015).  Specifically, the FWS announced that it is "considering rulemaking to address various approaches to regulating incidental take of migratory birds," *id*. at 30032-33, pursuant to the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712, and that it is embarking on preparation of an EIS in connection with that undertaking.  Once again, therefore, it is evident that the FWS can engage in "meaningful" NEPA analyses of broad programmatic initiatives when it desires to do so.

*Energy*, in which the Ninth Circuit held that the cumulative "programmatic effects" of an agency decision designed to "encourage" the siting of transmission facilities were "subject to review for environmental impacts at th[e] time" the programmatic decision was made, "or not at all."  631 F.3d at 1103.[15]

### C.   "Extraordinary Circumstances" Preclude Invocation Of A CE

Federal Defendants acknowledge that "certain types of 'extraordinary circumstances' may prevent reliance on a [CE]."  Def. Mem. at 17.  They maintain, however, that no such circumstances are present, "*as FWS explained in the final Tenure Amendment*."  Def. Mem. at 17 (emphasis added).  There are several fatal flaws in that response.

To begin with, the FWS did *not* "explain" in the final rule why extraordinary circumstances are not present here.  Rather, the Service merely *listed* the four extraordinary circumstances that commenters said applied and on which Plaintiffs also rely, and then simply stated that "[w]e have found that none apply to this final rule."  AR 11.  That was the extent of the agency's "explanation."  Accordingly, *every* argument about extraordinary circumstances is a *post hoc* rationalization on which the Court may not rely.  *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002) (where "there is substantial evidence in the record that exceptions to the categorical exclusions *may* apply, *the agency must at the very least explain why the action does not fall within one of the exceptions*") (emphasis added).

There is, however, no need for the Court to remand for the FWS to proffer its own explanation.  Where, as in this case, the presence of one or more extraordinary circumstances is "beyond doubt," *id*., the Court should hold that a CE may not be invoked.  First, as for whether the rule has "highly controversial environmental effects," 43 C.F.R. § 46.215(c), Defendants  reiterate

---

[15]  Further, any NEPA review on the *application* of the rule in a site-specific context cannot possibly serve NEPA's core function of informing the FWS's determination of whether the programmatic approach embodied in the thirty-year take rule should be adopted in the first instance.  As this Court has recognized, "post-hoc consideration of information and data 'would frustrate the fundamental purpose of NEPA, which is to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions, *early enough so that it can serve as a contribution to the decisionmaking process*.'"  *Los Padres Forestwatch*, 776 F. Supp. 2d at 1050 (emphasis in original; internal quotation omitted).

their erroneous theme that the final rule changed dramatically from the proposal, and contend that the myriad "concerns" raised by NPS's own experts,  the National Park Service, conservation groups, and Native American tribes were all adequately "addressed."  Def. Mem. at 18. Defendants cite nothing from the record to support that assertion, and it is insupportable.  The final rule stated that only "minor modifications" had been made to the proposal that drew scathing criticism, AR 2, and the record confirms that those outside the FWS (except for the wind power industry), as well as the agency's own in-house experts, remained deeply concerned about the impacts of the final rule.[16]

Second, with regard to whether the rule will have "highly uncertain" effects, 43 C.F.R. § 46.215(d) – which the final rule as much as concedes, *see* Pl. Mem. at 22 –  Defendants contend that Plaintiffs' "disagreement is with the Agency's Adaptive Management Process," which is an "outgrowth of the *original Take Rule*, which Plaintiffs have not challenged."  Def. Mem. at 18-19 (emphasis added).  This *post hoc* explanation stands the original rule on its head.  Notwithstanding "adaptive management," the 2009 rule established a *five-year* limit for programmatic permits precisely "because factors may change over a longer period of time ***such that a take authorized much earlier would later be incompatible with the preservation of the bald eagle or the golden eagle***."  AR 62 (emphasis added).  The "original Take Rule," therefore, reinforces that a regulation authorizing take permits for thirty years has "highly uncertain" effects that, at minimum, must be afforded a "hard look" in a NEPA document.

Third, Defendants misstate Plaintiffs' argument concerning the rule's establishment of a "precedent for future action," 43 C.F.R. § 46.215(e).  Plaintiffs' brief said nothing about the "Agency's Adaptive Management Process" as a whole establishing a precedent.  Def. Mem. at 19.

---

[16] *See, e.g.*, AR 3132 (Briefing Memo from the FWS Director to the Deputy Secretary of the Interior) ("T]he environmental community has adamantly opposed the Department/Service *promulgating the final rule* to extend the permit duration up to 30 years") (emphasis added); AR 2968 (Apr. 2, 2013 e-mail by rule's principal author) (criticizing the five-year reviews on the grounds that "I'm really worried that we are setting ourselves up with a framework that our agency does not have the resources to implement").  The *amicus* brief filed by the Inter Tribal Association of Arizona confirms that the final rule continues to be highly controversial in the Native American community.  *See* ECF No. 60.

1  Rather, Plaintiffs specifically argued that the thirty-year rule's incorporation of "experimental,"

2  unproven ACPs so as to allow the wind power industry to obtain long-term permits *explicitly*

3  established a dangerous precedent on which other industries may rely.  *See* Pl. Mem. 22-23.[17]

4        Fourth, as to whether the rule may have impacts on "historic or cultural resources,"

5  "parks," "migratory birds," and other "historic or cultural resources," 43 C.F.R. § 46.215(b),

6  Defendants say nothing about the warning by the FWS's sister agency, the National Park Service,

7  that the rule jeopardizes eagle populations that reside in national parks and migratory corridors.

8  *See* Pl. Mem. at 23.  Instead, Defendants make the astonishing assertion that eagles "cannot be

9  considered 'cultural or historical' resources," Def. Mem. at 19, although the FWS itself has

10  declared that "[o]f all America's wildlife, eagles hold perhaps the *most revered place in our*

11  *national history and culture.*"  AR 10372 (emphasis added).  More significantly, Congress enacted

12  BGEPA because the "'bald eagle is [not] a mere bird of biological interest *but a symbol of the*

13  *American ideals of freedom,*'" *United States v. Vasquez-Ramos*, 531 F.3d 987, 991 (9th Cir. 2008)

14  (emphasis added) (quoting 54 Stat. 250 (1940)), and because the golden eagle is "an important

15  part of the ceremonies and religion of many Indian tribes."  *United States v. Dion*, 476 U.S. 734,

16  742 (1986).

17        In sum, although only one "extraordinary circumstance" need exist to preclude invocation

18  of a CE, in this case at least four such circumstances are present.  The Court must reject the CE.[18]

---

22  [17]  The FWS's "Eagle Conservation Plan Guidance," issued in April 2013, refers to the use of

23  "experimental" ACPs by the wind industry.  *See* AR 10375.  However, compliance with that
guidance document was purely "voluntary," AR 10372, and it was also not subjected to any NEPA

24  review.  The thirty-year take rule represents the first time that the concept of experimental ACPs
has been incorporated into a formal regulation and the first time that the FWS explicitly stated that
the wind industry's reliance on it could afford a precedent "for other industries."  AR 3.

25  [18]  Plaintiffs have not "abandoned" their claim that the rule conflicts with BGEPA.  Def. Mem. at

26  20.  Rather, consistent with Circuit precedent, Plaintiffs explained that since NEPA review (as
well as section 7 consultation) is so clearly called for here  and may well lead to changes in the

27  rule (and will at the very least change the record for review), the Court need not address this
additional basis for setting aside the rule at this time.  *See* Pl. Mem. at 25 n.15.

1   **III.      THE FWS VIOLATED SECTION 7 OF THE ESA.**

2           Defendants acknowledge that the "threshold for a 'may affect' finding" sufficient to trigger

3   ESA section 7 consultation is "relatively low," Def. Mem. at 21, but Defendants offer two

4   groundless reasons for why it is not satisfied here.  First, Defendants assert that "Plaintiffs have

5   made no showing whatsoever that promulgating the Tenure Amendment will cause an actual

6   project to be built," Def. Mem. at 21, although, yet again, the rule *itself* states that "this change

7   will facilitate the development of renewable energy and other projects" in eagle habitat, AR 18;

8   *see also* ECF No. 33-1  ¶¶ 6, 7 (AWEA's sworn Declaration stating that the rule is "necessary for

9   the future of wind energy development" in areas occupied by eagles).  Further, the FWS's own

10  recent ESA listing decisions recognize that widespread wind power development may affect a

11  number of species protected by the ESA.[19]

12          Accordingly, the notion that a rule expressly designed to facilitate the broad expansion of

13  industrial wind power will have no effect whatsoever on any ESA-listed species defies credulity

14  and is certainly not supported by anything in the record before the Court.  *See* FWS, Endangered

15  Species Consultation Handbook (March 1998), at xvi (excerpt attached as Ex. G) (emphasizing

16  that the "may affect" standard for triggering section 7 consultation is satisfied "when a proposed

17  action may pose **any** effects on listed species or designated critical habitat") (emphasis in

18  original)[20];  80 Fed. Reg. 26832, 26833 (May 11, 2015) ("framework programmatic actions" that

19

20  _____

21  [19]  *See, e.g.*, 79 Fed. Reg. 69192, 69259 (Nov. 20, 2014) ("Sage-grouse could be killed by flying
22  into turbine rotors or towers" and "Sage-grouse populations are impacted by the . . . loss of habitat
    and behavioral avoidance of the wind turbines"); 79 Fed. Reg. 73706, 73713 (Dec. 11, 2014)
23  ("[W]ind energy development, especially near the coasts, may cause some unquantifiable amount
    of red knot mortality into the foreseeable future . . . ."); 79 Fed. Reg. 19974, 19984 (April 10,
24  2014) ("[A] single commercial-scale wind turbine creates a habitat avoidance zone for the greater
    prairie-chicken that extends as far as 1.6 km (1 mi) from the structure."); 80 Fed. Reg. 17974,
25  18002 (April 2, 2015) ("[s]ustained annual mortality of individual northern long-eared bats at a
    particular wind facility could result in impacts to local populations.").

26  [20]  Although the Consultation Handbook is not in the administrative record, the government has
    cited it.  *See* Def. Mem. at 5.  Plaintiffs agree that the Handbook represents an official FWS
27  interpretation of its section 7 consultation obligations, and hence the Court may take judicial
    notice of it.

28

1   "establishes a framework for the development of specific future action[s]" that may in turn affect

2   listed species are subject to the "duty to consult under section 7(a)(2)").

3       Second, Defendants contend that the "FWS has no statutory authority under the BGEPA to

4   authorize, fund, or carry out construction of wind facilities, and thus the [thirty-year take rule]

5   cannot be considered the legally relevant cause" of any "effects on ESA-listed species from those

6   activities." Def. Mem. at 22.  If this convoluted argument had any validity, it would mean that the

7   FWS would not even conduct section 7 consultations on *individual* BGEPA permits, thus

8   contradicting what the FWS said in the final rule, *see* AR 19 ("consultation under ESA Section 7

9   may be required prior to issuance of a permit").  In any case, the argument is baseless.  Under the

10  ESA implementing regulations, section 7 consultation must be conducted on all agency "actions,"

11  which are defined broadly to encompass "all actions or programs of any kind authorized, funded,

12  or carried out, in whole or in part, by Federal agencies," including, specifically, the "*promulgation

13  of regulations.*"  50 C.F.R. § 402.02 (emphasis added); *see also Pac. Rivers v. Thomas*, 30 F.2d

14  1050, 1054 (9th Cir. 1994) ("[T]here is little doubt that Congress intended to enact a broad

15  definition of agency action in the ESA.").

16      As the en banc Court of Appeals has held, therefore, section 7 consultation is required for

17  "*any discretionary action* that may affect a listed species or critical habitat."  *Karuk Tribe of Cal.*,

18  681 F.3d at 1020 (emphasis added).  Accordingly, in the cases cited by the government, the

19  agencies at issue lacked *any* "discretion to benefit protected species that fall under the ESA."  *Ctr.

20  for Biological Diversity v. U.S. Dep't of HUD*, 541 F. Supp. 2d 1091, 1097 (D. Ariz. 2008).  Here,

21  there is no possible argument that the FWS lacked discretion in issuing the thirty-year take rule,

22  nor is there any possible argument that the agency has no discretion to take ESA-listed species

23  impacts into account either in adopting that rule or in issuing individual BGEPA permits.  The

24  FWS must comply with section 7.

25                          **CONCLUSION**

26      For these reasons, the Court should set aside and remand the rule to the FWS.

27

28

1    **DATED**: June 15, 2015                    Respectfully submitted,

2                                                _/s/_ Eric R. Glitzenstein_____
                                                 Eric Glitzenstein, DC Bar No. 358287
3                                                (admitted _pro hac vice_)
                                                 _eglitzenstein@meyerglitz.com_
4                                                William S. Eubanks II, DC Bar No. 987036
                                                 (admitted _pro hac vice_)
5                                                _beubanks@meyerglitz.com_
                                                 Caitlin Zittkowski, CA Bar No. 290108
6                                                _czittkowski@meyerglitz_.com

7                                                MEYER GLITZENSTEIN & CRYSTAL
8                                                1601 Connecticut Ave., N.W., Suite 700
                                                 Washington, DC 20009
9                                                Telephone: (202) 588-5206
                                                 Facsimile: (202) 588-5049
10
                                                 Attorneys for Plaintiffs DEBRA
11                                               SHEARWATER, STEPHEN A. THAL,
                                                 MICHAEL DEE, DR. CAROLYN
12                                               CROCKETT,  ROBERT M. FERRIS,
                                                 and AMERICAN BIRD CONSERVANCY
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Caitlin Zittkowski, hereby certify that on June 15, 2015, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.


*/s/*Caitlin Zittkowski_____
Caitlin Zittkowski
*czittkowski@meyerglitz.com*

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, DC 20009
Telephone: (202) 588-5206
Facsimile: (202) 588-5049