1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10          SAN JOSE DIVISION

11

12   DEBRA SHEARWATER et al.,              Case No. 14-CV-02830-LHK

13          Plaintiffs,                    **ORDER GRANTING IN PART AND
                                           DENYING IN PART MOTIONS FOR
14      v.                                 SUMMARY JUDGMENT OF
                                           PLAINTIFFS, FEDERAL
15   DAN ASHE, Director, U.S. Fish and     DEFENDANTS, AND DEFENDANT-
     Wildlife Service; SALLY JEWELL,       INTERVENOR**
16   Secretary, U.S. Department of the Interior,

17          Defendants,

18      – and –

19

20   AMERICAN WIND ENERGY
     ASSOCIATION,
21
            Defendant-Intervenor.
22

23

24          Plaintiffs Debra Shearwater, Stephen A. Thal, Dr. Carolyn Crockett, Michael Dee, Robert

25   M. Ferris, and American Bird Conservancy (collectively, "Plaintiffs") challenge the December 9,

26   2013 adoption by the U.S. Fish and Wildlife Service ("FWS") of a new rule increasing the

27                                          1

28   Case No. 14-CV-02830-LHK
     ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
     PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

United States District Court
Northern District of California

maximum duration of programmatic permits to "take"[1] bald and golden eagles incident to otherwise lawful activities from five years to thirty years.  Before the Court are cross-motions for summary judgment: one filed by Plaintiffs, *see* ECF No. 52 ("Pls. MSJ"); one filed by Defendants FWS Director Dan Ashe and Secretary of the U.S. Department of the Interior ("DOI") Sally Jewell (collectively, "Federal Defendants"), *see* ECF No. 65 ("Fed. Defs. MSJ"); and one filed by Defendant-Intervenor American Wind Energy Association ("AWEA"), *see* ECF No. 64 ("AWEA MSJ").

Having considered the submissions of the parties, the relevant law, and the record in this case, the Court hereby GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment and the summary judgment motions filed by Federal Defendants and AWEA.  The case management conference set for August 26, 2015, at 1:30 p.m. is hereby VACATED.

# I.     BACKGROUND

## A.  Regulatory Framework

### 1.  National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, "is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'"  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (quoting *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002)).  NEPA requires a federal agency, such as FWS, to prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  "Major federal actions" are defined to include, inter alia, "new or revised agency rules, regulations, plans, policies, or procedures."  40 C.F.R. § 1508.18(a).

Alternatively, under regulations issued by the Council on Environmental Quality, a federal

United States District Court
Northern District of California

---

[1] The term "take" is defined to include "wound, kill, capture, trap, collect, molest or disturb."  16 U.S.C. § 668c.

2

Case No. 14-CV-02830-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

United States District Court
Northern District of California

agency may prepare an Environmental Assessment ("EA") to evaluate whether an EIS is required. 40 C.F.R. §§ 1501.3, 1501.4, 1508.9.  In contrast to the detailed EIS, an EA is meant to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether" an EIS is required.  *Id.* § 1508.9.  If, after preparing an EA, the agency finds that the proposed action would have no significant impact on the environment, the agency issues a Finding of No Significant Impact ("FONSI") and no EIS is required.  *Id.* § 1508.13.  Agencies must solicit public comment on EISs, *id.* § 1503.1, and "shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing [EAs]," *id.* § 1501.4(b).

Federal agencies may avoid preparing either an EIS or an EA only when the agency action is "categorically excluded" from NEPA review.  A "categorical exclusion" refers to a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect" in an agency's NEPA implementing regulations.  40 C.F.R. § 1508.4.  However, even if a proposed action would otherwise fall within a CE, an agency must prepare an EIS or an EA when certain "extraordinary circumstances" exist.  *California v. Norton*, 311 F.3d 1162, 1168 (9th Cir. 2002) (quoting 40 C.F.R. § 1508.4).  Extraordinary circumstances are those "in which a normally excluded action may have a significant environmental effect."  40 C.F.R. § 1508.4.  Before relying on a CE in a particular instance, an agency must therefore determine that extraordinary circumstances do not exist.  *Norton*, 311 F.3d at 1177.

### 2.  Bald and Golden Eagle Protection Act

The Bald and Golden Eagle Protection Act ("BGEPA"), which was enacted in 1940, imposes criminal and civil penalties against "whoever" shall "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import" bald and golden eagles, except as permitted by the DOI Secretary.  16 U.S.C. § 668(a)-(b).  This "prohibition," the U.S. Supreme Court has explained, "is 'sweepingly framed.'"  *United States v. Dion*, 476 U.S. 734, 740 (1986) (quoting *Andrus v. Allard*, 444 U.S. 51, 56 (1979)).  By enacting BGEPA, and its subsequent

3

1    amendments, "Congress intended to ban all threats" to bald and golden eagles' ability to survive,

2    and sought to eliminate "even incidental dangers" to their survival." *United States v. Fryberg*, 622

3    F.2d 1010, 1015-16 (9th Cir. 1980). Congress did so initially because "the bald eagle is not a

4    mere bird of biological interest but a symbol of the American ideals of freedom." *United States v.*

5    *Vasquez-Ramos*, 531 F.3d 987, 991 (9th Cir. 2008) (brackets omitted) (quoting 54 Stat. 250

6    (1940)). Equivalent congressional protection was extended to golden eagles in 1962, in large part

7    because "the golden eagle is an important part of the ceremonies and religion of many Indian

8    tribes." *Dion*, 476 U.S. at 740-43.

9         Against that backdrop, BGEPA makes it unlawful for anyone to "take" bald or golden

10   eagles without a permit. As indicated above, BGEPA defines "take" broadly to include, inter alia,

11   "wound, kill, capture, trap, collect, molest or disturb." 16 U.S.C. § 668c. BGEPA is implemented

12   by FWS on behalf of the DOI Secretary. Fed. Defs. MSJ at 4. Pursuant to this authority, FWS has

13   promulgated regulations under BGEPA that authorize FWS to issue permits for take of bald and

14   golden eagles for scientific or exhibition purposes, religious purposes, to protect human or eagle

15   health and safety, and falconry. *See* 50 C.F.R. §§ 22.21-22.25. The regulations also expressly

16   authorize FWS to issue permits for take of eagles that is "associated with, but not the purpose of,

17   an activity." *Id.* § 22.26. Such incidental take must be "compatible with the preservation of the

18   bald eagle and the golden eagle" and "necessary to protect an interest in a particular locality." *Id.*

19   § 22.26(a). For "individual instances" of such take, a permit application is appropriate only where

20   take "cannot practicably be avoided." *Id.* § 22.26(a)(1). For instances of "programmatic take"—

21   i.e., take that is "recurring" and "occurs over the long term," *id.* § 22.3—a permit application is

22   appropriate only where take is "unavoidable even though advanced conservation practices

23   [("ACPs")][2] are being implemented." *Id.* § 22.26(a)(2).

24

25         [2] ACPs are "scientifically supportable measures that are approved by [FWS] and represent
26   the best available techniques to reduce eagle disturbance and ongoing mortalities to a level where
27   remaining take is unavoidable." 50 C.F.R. § 22.3.

4

United States District Court
Northern District of California

### 3. Endangered Species Act

The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, contains both substantive and procedural provisions designed to protect species listed under the act as threatened or endangered. *See Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). Section 7(a)(2), ESA's substantive provision, requires federal agencies to "insure that any action authorized, funded, or carried out by [the] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

Section 7(b) then sets forth the process of consultation with FWS, 16 U.S.C. § 1536(b), which consists of two varieties: formal and informal. Formal consultation is required if the proposed action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). The phrase "may affect" has been interpreted broadly to mean that "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (brackets omitted) (quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)). Formal consultation requires FWS to produce a "biological opinion" that evaluates "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).

Where a proposed action "may affect" a listed species or critical habitat, but the agency desires to avoid the lengthy and costly process of formal consultation, the agency may first initiate informal consultation with FWS. *See* 50 C.F.R. § 402.13. Informal consultation "includes all discussions, correspondence, etc., between [FWS] and the Federal agency . . . designed to assist the Federal agency in determining whether formal consultation . . . is required." *Id.* § 402.13(a). "If during informal consultation it is determined by the Federal agency, with the written concurrence of [FWS], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* If,

5

1  however, informal consultation reveals that the proposed action is "likely to adversely affect" a

2  listed species or critical habitat, the agency must then engage in formal consultation.  *Id.*

3  § 402.14(a)-(b).

4     **B. Factual Background**

5        **1. 5-Year Rule (2009)**

6        On September 11, 2009, FWS issued regulations for the first time that "authorize limited

7  take of bald eagles . . . and golden eagles . . . under [BGEPA], where the take to be authorized is

8  associated with otherwise lawful activities"—i.e., where the take is not the purpose of the activity

9  but is a foreseeable consequence of that activity.  74 Fed. Reg. 46,836, 46,836 (Sept. 11, 2009)

10  (codified at 50 C.F.R. § 22.26).[3]  These regulations authorize FWS to issue permits for such

11  incidental take of bald and golden eagles.  *See id.*  Incidental eagle take permits, as stated above,

12  could be issued for "individual instances of take" or for "programmatic take," *id.* at 46,877

13  (codified at 50 C.F.R. § 22.26(a)(1)-(2)), the latter of which refers to take that is "recurring" and

14  "occurs over the long term," *id.* at 46,876 (codified at 50 C.F.R. § 22.3).  Before issuing a permit,

15  FWS must determine whether the take will be "[c]ompatible with the preservation of the bald

16  eagle and the golden eagle."  *Id.* at 46,878 (codified at 50 C.F.R. § 22.26(e)(2)(i)).  This

17  assessment requires "consideration of indirect effects and the cumulative effects of other permitted

18  take and other additional factors affecting eagle populations."  *Id.*

19        As relevant here, the 2009 BGEPA regulations provided that the maximum "duration of

20  each permit issued under this section," including programmatic take permits, "will not exceed 5

21  years."  74 Fed. Reg. at 46,878 (the "5-Year Rule").  At the end of the five-year period, the

22  "applicant could submit a request for renewal," affording FWS the opportunity, in a new decision,

23  "to re-evaluate the permit conditions if more take is occurring than anticipated," as well as to

24  address any other factors bearing on whether the permit should be renewed or modified.  *Id.* at

25

26        [3] The 2009 BGEPA regulations are reproduced in the administrative record ("AR").  *See*
   AR 41-85.

27

28  Case No. 14-CV-02830-LHK
   ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
   PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

46,845.  At the renewal stage, the permit applicant would have to establish to FWS's satisfaction that the requested take during the subsequent five years would be "compatible with the preservation of the bald eagle or the golden eagle, which is the statutory mandate."  *Id.* at 46,851.  Moreover, because permit renewal decisions are affirmative agency actions triggering procedural obligations under NEPA, *see id.* at 46,862 ("Programmatic permits will each be subject to NEPA."), the 5-Year Rule allowed for public access to, and involvement in, agency decision making at least every five years on programmatic permits affecting eagles.

Responding to public comments regarding the 2009 BGEPA regulations, FWS justified the 5-Year Rule as follows:

> the rule limits permit tenure to five years or less because factors may change over a longer period of time such that a take authorized much earlier would later be incompatible with the preservation of the bald eagle or the golden eagle. Accordingly, [FWS] believe[s] that five years is a long enough period within which a project proponent can identify when the proposed activity will result in take.

74 Fed. Reg. at 46,856.  FWS explained further that periodic renewal decisions were important because "[w]e expect that circumstances will often change such that the original ACPs for minimizing take may no longer be considered the most effective measures that could be adopted."  *Id.* at 46,861.  This was so, FWS continued, because "[t]here are likely to be technological advances in some industries that would warrant adoption of new, more effective conservation measures."  *Id.*  In addition, "new information regarding eagle biology, behavior, and responses to the permitted activity may warrant re-examination of the effects of the permitted activity and re-evaluation of the permit conditions."  *Id.*

FWS analyzed the environmental effects of the incidental take regulations, which included the 5-Year Rule, in an extensive EA that was published in April 2009 (the "2009 EA"), five months before the regulations were issued.  *See* AR 92-301.  The 2009 EA acknowledged that issuing programmatic permits for incidental take would "indirectly result in impacts to habitat from loss, fragmentation, and reduced suitability for eagles and other wildlife due to implementation of projects or portions of projects that may not have proceeded without the permit

7

because they are located in areas that are currently considered too high-risk for eagle mortality." AR 196.  Ultimately, however, the 2009 EA concluded that issuing a conservative number of such programmatic permits would have "no significant, direct impacts to the biological and physical environment."  AR 196.  Accordingly, FWS issued a FONSI, *see* AR 86-91, which concluded that "preparation of an [EIS] on the proposed action is not required," AR 91.  That conclusion was based in part on the fact that "[FWS] will review take thresholds on a regular basis (at least once every five years)," allowing FWS "to modify or adjust permitting accordingly."  AR 89.

There is little indication in the 2009 BGEPA regulations that FWS anticipated issuing a large number of programmatic permits to the wind power industry.  An internal FWS document explained that when the 2009 BGEPA regulations were developed, "[FWS] anticipated that most permits would be for short-term disturbance of eagles, or to authorize historic forms of programmatic take where conservation measures were being implemented to yield a net benefit to eagles."  AR 11234.  Indeed, the 2009 EA "primarily assessed affects [sic] associated with these kinds of take."  AR 11234.

Furthermore, the 2009 BGEPA regulations themselves included but a few references to wind power.  For instance, FWS cited "a company interested in siting a wind-power facility" as an example of an entity that "may qualify for a programmatic take permit."  74 Fed. Reg. at 46,842.  At the same time, however, FWS indicated it was "currently unaware of any measures that would eliminate eagle mortalities when turbines are sited in golden eagle habitat (including migration corridors)."  *Id.*  As a result, the wind power facility could obtain a programmatic permit only "[i]f ACPs can be developed to significantly reduce the take" resulting from "the operation of the turbines."  *Id.*  The other references to wind power emphasize the potential dangers posed to bald and golden eagles.  *See, e.g.*, *id.* at 46,862 (explaining that "[t]he location of facilities often can have significant impacts to eagles (e.g., wind farms)"); *id.* at 46,863 ("We agree that take of eagles within migratory corridors is a significant concern with regard to certain activities, particularly wind-power facilities.  However, we think the majority of applicants for individual permits will

8

1   not be engaging in activities that are likely to take eagles in migration corridors . . . .”).

2       **2. Proposed 30-Year Rule (2012)**

3       Soon after the 5-Year Rule was issued in September 2009, “there was a substantial

4   increase in the development of wind power for renewable energy purposes.”  AR 11234.  Because

5   “eagles can be killed by colliding with structures such as wind turbines,” AR 10372, FWS

6   developed the Eagle Conservation Plan Guidance (the “ECPG”) for the wind industry.  The

7   ECPG, which is voluntary, was designed to “help project operators in complying with regulatory

8   requirements and avoiding the unintentional ‘take’ of eagles at wind energy facilities.”  AR 10372.

9   The ECPG “will also assist the wind energy industry in providing the biological data needed to

10  support permit applications for facilities that may pose a risk to eagles.”  AR 10372.

11      The ECPG introduced the concept of “Experimental ACPs” as part of FWS’s adaptive

12  management process.  Experimental ACPs are prospective measures identified in a programmatic

13  take permit whose implementation is deferred until post-construction monitoring results indicate

14  that measures may be effective in reducing eagle mortality.  AR 10374-75, 10393, 10418.  These

15  “ACPs are considered experimental because they would not currently meet the definition of an

16  ACP in the eagle permit regulation,” AR 10374—i.e., they “have not yet been scientifically

17  demonstrated to be effective” in reducing eagle mortality, AR 3.

18      One issue not addressed by the ECPG “was the wind industry’s extensive comments that

19  the five-year maximum tenure of permits under the Eagle Take Rule is fundamentally unworkable

20  for the industry considering the life of most wind projects is 20 to 30 years.”  AR 11235.  The

21  industry’s chief complaint was that the uncertainty surrounding the renewal of programmatic eagle

22  take permits was preventing operators from obtaining the necessary financing for wind energy

23  projects that might last up to thirty years.  *See* AR 7439.  FWS had initially intended to consider

24  the issue of permit duration as part of a future substantive revision to the 2009 BGEPA

25  regulations.  However, “given the gravity of the situation as conveyed by industry,” and in light of

26  agency concerns that wind project operators were not obtaining permits as a result, FWS “moved

27      9

28

United States District Court
Northern District of California

1    forward with a proposed rule to extend the maximum tenure of programmatic permits under the

2    Eagle Take Rule to 30 years as soon as possible."  AR 11235; *see also* AR 1760.

3          Consequently, on April 13, 2012, FWS proposed a new rule that would "extend the

4    maximum term for programmatic permits to 30 years."  77 Fed. Reg. 22,267, 22,267 (Apr. 13,

5    2012) (the "Proposed 30-Year Rule").[4]  The stated purpose of the Proposed 30-Year Rule was to

6    "facilitate the development of renewable energy and other projects that are designed to be in

7    operation for many decades," and to "provide more certainty to project proponents and their

8    funding sources, while continuing to protect eagles consistent with statutory mandates."  *Id.* at

9    22,275.  At bottom, FWS issued the Proposed 30-Year Rule "[b]ecause industry has indicated that

10   it desires a longer permit."  *Id.* at 22,270.  Finding the Proposed 30-Year Rule "strictly

11   administrative" in nature, FWS determined that the rule was "categorically excluded from further

12   NEPA requirements."  *Id.* at 22,276 (citing 43 C.F.R. § 46.210(i)).  As a result, FWS did not

13   prepare an EIS or an EA in connection with the Proposed 30-Year Rule.[5]

14         FWS's decision not to conduct any further NEPA analysis before increasing the maximum

15   duration of programmatic eagle take permits from five to thirty years was met with considerable

16   opposition from non-profit conservation organizations, Indian tribes, and other governmental

17   agencies.  *See* AR 3132 (memo from FWS Director stating that "[t]he environmental community

18   has adamantly opposed the Department/Service promulgating the final rule to extend the permit

19   duration up to 30 years"); AR 4812-16 (table summarizing NEPA comments from public).

20   Governmental bodies opposing the Proposed 30-Year Rule included: (1) the Pacific Flyway

---

[4] The Proposed 30-Year Rule is reproduced at AR 29-40.

[5] As noted above, the 5-Year Rule was included in the 2009 BGEPA regulations.  At the same time the Proposed 30-Year Rule was published, FWS issued an Advance Notice of Proposed Rulemaking, which advised the public that FWS would consider comprehensive changes to the 2009 BGEPA regulations, specifically in the areas of unavoidable take, mitigation requirements, and BGEPA's "preservation" standard.  77 Fed. Reg. 22,278, 22,279-80 (Apr. 13, 2012).  On June 23, 2014, FWS stated its intent to prepare an EIS or EA on these comprehensive changes to the 2009 BGEPA regulations.  *See* 79 Fed. Reg. 35,564 (June 23, 2014).

10

1   Council, an entity within the Association of Fish and Wildlife Agencies, AR 7553; and (2) the

2   National Park Service ("NPS"), FWS's sister agency within DOI, which has a "particular interest"

3   in "[w]ind energy developments near NPS lands or located in migratory fly-ways," AR 7545.

4   NPS emphasized that it "does not support extending the term for programmatic take permits of

5   bald and golden eagles to 30 years as proposed" because "[t]he proposed rule appears to designate

6   30 years based on the lifecycle of industry development rather than the life history of the species

7   under protection," and because the rule "may fail to provide adequate response time for mitigating

8   a species decline."  AR 7545 (emphasis in original).

9          The conservation, wildlife protection, and scientific organizations urging withdrawal of the

10   Proposed 30-Year Rule included the American Bird Conservancy, AR 7584; the National

11   Audubon Society, as well as many local Audubon chapters throughout the country, AR 7547,

12   7825, 7838, 7852, 8058, 8115, 8220; the National Parks Conservation Association, AR 8075; the

13   Wyoming Outdoor Council, AR 8062; Defenders of Wildlife, AR 8115; the Natural Resources

14   Defense Council, AR 8115; the Center for Biological Diversity, AR 7862; the Nature

15   Conservancy, AR 7856; the Humane Society of the United States, AR 7841; the Ornithological

16   Council, AR 7806; the Hawk Migration Association, AR 7806; the Oregon Natural Desert

17   Association, AR 7730; Save the Eagles International, AR 7727; and the Maryland Ornithological

18   Society, AR 7496.

19          In addition, Indian tribes and tribal representatives opposing the Proposed 30-Year Rule

20   included the Inter Tribal Council of Arizona, AR 2320; the Salt River Pima-Maricopa Indian

21   Community, AR 8222; the San Carlos Apache Tribe, AR 8148; the Fort McDowell Yavapai

22   Nation, AR 8089; the Sault Ste. Marie Tribe of Chippewa Indians, AR 8241; the Nez Perce Tribe,

23   AR 7882; Confederated Bands and Tribes of the Yakama, AR 7531; and the Hopi Tribe, AR 7508.

24          Opposition to the lack of NEPA analysis was not limited to individuals outside FWS.  For

25   example, Eliza Savage, who is the "Eagle Program Manager for the Division of Migratory Bird

26   Management" in FWS and had "responsibility for overseeing the drafting and revision" of the

27                                                    11

28   Case No. 14-CV-02830-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

United States District Court
Northern District of California

1    Proposed 30-Year Rule, ECF No. 49-1 ("Savage Decl.") ¶ 1; *see also* AR 11360 (identifying Ms.

2    Savage as the "rule writer"), offered the following recommendation in response to public

3    comments about the rule: "EIS needed."  AR 11248-50.  In her view, many of the comments "have

4    a great deal of merit," AR 5083, and it was therefore a "no-brainer that [FWS] needed to do a

5    NEPA analysis," AR 11242; *see also* AR 11294 (Ms. Savage referring to the rule's "critical

6    NEPA deficiencies").  According to Ms. Savage, "the [30-year] permits will be inherently less

7    protective for eagles than 5-year permits that require, upon renewal, the project proponent to

8    implement any known measures to reduce take, many of which would not have been known when

9    the original permit was issued."  AR 11246.  She also criticized the process by which FWS

10   ultimately decided to increase the maximum duration of programmatic eagle take permits from

11   five to thirty years.  Labeling the process a "train wreck" that "no one could be proud of," Ms.

12   Savage warned: "Once again, we find ourselves having taken sloppy action that we will have to do

13   over instead of doing things the way they should have been done to begin with."  AR 11360.

14        Similarly, Diana Whittington, a FWS biologist who co-authored the 2009 EA, *see* AR 94,

15   207, stressed that the "issuance of long-term, industrial scale programmatic permits for lethal take

16   was **outside the scope** of the 2009 [EA]," which "did not envision or address numerous

17   prospective permits authorizing activities causing on-going and sustained eagle mortality—such as

18   wind development," AR 5124.  Ms. Whittington warned further:

19        Some of the major points upon which we are vulnerable (and frankly, will likely
          not be able to make our case on either NEPA or APA – we have no admin[i]strative
20        record demonstrating consideration of the issues) include:

21            • Misuse of categorical exclusion (the one we applied should not be used
                for this kind [of] action) . . .
22
             • Failure to consider extraordinary circumstances
23
     AR 5248.  On this basis, Ms. Whittington recommended repeatedly that FWS "conduct a full and

24   comprehensive NEPA analysis" because "all the extraordinary circumstances from the 2008 DOI

25   Regulations Implementing NEPA likely apply" and "FWS's application of a categorical exclusion

26   for the proposed regulation is beyond the plain meaning of the terms of the categorical exclusion."

27                                            12

28   Case No. 14-CV-02830-LHK
     ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
     PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

1    AR 5251-54.

2         Other agency personnel recognized the risks of increasing the maximum duration of

3    programmatic eagle take permits from five to thirty years absent further NEPA review.  An FWS

4    memo dated September 20, 2012, recommended that the agency "complete an Environmental

5    Impact Statement that addresses both adaptive management and tribal concerns before proceeding

6    further on the tenure rule."  AR 5200.  The following day, the Chief of FWS's Division of

7    Migratory Bird Management wrote in an email that the agency was "vulnerable in several areas

8    and . . . should propose a more comprehensive strategy to more fully develop our approach to

9    eagle management and permits."  AR 11362.  In response to that email, FWS's National Raptor

10   Coordinator predicted that the agency would "spend the next 2 years in court" if it went forward

11   with the "risky" Final 30-Year Rule.  AR 11361.

12        On October 12, 2012, FWS staff working on the Proposed 30-Year Rule met with FWS

13   Director Dan Ashe (the "Director").  *See* AR 4770.  Prior to that meeting, FWS had drafted a

14   memo to the Director advising that the agency "prepare an environmental impact statement"

15   before increasing the maximum duration of programmatic eagle take permits from five to thirty

16   years, and that preparing an EIS "would result in a significantly improved, legally defensible

17   regulation."  AR 11257.  At the meeting itself, the staff's "[b]ottomline" recommendation to the

18   Director was to "shelve the tenure rule and do an EIS."  AR 4771.  The Director disagreed.

19   Finding the Proposed 30-Year Rule "administrative in nature," and believing it was "[u]nlikely

20   we'll be sued by NGOs," the Director instructed the staff to "[g]o ahead with finalizing the tenure

21   rule."  AR 4771.  The final outcome of the meeting pursuant to the Director was: "Don't do more

22   NEPA.  Don't do an EA, they will only want an EIS."  AR 4879.

23        **3.  Final 30-Year Rule (2013)**

24        Following the Director's instructions, FWS issued the final rule on December 9, 2013,

25   "extend[ing] the maximum term for programmatic permits to 30 years."  78 Fed. Reg. 73,704,

26

27                                        13

73,704 (Dec. 9, 2013) (codified at 50 C.F.R. § 22.26(i)) ("Final 30-Year Rule").[6]  As with the

proposed version, the stated purpose of the Final 30-Year Rule is to "facilitate the development of

renewable energy and other projects that are designed to be in operation for many decades" and to

"provide more certainty to project proponents and their funding sources, while continuing to

protect eagles consistent with statutory mandates." *Id.* at 73,721; *see also id.* at 73,708 ("One of

the central objectives of [the Final 30-Year Rule] is to provide more certainty to project

developers for the operational life of a project.").  Specifically, the Final 30-Year Rule "will

facilitate the funding, construction, and operation of numerous energy generation projects,

including wind power facilities." *Id.* at 73,722.  "Wind developers," FWS explained, "have

informed the DOI and [FWS] that 5-year permits have inhibited their ability to obtain financing,

and [FWS] changed the regulations to accommodate that need while protecting eagles." *Id.* at

73,709; *see also* AR 318 (DOI Secretary press release explaining that the Final 30-Year Rule "will

help the renewable energy industry and others develop projects that can operate in the longer

term").  Thus, "[b]y extending the duration of permits [FWS] expect[s] to have more entities apply

for permits." 78 Fed. Reg. at 73,708.  Further, in promulgating the Final 30-Year Rule, FWS

acknowledged that "[l]eaving the 5-year maximum permit term in place would have allowed for

additional public and Tribal comment during the NEPA process for each of the multiple permit

applications [FWS] would have evaluated for an activity expected to last decades." 78 Fed. Reg.

at 73,709.[7]

　　　　The Final 30-Year Rule differs in several respects from the Proposed 30-Year Rule.  First,

---

[6] The Final 30-Year Rule is reproduced at AR 1-22.

[7] In addition to extending the maximum duration for programmatic eagle take permits to thirty years, the Final 30-Year Rule substantially increases the fees charged both for processing programmatic permit applications and for monitoring the effectiveness of the terms and conditions of those permits. 78 Fed. Reg. at 73,707-08.  The Final 30-Year Rule also allows programmatic permits to be transferable to new owners of projects, provided that any successor is qualified and committed to carrying out the conditions of the permit. *Id.* at 73,725 (codified at 50 C.F.R. § 22.26(j)).  Those changes are not at issue here.

14

United States District Court
Northern District of California

United States District Court
Northern District of California

the Final 30-Year Rule provides that FWS will internally review programmatic eagle take permits every five years.  78 Fed. Reg. at 73,725 (codified at 50 C.F.R. § 22.26(h)).  That provision requires the permittee to furnish FWS with a report documenting "eagle fatality data or other pertinent information that is site-specific for the project."  50 C.F.R. § 22.26(h).  FWS will make eagle mortality data compiled in these reports "available to the public."  *Id.*  FWS will then review the information with the permittee to determine if a trigger point has been reached that requires implementation of one or more experimental ACPs—these were not mentioned in the Proposed 30-Year Rule—or additional mitigation measures designed to reduce eagle mortalities.  *Id.*  FWS's evaluation will reassess fatality rates, effectiveness of measures to reduce take, the appropriate level of compensatory mitigation, and eagle population status.  *Id.* § 22.26(h)(1).  Based upon its internal review, FWS will amend the permit as necessary, including requiring additional reporting, conservation, and mitigation requirements, or it may "suspend or revoke the permit."  *Id.* § 22.26(h)(2).

Notwithstanding the addition of the five-year permit reviews, which were proposed internally as early as October 2012, *see* AR 4731, opposition remained within FWS to increasing the maximum duration of programmatic eagle take permits to thirty years.  For instance, on March 11, 2013, the rule's author, Ms. Savage, repeated her comment that "the [30-year] permits will be inherently less protective for eagles than 5-year permits that require, upon renewal, the project proponent to implement any known measures to reduce take."  AR 2998.  According to Ms. Savage:

> The proposed rule changes are more than "administrative" in nature and so do not fall under the NEPA categorical exclusion invoked by [FWS].  Real, significant, and cumulative biological impacts will result if the proposed regulatory changes are implemented. . . .  Extending the permit tenure to 30 years without undergoing a new, comprehensive NEPA analysis, much less carrying out the commitments made in the 2009 FONSI is not in accordance with NEPA.

AR 2998.  Similarly, on June 27, 2013, Ms. Savage, in an email to the Chief of FWS's Division of Migratory Bird Management, asked: "Since, the tenure rule is opposed by the wind industry, the

15

1    enviros, Native American tribes, general public, and the biologists and other staff within [FWS]

2    who will have to implement it, why is [FWS] still planning to finalize it?"  AR 2295.  Reiterating

3    her opposition to "this current rulemaking that would extend permit tenure to up to 30 years," Ms.

4    Savage wrote later that day: "The continuing urge to put the tenure rule forward ahead of the rest

5    of the overhaul, in spite of nearly total opposition to it, is what I'm not understanding."  AR 2295.

6          In the Final 30-Year Rule, FWS added another justification for avoiding further NEPA

7    review.  As with the Proposed 30-Year Rule, FWS found that the Final 30-Year Rule is

8    categorically "excluded from further NEPA analysis in an Environmental Assessment or an

9    Environmental Impact Statement" because the rule is "primarily administrative in nature."  78

10   Fed. Reg. at 73,721-22 (quoting 43 C.F.R. § 46.210(i)).  In the Final 30-Year Rule, however, FWS

11   added a second basis for the categorical exclusion: the rule's "environmental effects are too broad,

12   speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to

13   the NEPA process, either collectively, or case-by-case."  *Id.* at 73,721 (quoting 43 C.F.R.

14   § 46.210(i)).  Moreover, FWS addressed for the first time whether any "extraordinary

15   circumstances" precluded agency reliance on a categorical exclusion, concluding that "none apply

16   to this final rule."  *Id.* at 73,722.  Finding that "this rulemaking is not expected to have any

17   potentially significant environmental effects on future protection of eagles or other environmental

18   resources," and that "the effects of this rule are not highly controversial," FWS decided that

19   "further NEPA analysis in an Environmental Assessment or an Environmental Impact Statement

20   of this change to the regulations is not required."  *Id.*

21         In addition to finding no need for further NEPA review, FWS concluded that the Final 30-

22   Year Rule was exempt from ESA's consultation requirements.  In particular, FWS found: "This

23   rule, which amends the regulations governing administration of the permitting process under the

24   Eagle Act, will not affect endangered or threatened species or designated critical habitat."  78 Fed.

25   Reg. at 73,722.  "The rule," continued FWS, "simply increases the number of years that a

26   programmatic permit may be valid under certain conditions and requires [FWS] to conduct 5-year

27                                                    16

United States District Court
Northern District of California

reviews to monitor compliance with the permit conditions." *Id.* FWS did note, however, that "consultation under ESA Section 7 may be required prior to issuance of a permit for an individual project." *Id.*

### C. Procedural History

The Final 30-Year Rule took effect on January 8, 2014. *See* 50 C.F.R. § 22.26. On June 19, 2014, Plaintiffs filed suit in federal court. ECF No. 1. The case was reassigned to the undersigned judge on July 14, 2014. ECF No. 17.

On September 25, 2014, Plaintiffs filed a First Amended Complaint against Federal Defendants. ECF No. 21 ("FAC"). In the FAC, Plaintiffs seek to have the Final 30-Year Rule declared in violation of NEPA, BGEPA, ESA, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. FAC at 26. As a result, Plaintiffs ask the Court to set aside the rule and remand it to FWS for further consideration. *Id.* Federal Defendants answered the FAC on October 9, 2014. ECF No. 22.

On January 13, 2015, AWEA filed a motion to intervene as a defendant in this action. ECF No. 33. In a declaration supporting AWEA's motion, AWEA's "Director of Permitting Policy and Environmental Affairs," John Anderson, stated that "AWEA and its members believe that [the Final 30-Year Rule's] extension is necessary for the future of wind energy development" because "occasional, unintentional eagle mortality is an unavoidable reality for wind energy facilities." ECF No. 33-1 ("Anderson Decl.") ¶¶ 7, 9. On January 16, 2015, Plaintiffs filed a statement indicating that they did not oppose AWEA's intervention. ECF No. 36. So too did Federal Defendants on January 22, 2015. ECF No. 38. That same day, the Court granted AWEA's motion to intervene. ECF No. 39.

Pursuant to the case schedule, *see* ECF No. 31, Federal Defendants filed the AR on January 30, 2015, ECF No. 40. A revised AR was filed on March 23, 2015. ECF No. 49. This was done "to include the final [ECPG] from April 2013 and additional emails that were inadvertently left out of the original administrative record." Savage Decl. ¶ 5.

17

United States District Court
Northern District of California

On March 31, 2015, Plaintiffs filed their motion for summary judgment. *See* Pls. MSJ. Each of the five individual plaintiffs, as well as plaintiff American Bird Conservancy ("ABC"), filed declarations in support of their motion. ECF Nos. 52-1, 52-2, 52-3, 52-4, 52-5, 52-6. With the Court's permission, the Conservation Congress and the Inter Tribal Association of Arizona[8] filed amicus briefs in support of Plaintiffs on April 7, 2015, and April 9, 2015, respectively. ECF Nos. 59, 62. AWEA filed its combined cross-motion for summary judgment and opposition to Plaintiffs' motion on May 7, 2015. *See* AWEA MSJ. Federal Defendants did so as well. *See* Fed. Defs. MSJ. Plaintiffs filed their combined reply in support of their summary judgment motion and opposition to that of Federal Defendants on June 15, 2015. ECF No. 66 ("Pls. Reply"). That same day, Plaintiffs separately opposed AWEA's motion for summary judgment. ECF No. 67. On July 7, 2015, AWEA and Federal Defendants filed their respective replies. ECF No. 69; ECF No. 70 ("Fed. Defs. Reply").

On July 20, 2015, and pursuant to Civil Local Rule 7-1(b), the Court vacated the July 23, 2015 hearing date set for the parties' summary judgment motions. ECF No. 72. The case management conference set for that date was continued to August 26, 2015, at 1:30 p.m. *Id.*

## II.      LEGAL STANDARDS

### A.   APA Review

Alleged procedural violations of NEPA "are reviewed under the Administrative Procedure Act." *Kraayenbrink*, 632 F.3d at 481. The same is true for ESA claims, whether they are "brought under the citizen-suit provision of the ESA or . . . under the APA." *Id.*

Under the APA, "a court may set aside an agency action if the court determines that the action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)).

---

[8] In 2014, the Inter Tribal Council of Arizona formally changed its name to the Inter Tribal Association of Arizona. *See* ECF No. 62 at 1 n.2. Because nothing in the governance structure of the organization was altered as a result of this name change, *see id.*, the Court uses the names interchangeably.

18

United States District Court
Northern District of California

1    "To determine whether agency action is arbitrary or capricious, a court must consider 'whether the

2    decision was based on a consideration of the relevant factors and whether there has been clear

3    error of judgment.'"  *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999)

4    (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).  This standard is a

5    "deferential" one.  *Bosworth*, 510 F.3d at 1022.

6         Nonetheless, "to withstand review the agency must articulate a rational connection

7    between the facts found and the conclusions reached."  *Bosworth*, 510 F.3d at 1023 (brackets and

8    internal quotation marks omitted).  Courts "will defer to an agency's decision only if it is 'fully

9    informed and well-considered.'"  *Id.* (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717

10   (9th Cir. 1988)).  Importantly, "when an agency has taken action without observance of the

11   procedure required by law, that action will be set aside."  *Id.*  "'Unexplained inconsistency'

12   between agency actions" is a reason for finding "an arbitrary and capricious change."  *Organized*

13   *Vill. of Kake v. U.S. Dep't of Agric.*, — F.3d —, 2015 WL 4547088, at *7 (9th Cir. July 29, 2015)

14   (en banc) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981

15   (2005)).

16   **B.  Summary Judgment**

17        In general, summary judgment is appropriate if, viewing the evidence and drawing all

18   reasonable inferences in the light most favorable to the nonmoving party, there are no genuine

19   disputes of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

20   56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

21        In an APA case, however, a district court's function at summary judgment is not to resolve

22   disputed facts and make de novo factual determinations, but rather "to determine whether or not as

23   a matter of law the evidence in the administrative record permitted the agency to make the

24   decision it did."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985); *accord Nw.*

25   *Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) (explaining that

26   because "this case involves review of a final agency determination under the Administrative

27                                             19

28   Case No. 14-CV-02830-LHK
     ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
     PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

United States District Court
Northern District of California

1    Procedure Act, . . . resolution of this matter does not require fact finding on behalf of this court").

2    A court's review is therefore "limited to the administrative record." *Nw. Motorcycle Ass'n*, 18

3    F.3d at 1472.

4    **III.    DISCUSSION**

5           Plaintiffs seek to set aside the Final 30-Year Rule and remand it to FWS on grounds that

6    the agency failed to comply with NEPA's procedural requirements and ESA's consultation

7    requirements in promulgating the rule.  *See* Pls. MSJ at 14-25.  Federal Defendants argue that

8    Plaintiffs lack Article III standing to challenge the Final 30-Year Rule.  *See* Fed. Defs. MSJ at 11-

9    13.  Federal Defendants and AWEA argue further that Plaintiffs cannot show that FWS acted in an

10   arbitrary and capricious manner in promulgating the Final 30-Year Rule.  *See* Fed. Defs. MSJ at

11   14-25; AWEA MSJ at 5-23.

12          For the reasons stated below, the Court concludes that Plaintiffs have Article III standing,

13   that FWS violated NEPA's procedural requirements, and that the Final 30-Year Rule must

14   therefore be set aside and remanded to FWS.  The Court also concludes that Plaintiffs have not

15   shown a violation of ESA's consultation requirements.

16   **A. Plaintiffs' Standing**

17          For an action to proceed in federal court, it must satisfy the "case or controversy"

18   requirement of Article III of the U.S. Constitution.  "One element of the case-or-controversy

19   requirement is that plaintiffs must establish that they have standing to sue."  *Clapper v. Amnesty*

20   *Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (internal quotation marks omitted).  To establish Article

21   III standing, a plaintiff must allege: injury-in-fact that is (1) concrete and particularized, as well as

22   actual and imminent; (2) fairly traceable to the challenged action of the defendant; and (3)

23   redressable by a favorable ruling.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

24          At the summary judgment stage, a plaintiff seeking to establish standing "must set forth by

25   affidavit or other evidence specific facts, which for purposes of the summary judgment motion

26   will be taken to be true."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation

27                                                        20

*United States District Court*
*Northern District of California*

1   omitted).  Article III standing is analyzed "claim by claim," and a court "need not address the

2   standing of each plaintiff if [the court] conclude[s] that any plaintiff has standing." *California ex*

3   *rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 789 (9th

4   Cir. 2014).

5         Federal Defendants argue here that the six declarations filed by Plaintiffs do not satisfy the

6   Article III standing requirements, as articulated in *Summers*.  *See* Fed. Defs. MSJ at 11-13.

7   Specifically, Federal Defendants contend that Plaintiffs "have not met their burden to show a

8   'certainly impending' injury-in-fact, as required to establish standing." *Id.* at 12 (quoting *Clapper*,

9   133 S. Ct. at 1147).  According to Federal Defendants, "Plaintiffs merely speculate" that the Final

10  30-Year Rule "might encourage development of wind projects at as-yet-unknown locations within

11  large expanses of eagle habitat that they claim they use." *Id.*  "Mere conjecture," Federal

12  Defendants say, "that, at some time in the future, a permit might be issued under the [Final 30-

13  Year Rule] for a project in an area that one or more of the plaintiffs might visit later on does not

14  satisfy the strict requirements of Article III standing." *Id.* (citing *Summers*, 555 U.S. at 495-96).[9]

15        In *Summers*, a group of environmental organizations sought a nationwide injunction

16  against the enforcement of regulations issued by the U.S. Forest Service that exempted small-scale

17  fire-control and timber-salvage projects from the notice, comment, and appeal process that applied

18  to more substantial land management decisions.  555 U.S. at 490.  The plaintiffs in *Summers* also

19  specifically challenged a 238-acre salvage sale of timber, called the Burnt Ridge Project, in the

20  Sequoia National Forest.  *Id.* at 491.  During the course of litigation, however, the parties settled

21  their dispute over the Burnt Ridge Project, and the plaintiffs filed only one affidavit—from Jim

22  Bensman, a member of one of the plaintiff organizations—that purported to involve a threatened

23  interest beyond the Burnt Ridge Project.  *Id.* at 491, 495.

24

25        [9] AWEA does not vigorously challenge Plaintiffs' Article III standing, spending just one
26  sentence in a single footnote asserting that Plaintiffs "have suffered no cognizable injury to
    support standing to bring this action."  AWEA MSJ at 9 n.1.

27                                            21

28  Case No. 14-CV-02830-LHK
    ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
    PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

On these facts the U.S. Supreme Court held that the plaintiffs had failed to establish injury-in-fact necessary to satisfy Article III standing requirements. *Summers*, 555 U.S. at 494-97. The *Summers* Court held that Mr. Bensman's representation of general plans to visit "several unnamed National Forests in the future" was insufficient to establish standing because Mr. Bensman "fail[ed] to allege that any particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan . . . to enjoy the National Forests." *Id.* at 495. The *Summers* Court emphasized that, although Mr. Bensman referred to a series of projects in the Allegheny National Forest, he did not "assert . . . any firm intention to visit their locations, saying only that [he] 'wants to' go there." *Id.* at 496. Thus, the *Summers* Court concluded, there was "a chance, but . . . hardly a likelihood, that Bensman's wanderings w[ould] bring him to a parcel about to be affected by a project unlawfully subject to the regulations." *Id.* at 495.

Here, by contrast, Plaintiffs' six declarations offer far greater specificity. For instance, the declaration of Debra Shearwater, an ABC member who owns and operates a private birdwatching company, details her decades-long history of observing bald and golden eagles in specific locales throughout California, especially San Benito County. ECF No. 52-1 ("Shearwater Decl.") ¶¶ 1-2. In particular:

> Since moving to California [in 1976], I have enjoyed observing eagles throughout the region, particularly during my regular relaxation drives through Santa Ana Valley. During one visit to Santa Ana Valley, I observed as many as thirty Golden Eagles at one time in one small location. I also document and track nesting pairs of Golden Eagles throughout the region. In 2004, I discovered the first-ever breeding Bald Eagles in San Benito County, just seven miles from my home. Ever since, I have reported annually to the local Bald Eagle expert regarding the pair's nesting success, and the pair has successfully fledged two young every year but one. In addition, I have recently documented nesting Bald Eagles at Hernandez Reservoir, San Felipe Lake, the Gabilan Mountains, and very likely at San Justo Reservoir, all of which are within San Benito County.

*Id.* ¶ 3. Ms. Shearwater, who "purchased [her] current home [in Hollister] in 1996 specifically to observe Golden Eagles on a near-daily basis," *id.* ¶ 2, also "enjoy[s] observing other animal

United States District Court
Northern District of California

species whose habitats overlap with those of eagles," *id.* ¶ 5.  These animals include "a number of species protected under the Endangered Species Act," such as "the San Joaquin Kit Fox, the Blunt-Nosed Leopard Lizard, the Giant Kangaroo Rat, and the California Condor." *Id.* ¶ 5.  Ms. Shearwater "will continue to devote . . . much of [her] time to the observation, study, and monitoring of Bald and Golden Eagles" on these lands. *Id.* ¶ 6.

Ms. Shearwater's declaration, unlike Mr. Bensman's affidavit in *Summers*, demonstrates certain plans to visit specific geographic areas for the express purpose of observing, enjoying, and studying bald and golden eagles, as well as additional species protected by ESA. *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1080 (9th Cir. 2015) (distinguishing *Summers* because declarations from plaintiff's members establish that they "extensively utilize specific National Forests where the Lynx Amendments apply and demonstrate their date-certain plans to visit the forests for the express purpose of viewing, enjoying, and studying Canada lynx"). Plaintiffs' other declarations contain similar details.  *See, e.g.*, ECF No. 52-5 ("Thal Decl.") (stating that Mr. Thal, an ABC member, "will continue to visit" the following areas to observe bald and golden eagles: "the Sacramento Refuge near Willows, California" and "the Lake Tule Refuge, the Lower Klamath Refuge, and the Upper Klamath Refuge on the border of California and Oregon").

As Plaintiffs bring a claim for "procedural injury" under NEPA and ESA—i.e., FWS's failure to prepare an EIS or an EA under NEPA and failure to consult under ESA—Plaintiffs must show that "the procedures in question are designed to protect some threatened concrete interest of [theirs] that is the ultimate basis of [their] standing." *Kraayenbrink*, 632 F.3d at 485 (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003)).  "Of course," the U.S. Supreme Court has said, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562-63.  To satisfy the "concrete interest test," Plaintiffs must establish "a geographic nexus between the individual asserting the claim and the location suffering an environmental

23

United States District Court
Northern District of California

impact." *Kraayenbrink*, 632 F.3d at 485 (quoting *Citizens for Better Forestry*, 341 F.3d at 971).

Plaintiffs have done so here. As Ms. Shearwater's declaration makes clear, she has long been documenting bald and golden eagles in San Benito County, and "FWS's promulgation of the thirty-year eagle take rule without any review of the rule's environmental impacts under NEPA—through preparation of an Environmental Impact Statement or at least an Environmental Assessment—is extremely detrimental to [her] interests in enjoying, observing, and studying eagles." Shearwater Decl. ¶¶ 1-3, 9. This is so, Ms. Shearwater says, because NEPA review would require FWS "to analyze the potential *cumulative* effects on eagles of facilitating and encouraging the expansion of wind power and other projects in eagle habitat." *Id.* ¶ 9.

Ms. Shearwater's alleged procedural injury is far from speculative. On May 1, 2015, FWS published a notice in the Federal Register that Pacific Gas and Electric Company ("PG&E"), a California-based utility, is seeking "a 30-year programmatic eagle take permit for take of bald eagles and golden eagles" over a large area that includes fifty-four California counties. 80 Fed. Reg. 24,955, 24,956 (May 1, 2015).[10] One of the counties specifically mentioned is "San Benito."[11] *Id.* Accordingly, Plaintiffs' "declarations sufficiently establish 'a geographic nexus between the individual[s] asserting the claim and the location suffering an environmental impact.'" *Cottonwood*, 789 F.3d at 1081 (quoting *Kraayenbrink*, 632 F.3d at 485); *see also WildEarth Guardians v. U.S. Dep't of Agric.*, — F.3d —, 2015 WL 4604142, at *5 (9th Cir. Aug. 3, 2015) (finding concrete injury with geographic nexus where plaintiff alleged "his reduced recreational and aesthetic enjoyment of . . . specific wilderness areas in Nevada that he has visited and has specific plans to visit again" and that were impacted by the agency action).

---

[10] The Court sua sponte takes judicial notice of this entry in the Federal Register. *See City of Las Vegas v. FAA*, 570 F.3d 1109, 1118 (9th Cir. 2009) (taking "judicial notice of Federal Register Notices"). Neither Federal Defendants nor AWEA disputes the accuracy of the notice or that PG&E has applied for a programmatic eagle take permit under the Final 30-Year Rule. *See* Fed. R. Evid. 201(b).

[11] The notice also mentions Glenn and Siskiyou counties, *see* 80 Fed. Reg. at 24,956, which contain eagle refuges that Mr. Thal declares he "will continue to visit." Thal Decl. ¶¶ 2-3.

24

1   As the Ninth Circuit explained recently, the fact that Plaintiffs are challenging

2   "programmatic management direction without also challenging an implementing project that will

3   cause discrete injury" does not deprive them of Article III standing. *Cottonwood*, 789 F.3d at

4   1081. Plaintiffs are "not required to challenge directly any specific project" because their

5   "procedural injury was complete" when FWS failed to conduct further NEPA analysis or failed to

6   engage in ESA consultation. *Id.* (brackets omitted) (quoting *Sierra Forest Legacy v. Sherman*,

7   646 F.3d 1161, 1179 (9th Cir. 2011)).

8   Nor must Plaintiffs establish that further NEPA review or ESA consultation "would lead to

9   different, injurious results." *Cottonwood*, 789 F.3d at 1082. It is well established in the Ninth

10   Circuit that Plaintiffs' "allegation of a procedural injury relaxes [their] burden of showing

11   causation and redressability." *Id.* at 1083; *see also Lujan*, 504 U.S. at 572 n.7 ("The person who

12   has been accorded a procedural right to protect his concrete interests can assert that right without

13   meeting all the normal standards for redressability and immediacy."). "This relaxed redressability

14   standard governs procedural challenges to programmatic actions as well as to specific

15   implementing actions." *WildEarth Guardians*, 2015 WL 4604142, at *6. To that end, "a litigant

16   need only demonstrate that he has a procedural right that, if exercised, *could* protect his concrete

17   interests and that those interests fall within the zone of interests protected by the statute at issue."

18   *Cottonwood*, 789 F.3d at 1082-83 (quoting *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 783

19   (9th Cir. 2014) (en banc)).

20   Plaintiffs, like the plaintiff organization in *Cottonwood*, have "properly alleged" that

21   further NEPA analysis and ESA consultation "could result in the protection of [their] interests in

22   specific [eagle habitats] where [they] recreate." 789 F.3d at 1083; *see also* Shearwater Decl. ¶¶ 1-

23   3, 7-9; Thal Decl. ¶¶ 2-3, 5. "Those interests," moreover, "are clearly within the "zone of interests

24   protected by" NEPA and ESA. *Cottonwood*, 789 F.3d at 1083. "Because it is enough that [NEPA

25   analysis or ESA consultation] *may* redress plaintiffs' alleged injuries," Plaintiffs have "satisfie[d]

26   the causation and redressability requirements" of Article III standing. *Kraayenbrink*, 632 F.3d at

27   25

United States District Court
Northern District of California

485 (emphasis added) (internal quotation marks omitted).[12]

For these reasons, the Court concludes that Plaintiffs have Article III standing to pursue their claims for procedural injury under NEPA and ESA.[13]

**B. NEPA Compliance**

NEPA "is our basic national charter for protection of the environment." *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009).  In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment" and set out "to create and maintain conditions under which man and nature can exist in productive harmony."  42 U.S.C. § 4331(a).  To accomplish that goal, "NEPA 'establishes "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences.'"  *Kraayenbrink*, 632 F.3d at 486 (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000)).

"Foremost among those procedures," as explained previously, "is the preparation of an environmental impact statement (EIS)."  *Kraayenbrink*, 632 F.3d at 486.  For all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), agencies "are required to prepare an EIS," *Kraayenbrink*, 632 F.3d at 486-87.  "When it is unclear whether the federal action will have a significant effect on the environment, the agency must prepare an 'environmental assessment' to determine whether an EIS is required." *WildEarth Guardians*, 2015 WL 4604142, at *1 (citing 40 C.F.R. § 1501.4(b)).  The purpose of preparing an EIS—or an EA to determine whether an EIS is necessary—is twofold:

---

[12] Federal Defendants' citation to *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010), is unavailing.  *See* Fed. Defs. MSJ at 12-13; Fed. Defs. Reply at 1.  There, unlike here, the plaintiff declared little more than a "'some day' general intention to return to the national forests of two geographically large states."  *Rey*, 622 F.3d at 1256.  As explained above, Plaintiffs' declarations are far more concrete.

[13] Because the Court concludes that Plaintiffs have established a procedural injury that confers Article III standing, the Court "need not address" whether ABC has independently shown organizational standing.  *Imperial Cnty.*, 767 F.3d at 789.

26

United States District Court
Northern District of California

> First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts. Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Kraayenbrink*, 632 F.3d at 487. "By focusing agency and public attention on the environmental effects of proposed agency action, 'NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" *Id.* at 487 (quoting *Marsh*, 490 U.S. at 371).

"When," however, "an action falls within a categorical exclusion and an agency reasonably determines that there are no extraordinary circumstances," the agency need not prepare an EIS or an EA. *Lockyer*, 575 F.3d at 1013. "Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Bosworth*, 510 F.3d at 1027 (quoting *Alaska Ctr.*, 189 F.3d at 859). Application of a categorical exclusion ("CE") is therefore "inappropriate if there is the possibility that an action *may have* a significant environmental effect." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1087 (N.D. Cal. 2007).

As indicated previously, FWS elected not to prepare an EIS—let alone an EA—before promulgating the Final 30-Year Rule. Instead, FWS relied on a single two-part CE to avoid NEPA review: (1) that several provisions of the Final 30-Year Rule were merely "administrative or financial in nature"; and (2) that the rule's "environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively, or case-by-case." 78 Fed. Reg. at 73,721-22 (quoting 43 C.F.R. § 46.210(i)). FWS found further that "none" of the extraordinary circumstances listed in the DOI regulations at 43 C.F.R. § 46.215 applied to the Final 30-Year Rule. *Id.* at 73,722. As a result, FWS concluded, "further NEPA analysis in an Environmental Assessment or an Environmental Impact Statement of this change to the regulations is not required." *Id.*

Plaintiffs here challenge FWS's decision to prepare neither an EIS nor an EA before

27

increasing the maximum duration of programmatic permits to take bald and golden eagles from five years to thirty years. *See* Pls. MSJ at 14-24. Because "the very purpose of the [Final 30-Year Rule] is to have a significant impact on the environment by encouraging the development of industrial wind power and other renewable energy projects in eagle habitat," Plaintiffs argue that "FWS cannot invoke a CE" as a matter of law. *Id.* at 15-16 (emphasis omitted). Plaintiffs argue further that the CE invoked by FWS does not apply to the Final 30-Year Rule. *Id.* at 17-20. Even if that CE applied, Plaintiffs contend that "extraordinary circumstances" exist that preclude FWS's reliance on it. *Id.* at 20-24. For the reasons stated below, the Court agrees with Plaintiffs.

### 1. CE Designation

Courts "generally review [an agency's] compliance with the National Environmental Policy Act . . . under the 'arbitrary and capricious' standard of the Administrative Procedure Act." *Lockyer*, 575 F.3d at 1011 (quoting 5 U.S.C. § 706(2)(A)). "An 'agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.'" *Id.* (quoting *Alaska Ctr.*, 189 F.3d at 857). "In the Ninth Circuit," however, "an agency's threshold decision that certain activities are not subject to NEPA is reviewed for reasonableness." *Id.* (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1070 (9th Cir. 2002)). "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Bosworth*, 510 F.3d at 1026 (quoting *Alaska Ctr.*, 189 F.3d at 859).

In declining to conduct further NEPA review before promulgating the Final 30-Year Rule, FWS relied on the following two-part CE from DOI regulations:

> Policies, directives, regulations, and guidelines: [(1)] that are of an administrative, financial, legal, technical, or procedural nature; *or* [(2)] whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis *and* will later be subject to the NEPA process, either collectively or case-by-case.

43 C.F.R. § 46.210(i) (emphases added). As discussed below, because FWS did not adequately explain its reliance on either part of this CE as a basis for avoiding further NEPA review of the

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Final 30-Year Rule, the Court concludes that FWS's application of the CE was unreasonable.  *See*

*Lockyer*, 575 F.3d at 1014-15 (rejecting as "unreasonable" the U.S. Forest Service's reliance on a

CE reserved for "administrative" or "procedural" agency actions where the rule at issue had the

effect of "taking substantive environmental protections off the books").

### a.  Administrative in Nature

It is not entirely clear that FWS, in promulgating the Final 30-Year Rule, relied on the

"administrative" portion of the CE to avoid NEPA review of its decision to increase the maximum

duration for programmatic eagle take permits from five years to thirty years.  Rather, FWS stated

that "[s]everal provisions of this rule are specifically administrative or financial in nature," such as

"the implementation of a new fee schedule, the adjustments to the permit transfer and right of

succession requirements, and the reduction of the administrative burdens and duplication of effort

represented by the extension of permit duration to a possible 30-years, instead of the current 5-

year limit, under which proponents of longer-term projects must apply for, and the FWS review

permits more frequently." 78 Fed. Reg. at 73,721.  FWS offers no further explanation.

Plaintiffs, however, do not challenge the Final 30-Year Rule's changes to the fee schedule

or the adjustments to permit transferability.  *See supra* note 7.  What Plaintiffs challenge is FWS's

decision to increase the maximum duration for programmatic eagle take permits from five years to

thirty years.  As to that issue, FWS says only that increasing the maximum duration will have the

effect of reducing the "administrative burdens" on the agency. 78 Fed. Reg. at 73,721.  That may

be true, but just because a regulation might reduce an agency's administrative burden does not

necessarily mean that the regulation itself is administrative in nature.  The Court can imagine

plenty of substantive regulations that, if promulgated, might also have the effect of reducing an

agency's administrative burden.

In any event, the evidence before the Court suggests that FWS's decision to increase the

maximum duration for programmatic eagle take permits from five years to thirty years is not

merely administrative in nature.  As the Ninth Circuit explained in *Kraayenbrink*, regulations that

29

United States District Court
Northern District of California

1    "increase the barriers to public involvement" in agency management "are not purely

2    administrative."  632 F.3d at 498.  In that case, the Ninth Circuit reviewed certain regulations that

3    altered the Bureau of Land Management's ("BLM") oversight of livestock grazing on public

4    lands.  *Id.* at 478-81.  One of the "major modifications" imposed by the new regulations was to

5    "narrow the definition of 'interested public' and remove the requirement that the BLM consult,

6    cooperate, and coordinate with the 'interested public' with respect to various management

7    decisions."  *Id.* at 479.  Specifically, BLM was "no longer required to involve interested members

8    of the public when issuing or renewing an individual grazing permit."  *Id.* at 480.  In

9    *Kraayenbrink*, unlike here, BLM actually prepared an EIS, but the EIS concluded that the

10   proposed regulations would have no significant environmental impact.  *Id.* at 487.  Nevertheless,

11   the Ninth Circuit held that BLM's failure to provide "a reasoned explanation" in the EIS for such

12   "substantial reductions in the avenues for public input" violated NEPA's "hard look" requirement.

13   *Id.* at 494-95.

14           Similarly, here, there is no serious dispute that a sixfold increase in the maximum duration

15   of programmatic eagle take permits will have the effect of reducing public participation in

16   permitting decisions.  Over the lifespan of a thirty-year permit, a project might be subject to

17   NEPA's public participation requirements only once, when that permit is first issued.  By contrast,

18   a project under a five-year permitting regime would be subject to NEPA's public participation

19   requirements six times during that same thirty-year period.  FWS's apparent compromise to make

20   eagle mortality data compiled by permittees every five years "available to the public" in some

21   unspecified manner is no substitute for the public's right under NEPA to participate in permitting

22   decisions.  50 C.F.R. § 22.26(h).  Nothing in the Final 30-Year Rule requires FWS to provide the

23   agency's *analysis* of that data to the public, and Federal Defendants acknowledge that under the

24   new rule the public may become involved only "if" FWS decides that there is a "need for a

25   significant permit amendment."  Fed. Defs. MSJ at 15.  Unsurprisingly, one of the public

26   comments when FWS adopted the Final 30-Year Rule stated: "A 30-year permit would decrease

27                                                           30

28   Case No. 14-CV-02830-LHK
     ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
     PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

1    opportunities for public stakeholder involvement because decisions on issuance and reissuance are

2    subject to NEPA analysis and tribal consultation." 78 Fed. Reg. at 73,709.  In response to that

3    comment, FWS conceded the inevitable: "Leaving the 5-year maximum permit term in place

4    would have allowed for additional public and Tribal comment during the NEPA process for each

5    of the multiple permit applications [FWS] would have evaluated for an activity expected to last

6    decades." *Id.*

7         Another arguably substantive change effected by the Final 30-Year Rule is that it "shifts

8    the burden" from the permittee to FWS.  78 Fed. Reg. at 73,709.  This is the case because, under

9    the old five-year regime, a permittee would be required to satisfy the criteria for permit renewal

10   every five years. *See* 74 Fed. Reg. at 46,845, 46,851.  Under the new thirty-year regime, however,

11   the burden shifts to FWS to determine every five years whether any changes to the permit are

12   necessary. *See* 50 C.F.R. § 22.26(h) (discussing internal five-year permit reviews).  It is not clear

13   how onerous these five-year reviews will be.  The wind industry's criticism of the 5-Year Rule

14   was that it was "fundamentally unworkable for the industry considering the life of most wind

15   projects is 20 to 30 years." AR 11235.  In the Final 30-Year Rule, FWS stated: "One of the

16   central objectives of this regulation is to provide more certainty to project developers for the

17   operational life of a project." *Id.*  Thus, FWS rejected a proposal that would have allowed "[t]he

18   burden of proof [to] remain with the permittee" because doing so "would not provide project

19   developers the certainty provided by a permit for the anticipated project life." 78 Fed. Reg. at

20   73,709.

21        In addition, the primary purpose of the Final 30-Year Rule, according to the regulation

22   itself, was not to reduce FWS's administrative burden.  Rather, the primary purpose was to

23   "facilitate the responsible development of renewable energy and other projects designed to operate

24   for decades." 78 Fed. Reg. at 73,704.  In particular, the Final 30-Year Rule would "facilitate the

25   funding, construction, and operation of numerous energy generation projects, including wind

26   power facilities." *Id.* at 73,722; *see also* AR 2251 (July 18, 2013 email from a senior advisor to

27                                                          31

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

the Director: "At the urging of the wind industry, [FWS] is in the final stages of promulgating a rule to extend the duration of eagle take permits from 5 to up to 30 years").  A press release from the DOI Secretary accompanying the Final 30-Year Rule's publication emphasized that the rule "will help the renewable energy industry and others develop projects that can operate in the longer term." AR 318.  Considering that the wind industry's substantive—and not procedural—concerns drove the Final 30-Year Rule's promulgation, and in the absence of further explanation from FWS, the Court fails to see how the regulation could be considered strictly administrative.  *Cf. Lockyer*, 575 F.3d at 1017 n.16 (listing the following as examples of "routine and procedural matters" properly subject to the CE: "changes to locations at which the Forest Service may charge admission fees, clarifications of the appraisal procedures for determining fair market value when appraising timber, updates for field unit names and addresses, clarification of appeal procedures, and revisions to building standards for residential outbuildings").

The record bolsters the Court's conclusion, as FWS's failure to adequately "address concerns raised by its own experts" is cause for the Court to find a NEPA violation. *Kraayenbrink*, 632 F.3d at 492.  Ms. Whittington, a FWS biologist who co-authored the 2009 EA, *see* AR 94, 207, explained in an email dated September 14, 2012, that FWS's reliance on the administrative CE was "vulnerable" to the following criticism: "Misuse of categorical exclusion (the one we applied should not be used for this kind [of] action)," AR 5248.  In her candid assessment, FWS "will likely not be able to make [its] case on either NEPA or APA."  AR 5248. This was so, Ms. Whittington explained, because "FWS's application of a categorical exclusion for the proposed regulation is beyond the plain meaning of the terms of the categorical exclusion." AR 5253-54.  *Id.*  According to Ms. Savage, who authored the Final 30-Year Rule, *see* Savage Decl. ¶ 1, it was a "no-brainer that [FWS] needed to do a NEPA analysis," AR 11242.

On October 12, 2012, just two days after Ms. Savage had expressed that view, FWS staff working on the Proposed 30-Year Rule met with the Director to give their final recommendation. *See* AR 4770.  Prior to that meeting, FWS had drafted a memo to the Director advising that the

32

agency "prepare an environmental impact statement" before adopting the Final 30-Year Rule and that doing so "would result in a significantly improved, legally defensible regulation." AR 11257. The staff's "[b]ottomline" message to the Director at the meeting itself was to "shelve the tenure rule and do an EIS." AR 4771. The Director disagreed, however. Finding the Proposed 30-Year Rule "administrative in nature," and believing it was "[u]nlikely we'll be sued by NGOs," the Director instructed the staff to "[g]o ahead with finalizing the tenure rule." AR 4771. The final outcome of the meeting pursuant to the Director was: "Don't do more NEPA. Don't do an EA, they will only want an EIS." AR 4879.

Criticism by FWS experts of the decision to label the Final 30-Year Rule "administrative" in nature did not end with that October 2012 meeting. Ms. Savage wrote on March 11, 2013, that the decision to increase the maximum duration for programmatic eagle take permits from five years to thirty years was "more than 'administrative' in nature and so do[es] not fall under the NEPA categorical exclusion invoked by [FWS]." AR 2998. "Real, significant, and cumulative biological impacts will result," Ms. Savage continued, "if the proposed regulatory changes are implemented." AR 2998.

Federal Defendants argue that these "citations to internal agency staff e-mails appear to concern the [Proposed and not the Final 30-Year Rule]—that is, without the five-year review, public information, and permit modification or revocation procedures." Fed. Defs. MSJ at 15. The Court finds this argument unpersuasive for two reasons. First, the Final 30-Year Rule explains that it was finalizing the Proposed 30-Year Rule subject to only "minor modifications." 78 Fed. Reg. at 73,705. Although Federal Defendants assert that these minor changes adequately "addressed" the criticism from FWS's own NEPA experts, Fed. Defs. MSJ at 18, Federal Defendants do not explain why. Nor do they cite any evidence in the record to support their assertion. Second, as a factual matter, the five-year reviews were proposed within the agency as early as October 2012. *See* AR 4731. However, several of the more trenchant internal criticisms of the decision to increase the maximum duration for programmatic eagle take permits from five

33

United States District Court
Northern District of California

years to thirty years were issued well after that date.  *See, e.g.*, AR 2998 (March 11, 2013

statement by Ms. Savage that the rule was "more than 'administrative' in nature and so do[es] not

fall under the NEPA categorical exclusion invoked by [FWS]"); AR 2295 (June 27, 2013 email

from Ms. Savage questioning FWS's decision to press on with the rule despite the "nearly total

opposition to it," including from "the wind industry, the enviros, Native American tribes, general

public, and the biologists and other staff within [FWS] who will have to implement it"); AR 2283

(July 5, 2013 memo from FWS staff to the Director labeling the rule "highly controversial within

the environmental community").

      Accordingly, the Court concludes that FWS has failed to "adequately explain its decision"

to rely on the "administrative" portion of the CE to avoid NEPA review.  *Bosworth*, 510 F.3d at

1026 (quoting *Alaska Ctr.*, 189 F.3d at 859).  Such reliance, the Court finds, was therefore

"unreasonable."  *See Lockyer*, 575 F.3d at 1014.

### b.  Environmental Effects Too Broad, Speculative, or Conjectural to Yield Meaningful Analysis and Will Later Be Subject to NEPA Process

      In deciding to increase the maximum duration for programmatic eagle take permits from

five years to thirty years, FWS appears to rely primarily on the second portion of the CE to avoid

NEPA review.  *See* 78 Fed. Reg. at 73,714 ("More importantly, however, the extension of the

allowable permit duration from 5 to 30 years is subject to the second part of this categorical

exclusion . . . .").  To rely on this part of the CE, FWS must establish that the environmental

effects of the Final 30-Year Rule are both (1) "too broad, speculative, or conjectural to lend

themselves to meaningful analysis"; *and* (2) "will later be subject to the NEPA process, either

collectively or case-by-case."  43 C.F.R. § 46.210(i).

      FWS, however, has not adequately explained why the environmental effects of the Final

30-Year Rule are "too broad, speculative, or conjectural to lend themselves to meaningful

analysis."  In fact, FWS, as far as the Court can tell, did not offer any explanation in the Final 30-

Year Rule itself beyond the assertion that the rule "will be broadly implemented."  78 Fed. Reg. at

34

73,714. Such a "cursory statement" is insufficient. *Lockyer*, 575 F.3d at 1018; *see also Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011) ("[O]ur precedents hold that an agency cannot merely assert that its decision will have an insignificant effect on the environment, but must adequately explain its decision" (internal quotation marks omitted)); *Alaska Ctr.*, 189 F.3d at 859 ("An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." (quoting *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986))).

In addition, FWS does not explain how or why the environmental effects of the Final 30-Year Rule do not "lend themselves to meaningful analysis." 43 C.F.R. § 46.210(i). Indeed, the record indicates that the Final 30-Year Rule's effects may be amenable to such analysis. As Plaintiffs point out, *see* Pls. MSJ at 18, FWS *did* conduct an extensive EA in connection with the 2009 BGEPA regulations, which included the 5-Year Rule, *see* AR 92-301. The fact that FWS prepared the 2009 EA suggests that the environmental effects on bald and golden eagles of a decision to increase the maximum duration for programmatic take permits from five years to thirty years may very well be subject to meaningful analysis. *See Cal. Wilderness Coal.*, 631 F.3d at 1104 (finding that an agency's previous preparation of a related programmatic EIS was "strong evidence . . . that it is possible to determine the environmental impacts of a proposed [action]" through further NEPA study).

As indicated earlier, the 2009 EA was published in April, five months before the 5-Year Rule was promulgated. The 5-Year Rule is consistent with the following statement found in the 2009 EA's discussion of the "environmentally-preferred alternative": "Because the [FWS] will review take thresholds on a regular basis (at least once every five years) relative to eagle population and demographic parameters, [FWS] will be able to modify or adjust permitting accordingly." AR 106. Moreover, in responding to comments regarding the 2009 BGEPA regulations, FWS justified the 5-Year Rule as follows:

35

United States District Court
Northern District of California

the rule limits permit tenure to five years or less because factors may change over a
longer period of time such that a take authorized much earlier would later be
incompatible with the preservation of the bald eagle or the golden eagle.
Accordingly, [FWS] believe[s] that five years is a long enough period within which
a project proponent can identify when the proposed activity will result in take.

74 Fed. Reg. at 46,856.  FWS explained further that five-year renewal decisions were important

because "[w]e expect that circumstances will often change such that the original ACPs for

minimizing take may no longer be considered the most effective measures that could be adopted."

*Id.* at 46,861.  This was the case, FWS continued, because "[t]here are likely to be technological

advances in some industries that would warrant adoption of new, more effective conservation

measures."  *Id.*  In addition, "new information regarding eagle biology, behavior, and responses to

the permitted activity may warrant re-examination of the effects of the permitted activity and re-

evaluation of the permit conditions."  *Id.*  If such analysis went into adopting the 5-Year Rule in

the first place, it appears that additional meaningful analysis could have been conducted before

increasing the maximum duration for programmatic eagle take permits by sixfold.[14]

Lastly, while Federal Defendants assert post-hoc that any environmental effects of the

Final 30-Year Rule are "purely conjectural," Fed. Defs. MSJ at 15, they point to nothing in the

record to support that assertion.  *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378

F.3d 1059, 1071 n.7 (9th Cir. 2004) ("In no case are we to hypothesize the FWS's rationales; nor

are we to accept the FWS's post hoc rationalizations . . . .").  Plaintiffs, on the other hand, cite

specific predictions as to the number of long-term programmatic eagle take permits that might be

issued under the Final 30-Year Rule.  *See* Pls. MSJ at 19.  For example, an economic analysis

performed by FWS in November 2011 predicted that "[o]ver the next thirty years, [FWS] could

issue 1,108 30-year permits."  AR 6644.  This prediction was based on the assumption that "by

---

[14] According to Federal Defendants, "FWS had limited data available on golden eagles at
the time it issued the [5-Year Rule]."  Fed. Defs. MSJ at 6.  Federal Defendants, however, point to
no subsequent data in the record suggesting that the decision to increase the maximum duration for
programmatic take permits from five years to thirty years would have insignificant environmental
effects on bald and golden eagles.  Studying this issue is the very purpose of preparing an EIS.

36

2020 industry will be seeking on average 40 permits per year." AR 6644. "[T]he majority of private applicants seeking a 30-year permit," FWS expected, "will be in the wind energy production business." AR 6644. According to AWEA, "the level of [wind power] production [was] expected to double by the end of this century in order to meet a goal of providing 20 percent of the country's electricity supply." AR 6644. These predictions are consistent with FWS's own acknowledgement that "[b]y extending the duration of permits [FWS] expect[s] to have more entities apply for permits." 78 Fed. Reg. at 73,708. Other estimates of thirty-year programmatic eagle take permits exist in the record. *See* AR 5595 (estimating 22 thirty-year programmatic take permits issued per year by 2020); AR 5751 (estimating programmatic take permits by industry).

For these reasons, the Court concludes that FWS has failed to "adequately explain its decision" to rely on the "too broad, speculative, or conjectural to lend themselves to meaningful analysis" prong of the second portion of the CE to avoid NEPA review. *Bosworth*, 510 F.3d at 1026 (quoting *Alaska Ctr.*, 189 F.3d at 859). Such reliance, the Court finds, was therefore "unreasonable." *See Lockyer*, 575 F.3d at 1014. Because FWS must establish both prongs of the second portion of the CE, the Court need not address whether FWS erred in finding that the environmental effects of the Final 30-Year Rule "will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i).

### 2. Extraordinary Circumstances

Even if either of the two portions of the CE discussed in Part III.B.1, *supra*, applied to FWS's decision to increase the maximum duration for programmatic eagle take permits from five years to thirty years, the Court finds that "extraordinary circumstances" preclude FWS from relying on the CE. As explained above, an agency "must 'provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.'" *Norton*, 311 F.3d at 1175 (quoting 40 C.F.R. § 1508.4). Before a CE may be invoked for a particular agency action, the agency must "determine whether [the action] meets any of the extraordinary circumstances." 43 C.F.R. § 46.205(c)(1). It is well established that "an agency may not use a CE

37

United States District Court
Northern District of California

when 'extraordinary circumstances' exist." *Citizens for Better Forestry*, 481 F. Supp. 2d at 1081. "In such extraordinary circumstances, a categorically excluded action would nevertheless trigger preparation of an EIS or an EA." *Norton*, 311 F.3d at 1168.  Importantly, "the fact that [extraordinary circumstances] *may* apply is all that is required to prohibit use of the categorical exclusion." *Id.* at 1177 (emphasis added).  "Where there is substantial evidence in the record that exceptions to the categorical exclusion may apply, the agency must at the very least explain why the action does not fall within one of the exceptions." *Id.*

DOI regulations provide for a number of extraordinary circumstances.  *See* 43 C.F.R. § 46.215.  According to Plaintiffs, *see* Pls. MSJ at 21-24, at least four of the listed extraordinary circumstances apply to the Final 30-Year Rule:

> (b) Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands . . . migratory birds; and other ecologically significant or critical areas.
>
> (c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources . . . .
>
> (d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.
>
> (e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

43 C.F.R. § 46.215.  In promulgating the Final 30-Year Rule, FWS stated: "we have reviewed our reliance upon this categorical exclusion against the Department of the Interior's list of extraordinary circumstances, at 43 CFR 46.215, and have found that none apply to this final rule." 78 Fed. Reg. at 73,722.

The Court is not convinced.  At the very least, there is substantial evidence in the record indicating that the Final 30-Year Rule's increase in the maximum duration for programmatic take permits may have "highly controversial environmental effects" on bald and golden eagles.  43 C.F.R. § 46.215(c).

"A proposal is highly controversial when substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor, or there is a

38

1    substantial dispute about the size, nature, or effect of the major Federal action."  *Bosworth*, 510

2    F.3d at 1030-31 (citations, alterations, and internal quotation marks omitted).  Although the mere

3    "existence of opposition" to a rule is insufficient, *Native Ecosystems Council v. U.S. Forest Serv.*,

4    428 F.3d 1233, 1240 (9th Cir. 2005), the agency must adequately explain why such opposition

5    "do[es] not suffice to create a public controversy based on potential environmental consequences,"

6    *Bosworth*, 510 F.3d at 1032 (internal quotation marks omitted).  Further, the "substantial

7    questions" standard, the Ninth Circuit has held, "is a low" one.  *Cal. Wilderness Coal.*, 631 F.3d at

8    1097 (quoting *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006)).

9         That standard is met here.  First of all, FWS is well aware that "eagles can be killed by

10   colliding with structures such as wind turbines."  AR 10372; *see also* 78 Fed. Reg. at 73,705

11   (citing "evidence show[ing] that in some areas or specific situations, large soaring birds,

12   specifically raptors, are especially vulnerable to colliding with wind turbines").  In the years prior

13   to adopting the Final 30-Year Rule, FWS expressed concern over the deleterious effects wind

14   power facilities may have on eagle populations.  In promulgating the 2009 BGEPA regulations,

15   for example, FWS said it was "currently unaware of any measures that would eliminate eagle

16   mortalities when turbines are sited in golden eagle habitat (including migration corridors)."  74

17   Fed. Reg. at 46,842.  "We agree," the agency continued, "that take of eagles within migratory

18   corridors is a significant concern with regard to certain activities, particularly wind-power

19   facilities."  *Id.* at 46,863; *see also id.* at 46,862 (explaining that "[t]he location of facilities often

20   can have significant impacts to eagles (e.g., wind farms)").

21        FWS's concerns were assuaged in 2009 because the agency believed "the majority of

22   applicants for individual permits will not be engaging in activities that are likely to take eagles in

23   migration corridors."  74 Fed. Reg. at 46,863.  By November 2011, however, FWS had apparently

24   changed its position.  At that point, the agency "expect[ed] that the majority of private applicants

25   seeking a 30-year permit will be in the wind energy production business."  AR 6644.  According

26   to AWEA, moreover, "the level of [wind power] production [was] expected to double by the end

27                                          39

United States District Court
Northern District of California

1 of this century in order to meet a goal of providing 20 percent of the country's electricity supply."

2 AR 6644. Considering that the primary aim of the Final 30-Year Rule's sixfold increase in the

3 maximum duration for programmatic eagle take permits was to "facilitate the funding,

4 construction, and operation of numerous energy generation projects, including wind power

5 facilities," 78 Fed. Reg. at 73,722, it stands to reason that bald and golden eagles may face greater

6 mortality risks as a result.[15] At the very least, substantial questions are raised as to whether the

7 Final 30-Year Rule may have a significant adverse effect on bald and golden eagle populations.

8 The record bears this point out. NPS, the sister agency of FWS, opposed FWS's decision

9 to increase the maximum duration for programmatic eagle take permits from five years to thirty

10 years. *See Bosworth*, 510 F.3d at 1031 (finding "highly controversial" extraordinary

11 circumstances precluded use of CE where another federal agency had "raised substantial questions

12 as to whether the [rule] would cause significant environmental harm"). NPS, which has a

13 "particular interest" in "[w]ind energy developments near NPS lands or located in migratory fly-

14 ways," emphasized that it "does not support extending the term for programmatic take permits of

15 bald and golden eagles to 30 years." AR 7545 (emphasis in original). NPS so concluded because

16 "[t]he proposed rule appears to designate 30 years based on the lifecycle of industry development

17 rather than the life history of the species under protection," and because the rule "may fail to

18 provide adequate response time for mitigating a species decline." AR 7545; *see also* AR 7553

19 (letter detailing opposition to thirty-year permits by the Pacific Flyway Council).

20 In addition, Ms. Savage, the FWS employee who wrote the Final 30-Year Rule, opined

21 repeatedly that "the [30-year] permits will be inherently less protective for eagles than 5-year

22 permits that require, upon renewal, the project proponent to implement any known measures to

23 reduce take." AR 2998. According to Ms. Savage, "Real, significant, and cumulative biological

24

25 _____

26 [15] Contrast the stated purpose of the Final 30-Year Rule with the position staked out by AWEA in its summary judgment motion: "Simply put, the Rule itself has no impact on the environment." AWEA MSJ at 8.

27 40

28

United States District Court
Northern District of California

1    impacts will result if the proposed regulatory changes are implemented." AR 2998.  In her view,

2    many of the public comments opposing the decision to increase the maximum duration for

3    programmatic eagle take permits from five years to thirty years "have a great deal of merit," AR

4    5083, and it was therefore a "no-brainer that [FWS] needed to do a NEPA analysis," AR 11242;

5    *see also* AR 11294 (Ms. Savage referring to the rule's "critical NEPA deficiencies").  Ms. Savage

6    also criticized the process by which FWS ultimately decided to go through with the Final 30-Year

7    Rule without an EIS, or even an EA.  Calling the process a "train wreck" that "no one could be

8    proud of," Ms. Savage warned: "Once again, we find ourselves having taken sloppy action that we

9    will have to do over instead of doing things the way they should have been done to begin with,"

10   AR 11360.

11       Other agency personnel recognized the risks of proceeding with the Final 30-Year Rule

12   absent further NEPA review.  An FWS memo dated September 20, 2012, recommended that the

13   agency "complete an Environmental Impact Statement that addresses both adaptive management

14   and tribal concerns before proceeding further on the tenure rule." AR 5200.  The following day,

15   the Chief of FWS's Division of Migratory Bird Management wrote in an email that the agency

16   was "vulnerable in several areas and . . . should propose a more comprehensive strategy to more

17   fully develop our approach to eagle management and permits." AR 11362.  In response to that

18   email, FWS's National Raptor Coordinator predicted that the agency would "spend the next 2

19   years in court" if it went forward with the "risky" Final 30-Year Rule.  AR 11361.

20       In light of these examples of dissenting expert opinion within the government, it comes as

21   little surprise that Ms. Whittington, a NEPA specialist at FWS, concluded in September 2012 that

22   "*all* the extraordinary circumstances from the 2008 DOI Regulations Implementing NEPA,"

23   including the one for highly controversial environmental effects, "likely apply" to the Final 30-

24   Year Rule.  AR 5253 (emphasis added).  Less than a month after Ms. Whittington reached this

25   conclusion, FWS staff met with the Director to give their final recommendation.  *See* AR 4770.

26   Prior to that meeting, FWS had drafted a memo to the Director advising that the agency "prepare

27                                                    41

28   Case No. 14-CV-02830-LHK
     ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
     PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

United States District Court
Northern District of California

United States District Court
Northern District of California

1  an environmental impact statement" before adopting the Final 30-Year Rule and that doing so

2  "would result in a significantly improved, legally defensible regulation."  AR 11257.  At the

3  meeting itself, the staff's "[b]ottomline" message to the Director was to "shelve the tenure rule and

4  do an EIS."  AR 4771.  However, the Director disagreed, finding it "[u]nlikely we'll be sued by

5  NGOs" and instructing the staff to "[g]o ahead with finalizing the tenure rule."  AR 4771.  The

6  result of the meeting pursuant to the Director was: "Don't do more NEPA.  Don't do an EA, they

7  will only want an EIS."  AR 4879.

8       Other FWS documents raise substantial questions that the Final 30-Year Rule might have

9  highly controversial environmental effects.  In an email dated June 27, 2013, Ms. Savage

10  questioned FWS's decision to press on with "this current rulemaking that would extend permit

11  tenure to up to 30 years" despite the "nearly total opposition to it."  AR 2295.  That opposition,

12  Ms. Savage noted further, included "the wind industry, the enviros, Native American tribes,

13  general public, and the biologists and other staff within [FWS] who will have to implement it."

14  AR 2295.  In a memo to the Director dated July 5, 2013, FWS staff described the decision to

15  increase the maximum duration for programmatic eagle take permits from five years to thirty years

16  as "*highly controversial* within the environmental community."  AR 2283 (emphasis added).

17  Another email dated July 18, 2013, from a senior advisor to the Director explained: "At the urging

18  of the wind industry, [FWS] is in the final stages of promulgating a rule to extend the duration of

19  eagle take permits from 5 to up to 30 years."  AR 2251.  "Environmentalists and tribes," however,

20  "have expressed significant concern about this change."  AR 2251.

21       As those documents suggest, FWS's decision to increase the maximum duration for

22  programmatic eagle take permits from five years to thirty years was the subject of considerable

23  opposition outside of the agency.  The following conservation, wildlife protection, and scientific

24  organizations opposed the rule: plaintiff ABC, AR 7584; the National Audubon Society, as well as

25  many local Audubon chapters throughout the country, AR 7547, 7825, 7838, 7852, 8058, 8115,

26  8220; the National Parks Conservation Association, AR 8075; the Wyoming Outdoor Council, AR

27                                                    42

28  Case No. 14-CV-02830-LHK
    ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
    PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

8062; Defenders of Wildlife, AR 8115; the Natural Resources Defense Council, AR 8115; the Center for Biological Diversity, AR 7862; the Nature Conservancy, AR 7856; the Humane Society of the United States, AR 7841; the Ornithological Council, AR 7805; the Hawk Migration Association, AR 7805; the Oregon Natural Desert Association, AR 7730; Save the Eagles International, AR 7727; and the Maryland Ornithological Society, AR 7496.

Several Indian tribes and tribal representatives expressed similar opposition: the Inter Tribal Council of Arizona, AR 2320; the Salt River Pima-Maricopa Indian Community, AR 8222; the San Carlos Apache Tribe, AR 8148; the Fort McDowell Yavapai Nation, AR 8089; the Sault Ste. Marie Tribe of Chippewa Indians, AR 8241; the Nez Perce Tribe, AR 7882; Confederated Bands and Tribes of the Yakama, AR 7531; and the Hopi Tribe, AR 7508.

Notwithstanding the aforementioned controversy, FWS's response was limited to one sentence: "the effects of this rule are not highly controversial as they mainly involve procedural alterations to regulatory permit provisions that are not anticipated to have any meaningful or significant environmental effects on eagle populations." 78 Fed. Reg. at 73,722. The Court finds this justification inadequate because, for the reasons stated in Part III.B.1.a, *supra*, FWS has failed to establish that the Final 30-Year Rule is "administrative" or "procedural" in nature. Like the U.S. Forest Service in *Bosworth*, FWS has "failed to meet its burden to provide a 'well-reasoned explanation' demonstrating that these responses to the [Final 30-Year Rule] do not suffice to create a public controversy based on potential environmental consequences." 510 F.3d at 1032 (internal quotation marks omitted); *see also Norton*, 311 F.3d at 1176-77 (rejecting agency's reliance on CE because the exception for "highly controversial" actions "*may* apply" and agency failed to "explain why the action does not fall within one of the exceptions"). Where, as here, the agency has failed to adequately "address concerns raised by its own experts" indicating that the Final 30-Year Rule may have highly controversial environmental effects—and has failed to cite expert opinion to the contrary—the agency action should be set aside. *Kraayenbrink*, 632 F.3d at 492.

43

United States District Court
Northern District of California

### 3.  NEPA Conclusion

In light of the foregoing, the Court concludes that FWS has failed to show an adequate basis in the record for deciding not to prepare an EIS—much less an EA—prior to increasing the maximum duration for programmatic eagle take permits by sixfold.  *See Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 562 ("[N]ot only did [the agency] fail to conduct an EIS . . . , it did not even conduct an EA.").  While promoting renewable energy projects may well be a "worthy goal, it is no substitute for the [agency's] obligations to comply with NEPA and to conduct a studied review and response to concerns about the environmental implications of major agency action." *Kraayenbrink*, 632 F.3d at 492.  Accordingly, the Court holds that FWS violated NEPA's procedural requirements and that the Final 30-Year Rule must therefore be set aside and remanded to FWS for further consideration.

### C.  ESA Consultation

As explained earlier, courts "generally review [an agency's] compliance with . . . the Endangered Species Act under the 'arbitrary and capricious' standard of the Administrative Procedure Act." *Lockyer*, 575 F.3d at 1011 (quoting 5 U.S.C. § 706(2)(A)).  ESA section 7 requires federal agencies to "insure that any action authorized, funded, or carried out by [the] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).  To that end, federal agencies must complete formal consultation with FWS whenever the proposed agency action "may affect" a listed species or critical habitat.  50 C.F.R. § 402.14(a).  The phrase "may affect" has been interpreted broadly to mean that "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Kraayenbrink*, 632 F.3d at 496 (brackets omitted) (quoting 51 Fed. Reg. at 19,949).  The threshold for triggering ESA consultation, the Ninth Circuit has explained, "is relatively low." *Lockyer*, 575 F.3d at 1018.  The consultation requirement applies equally when "the action agency is [FWS] itself." *Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d

44

United States District Court
Northern District of California

1   1274, 1286 (E.D. Cal. 2000).

2        In the instant case, Plaintiffs' argument concerning ESA consultation occupies just two

3   sentences of their twenty-five-page summary judgment motion:

4        This low "may affect" standard is satisfied here since many ESA-protected species
         share the same habitat as eagles and thus may be affected by the expansion of
5        industrial wind projects in eagle habitat that the rule seeks to foster. Yet the FWS
         refused to engage in any section 7 consultation, in violation of the ESA.
6
    Pls. MSJ at 25 (citation and footnote omitted). In a footnote, Plaintiffs cite four pages from the
7
    record to support their assertion that FWS violated ESA's consultation requirements. *Id.* at 25
8
    n.14 (citing AR 196, 2327, 7727, 11825).
9
         These four pages, without more, do not provide the Court with a basis for setting aside as
10
    arbitrary and capricious FWS's conclusion that the Final 30-Year Rule "will not affect endangered
11
    or threatened species or designated critical habitat." 78 Fed. Reg. at 73,722. None of the four
12
    pages even mentions ESA or its consultation requirements. Page 11825 is part of a June 7, 2011
13
    draft memo to the Secretary of the Interior that makes no mention of the proposal to increase the
14
    maximum duration for programmatic eagle take permits from five years to thirty years. AR
15
    11825. In fact, the memo's reference to "loss of habitat for endangered species" pertained to
16
    "solar farms that are many square miles in size," not wind projects. AR 11825. Page 196, which
17
    comes from the 2009 EA, concerns the threshold effects of allowing incidental take permits in the
18
    first place, not the duration of such permits. AR 196. Moreover, this page makes no mention of
19
    potential effects to ESA-listed species; it only mentions "other wildlife." AR 196. Page 2327,
20
    from the Inter Tribal Council of Arizona's letter opposing the proposal to increase the maximum
21
    duration for programmatic eagle take permits, says only that such a rule "will impact the fabric of
22
    countless natural ecosystems." AR 2327. No ESA-protected species are identified. Lastly, page
23
    7727, from Save the Eagles International's public comment, asserts that wind turbines have had
24
    "an even worse impact of [sic] the Whooping Crane and Condor." AR 7727. This comment,
25
    however, provides no support, scientific or otherwise, for its assertion. Nor does it make any
26

27                                                    45

28  Case No. 14-CV-02830-LHK
    ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
    PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

attempt to connect the proposal to increase the maximum duration for programmatic eagle take permits with any potential adverse impacts on such endangered species.

Because Plaintiffs have not pointed to evidence in the record showing that FWS "entirely failed to consider an important aspect of the problem" or "offered an explanation that runs counter to the evidence before the agency," *Kraayenbrink*, 632 F.3d at 496 (internal quotation marks omitted), the Court cannot conclude that FWS's decision to forgo internal ESA consultation was arbitrary and capricious.

## IV.   CONCLUSION

For the reasons stated above, the Court hereby GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment.  Specifically, Plaintiffs' motion is granted as to Plaintiffs' NEPA claim but denied as to Plaintiffs' ESA claim.  The Court also GRANTS in part and DENIES in part the summary judgment motions filed by Federal Defendants and AWEA. These motions are denied as to Plaintiffs' NEPA claim but granted as to Plaintiffs' ESA claim.

The Final 30-Year Rule is hereby set aside and remanded to FWS for further consideration consistent with this Order.

The Clerk shall close the case file.

**IT IS SO ORDERED.**

Dated: August 11, 2015

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

Case No. 14-CV-02830-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF
PLAINTIFFS, FEDERAL DEFENDANTS, AND DEFENDANT-INTERVENOR

United States District Court
Northern District of California